### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| OWENS CORNING, *et al.,* | | |
| | : | **Case No. 04-cv-1359 (JPF)** |
| Debtors. | | |
| | : | |

---

| | | |
|---|---|---|
| PRICE MANAGEMENT CONTROL | : | |
| CORPORATION, | | |
| | : | |
| Appellant, | | |
| | : | |
| v. | | |
| | : | |
| OWENS CORNING, | | |
| | : | |
| Appellee. | | |
| | : | |

---

### BRIEF OF APPELLEE

Dated: June 15, 2005

SAUL EWING LLP

Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
222 Delaware Avenue, Suite 1200
Wilmington, DE  19899
(302) 421-6800
(302) 421-5879 (Fax)

and

Charles O. Monk, II
Daniel R. Chemers
100 South Charles Street
Baltimore, MD  21201
(410) 332-8600

Counsel for Owens Corning, *et al.*,
Debtors and Debtors-in-Possession

522630.1

## TABLE OF CONTENTS

                                                                                    **PAGE**

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF ISSUES PRESENTED AND STANDARD OF
APPELLATE REVIEW............................................................................................................ 1

     A.       Questions Presented ........................................................................................ 1

     B.       Standard of Appellate Review ........................................................................ 2

STATEMENT OF FACTS ....................................................................................................... 3

     A.       Owens Corning's Asphalt Procurement and Use ............................................ 3

     B.       PMCC and Dennis Mangan .............................................................................. 4

     C.       The Agreement ................................................................................................. 4

     D.       Performance Under The Agreement .................................................................. 6

     E.       The PMCC Claim .............................................................................................. 8

ARGUMENT ............................................................................................................................ 9

     A.       Summary Judgment on PMCC's Contract Claim was Warranted ................ 10

     B.       Summary Judgment on PMCC's Non-Contract Claims was Warranted ........ 16

CONCLUSION ....................................................................................................................... 22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Biener v. Calio,*
  361 F.3d 206 (3$^d$ Cir. 2004) ..................................................................................... 2

*Engineered Data Prods. Inc. v. Nova Office Furniture, Inc.,*
  849 F. Supp. 1412 (D. Colo. 1994).......................................................................... 14

*Simmons v. Galin,*
  55 Fed. Appx. 38 (3$^d$ Cir. 2002)............................................................................... 2

*Young v. State Farm Mut. Auto Ins. Co.,*
  54 Fed. Appx. 365 (3$^d$ Cir. 2002)............................................................................. 2

## STATE CASES

*Agland, Inc. v. Koch Truck Line, Inc.,*
  757 P.2d 1138 (Colo. Ct. App. 1988) ...................................................................... 21

*Aspen Highlands Skiing Corp. v. Apostolou,*
  866 P.2d 1384 (Colo. 1994)...................................................................................... 15

*Atmel Corp. Vitesse Semiconductor Corp.,*
  30 P.3d 789 (Colo. Ct. App. 2001) .......................................................................... 16

*Bair v. Public Serv. Employees Credit Union,*
  709 P.2d 961 (Colo. Ct. App. 1985) ........................................................................ 18

*Berger v. Sec. Pac. Info. Sys., Inc.,*
  795 P.2d 1380 (Colo. Ct. App. 1990) ...................................................................... 18

*Bettenson v. Call Auto and Equip. Sales, Inc.,*
  645 P.2d 684 (Utah 1982).......................................................................................... 20

*Branscum v. Am. Cmty. Mut. Ins.,*
  984 P.2d 675 (Colo. Ct. App. 1999) .................................................................... 19, 20

*Breckenridge Co. v. Swales Mgmt. Corp.,*
  522 P.2d 737 (Colo. 1974)........................................................................................ 21

*Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.,*
  633 P.2d 1081 (Colo. 1981)...................................................................................... 11

*Colorado Interstate Gas Co. v. Chemco, Inc.*,
    833 P.2d 786 (Colo. Ct. App. 1992) ...............................................................................11

*Compass Ins. Co. v. City of Littleton*,
    984 P.2d 606 (Colo. 1999)............................................................................................21

*E-470 Public Highway Auth. v. Jagow*,
    30 P.3d 798 (Colo. App. 2001)....................................................................................14

*Employment Television Enter. v. Barocas*,
    100 P.3d 37 (Colo. Ct. App. 2004) ..............................................................................16

*Interbank Inv. LLC v. Eagle River Water and Sanitation Dist.*,
    77 P.3d 814 (Colo. Ct. App. 2003) ..............................................................................17

*Las Animas Consol. Canal Co. v. Hinderliades*,
    100 Colo. 508, 68 P.2d 564 (Colo. 1937).....................................................................14

*Pepcol Mfg. Co. v. Denver Union Corp.*,
    687 P.2d 1310 (Colo. 1984).........................................................................................11

*Printz Servs. Corp. v. Main Elec. Ltd.*,
    949 P.2d 77 (Colo. Ct. App. 1997) ..............................................................................17

## MISCELLANEOUS

8 Catherine M. A. McCauliff, Corbin on Contracts § 30.3 (rev. ed. 1999)...................................15

46 Am. Jur. 2d, *Joint Ventures* §§ 17, 25, 51 and 57...................................................................21

Restatement (Second) of Torts § 551(2) (1977) ...........................................................................18

Owens Corning and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively "Owens Corning") hereby respond to "Appellant's Opening Brief" filed on behalf of Price Management Control Corporation ("PMCC").[1]

Owens Corning is satisfied with PMCC's Statement of Appellate Jurisdiction, and with PMCC's Statement of the Case, with the exception of the last sentence in the latter Statement.

## I.    STATEMENT OF ISSUES PRESENTED AND STANDARD OF APPELLATE REVIEW

A.    Questions Presented

    1.    Whether the Bankruptcy Court correctly granted summary judgment to Owens Corning on PMCC's breach of contract claim where Owens Corning paid PMCC the full compensation required by the October 23, 1998 Agreement ("the Agreement") in the absence of any trading, and the record demonstrated that no trading had taken place?

    2.    Whether the Bankruptcy Court correctly granted summary judgment to Owens Corning on PMCC's unjust enrichment claim where (*inter alia*) the express Agreement covered the same subject matter?

    3.    Whether the Bankruptcy Court correctly granted summary judgment to Owens Corning on PMCC's fraudulent inducement claim where (*inter alia*) the clear and plain meaning of the Agreement contradicted the alleged misrepresentations?

---

[1]    PMCC filed "Appellant's Opening Brief" on June 1, 2005, and on June 3, 2005 filed Exhibits A through D in support of that Brief. Owens Corning will refer to Appellant's Opening Brief by using the form "Open. Br. ____."

4.    Whether the Bankruptcy Court correctly granted summary judgment to Owens Corning on PMCC's joint venture claim where (*inter alia*) Owens Corning paid PMCC the full compensation required by the Agreement which allegedly governed the joint venture?

## B.    Standard of Appellate Review

The Bankruptcy Court ruled that the Agreement was unambiguous in pertinent part, and that judgment for Owens Corning was appropriate on PMCC's contract claim because Owens Corning had paid PMCC the contractually-specified amount for services rendered. The Bankruptcy Court also ruled that PMCC's non-contract claims were deficient as a matter of law.

In deciding whether to affirm, this Court is limited to the record before the Bankruptcy Court. *Biener v. Calio*, 361 F.3d 206, 210 (3$^d$ Cir. 2004).[2]  Based upon that record, this Court must decide whether the Bankruptcy Court correctly ruled that there was no genuine issue as to any material fact, and that Owens Corning was entitled to judgment as a matter of law on PMCC's claims. *Id.*  This Court has the authority to affirm the Bankruptcy Court's ruling based upon any ground apparent from the record, even if the ground was not relied upon by the Bankruptcy Court. *Simmons v. Galin*, 55 Fed. Appx. 38, 39 (3$^d$ Cir. 2002); *see also Young v. State Farm Mut. Auto Ins. Co.*, 54 Fed. Appx. 365, 366 (3$^d$ Cir. 2002).

---

[2]    In Open. Br. n.8, PMCC relies upon purported "factual material" that was not before the Bankruptcy Court, and would not have been admissible if PMCC had tried to introduce it on summary judgment. Owens Corning objects to PMCC's effort to go beyond the record.

-2-

## II.    STATEMENT OF FACTS

A.    Owens Corning's Asphalt Procurement and Use

Asphalt is a by-product of the refining of crude oil. (Mitchell Aff. at B-1, ¶ 3).[3]

During the late 1990's, Owens Corning's Roofing Systems Business procured

approximately 15 million barrels of asphalt annually. (Hileman Aff. at B-21, ¶ 8). It

purchased the great majority of this asphalt from crude oil refiners.[4] (Mitchell Aff. at B-

1, ¶ 3).

Owens Corning processed the asphalt it procured into a coating used in the

fabrication of asphalt shingles. *Id.* It annually used about 4 to 5 million barrels of

processed asphalt in the manufacture of its own shingles. (Hileman Dep. at B-31;

Hileman Aff. at B-21, ¶ 8). It sold the remainder of its processed asphalt to other

customers, primarily other manufacturers of asphalt shingles. (Hileman Aff. at B-21,

¶ 8).

The price that refiners charge for asphalt has always been somewhat volatile.

Owens Corning has been unable to limit this volatility by obtaining future pricing

commitments from suppliers. (*Id.* ¶ 9). As a consequence, Owens Corning has faced a

commercial exposure (in the form of decreasing margins) to the extent it has been unable

to promptly pass on cost increases to customers. *Id.* Historically, Owens Corning has

---

[3]    Reference is to the Affidavit of Michael G. Mitchell which is included in the
Appendix at pages B-1-19. The Appendix has been paginated in accordance with
D. Del. LR 7.1.3. All references to cited documents will identify the particular
document, and will specify the applicable Appendix pages (e.g., "Mitchell Aff. at
B-___-___.").

[4]    In addition, Owens Corning produced approximately 5% of its total asphalt needs,
purchasing and processing crude oil under an arrangement with an oil refiner
named Young Refining Company.

been able to pass on asphalt cost increases to shingle manufacturers who buy its processed asphalt, but has been unable to as promptly pass on increased costs to customers who purchase Owens Corning's shingles. *Id.* As to the latter, Owens Corning has faced a degree of commercial exposure. *Id.*

B.    PMCC and Dennis Mangan

Dennis Mangan ("Mangan") is an individual with a background in the commodity business. (Mangan Dep. at B-35-49). In 1995, he formed PMCC. (*Id.* at B-33). Mangan is and has always been the sole owner, director, officer and employee of PMCC. (*Id.* at B-33-34).

Hedging is a tool that is intended to reduce a company's commercial exposure by reducing procurement cost variability (and, as a corollary, making procurement cost more predictable). (Zoller Dep. at B-77-78; Hileman Aff. at B-21, ¶ 6). Before being introduced to Owens Corning, Mangan had developed a program for hedging the procurement of transportation fuel. (Mangan Dep. at B-50-51). There were recognized markets in crude oil, heating oil, and gasoline, and therefore various highly correlated instruments were available to hedge the price volatility of transportation fuel. In contrast, asphalt was and is a commodity in which there is no recognized market, and it is therefore more difficult to design an acceptable hedging program for asphalt. (Mangan Dep. at B-64-66; Hileman Aff. at B-21, ¶ 6.)

C.    The Agreement

Mangan presented himself to Owens Corning as an expert in commodity hedging who had done substantial work for corporate entities. (Mitchell Aff. at B-1, ¶ 5). He offered to develop an asphalt hedging program for Owens Corning. *Id.* Owens Corning wanted to see if he could develop a program that would be acceptable and useful. *Id.*

Mangan and Owens Corning negotiated the terms of their arrangement, and signed the October 23, 1998 Agreement that is at the core of this proceeding. The Agreement provided, in pertinent part, that (1) Owens Corning was engaging PMCC to perform "the Services as described in the PMCC Proposal, [*sic*] of July 30, 1998" that was attached to the Agreement as Exhibit A, and (2) that Owens Corning was to pay PMCC for the performance of the Services in accordance with the compensation provisions of the Agreement and "the July 30, 1998 Proposal." (Agmt. at B-4, ¶ 3).

The Agreement expressly defined PMCC's "Services" as the services described in 19 tasks that were numbered and listed in Exhibit A, with Tasks 1-18 relating to PMCC's preparation of documentation for a Hedging Manual, and Task 19 relating to PMCC's participation in "meetings to discuss and help implement the hedging program with appropriate [Owens Corning] management staff personnel."[5] As compensation, Owens Corning agreed to pay PMCC (1) a $22,500.00 fixed fee, (2) $600 per day plus travel expenses for each meeting (hereafter "training session") covered by Task 19, and (3) a percentage of the aggregate profits, if any, obtained from any hedges placed under the proposed program if any hedges were placed before the termination of the Agreement. The Agreement provided that if no hedges were in place at the time of termination, "Owens Corning will only owe PMCC the original fee of $22,500.00 and if that has been paid in full Owens Corning shall have no further obligation to PMCC." (Agmt. at B-6, ¶ 9). Owens Corning was free to terminate the Agreement at any time upon thirty days

---

5    Task 19 provided that the meetings would be structured "so as to go over the Hedging Manual methods and activities," and said the purpose would be to give "an in depth explanation of the hedging program and a question and answer period so as to give management a thorough understanding of the Hedging Program." It provided further that other meetings might be scheduled "to resolve any additional questions and to give any further advice to client."

notice.[6]  (Agmt. at B-6, ¶ 9).  The Agreement set forth the entire understanding of the parties.  (Agmt. at B-7, ¶ 11).

D.    Performance Under The Agreement

Mangan began delivering portions of his Hedging  Manual to Owens Corning shortly after the Agreement was signed, and completed delivery by late December 1998 or early January 1999.[7]  (Mitchell Aff. at B-2, ¶ 8; Mangan Dep. at B-54-55).  He conducted a training session with Owens Corning representatives in Toledo in January 1999, and conducted a second training session with Owens Corning representatives in Denver on March 10 and 11, 1999.  (Mangan Dep. at B-69).  Owens Corning paid PMCC the $22,500.00 fixed fee, and also paid PMCC's invoices for the two training sessions that occurred.  (Mitchell Aff. at B-2, ¶ 9).

Mangan says the oil market became ripe for hedging in mid-March 1999, and remained viable for hedging for only a short time.[8]  He claims that a few days after the Denver training session concluded, he recommended that Owens Corning enter into certain trades immediately.  (Mangan Dep. at B-63; B-70-74A).  Whether Mangan sent Owens Corning a trading recommendation in mid-March and, if so, what it provided, are matters in dispute.  On this appeal, however, Owens Corning assumes *arguendo* that

---

[6]    The Agreement was to last for three years unless it was terminated earlier. (Agmt. at B-4-6, ¶¶ 2, 9).

[7]    Owens Corning's expert has said that what Mangan delivered was a highly speculative trading strategy, not a hedging program (Dorris. Aff. at B-79, ¶ 3).

[8]    Mangan testified that "after the spring of 1999... [the petroleum markets were] too high to do any hedging."  (Mangan Dep. at B-52-53).

Mangan recommended in mid-March 1999 that Owens Corning immediately enter into swap transactions involving 85,000,000 barrels of crude oil.[9]

In mid-March 1999 (i.e. at the time of Mangan's claimed recommendation), Owens Corning was for the first time in a position to begin its analysis of the potential financial implications of Mangan's proposed methodology.[10] (Hileman Aff. at B-20, ¶ 4). This analysis included an assessment of the potential impact of the program on an earnings per share basis, with the Controller of the Roofing Systems Business, James Hileman ("Hileman"), examining what the impact would have been if the program had been followed during the 1986-1999 period for asphalt used in the manufacture of Owens Corning's shingles. (*Id.* B-21, ¶ 7). Hileman's goal was to understand the potential financial implications of the program so he would be able to make an informed recommendation to others in his business unit and, if appropriate, to Owens Corning's Chief Financial Officer ("CFO"). (*Id.* ¶ 5). Under Owens Corning's Derivatives Policy, the company's CFO had to approve programs and trades involving derivative instruments. (*Id.*; Hileman Aff. at B-21).

---

[9]     In effect, Mangan claims that he recommended that Owens Corning take a 1.29 billion dollar derivative position on a poorly correlated hedging commodity (crude oil) in order to address a very limited asphalt procurement risk. (Dorris Aff. at B-79-80, ¶ 5). Such a recommendation would have been (among other things) facially inappropriate and inconsistent with Mangan's own Hedging Manual. (Mangan Dep. at B-58-61). Indeed, "[s]uch a massive investment in a derivative position would have constituted a speculative trading strategy that would have astronomically increased Owens Corning's financial risks . . . [and] it would have been . . . utterly imprudent for a public company such as Owens Corning." (Dorris Aff. at B-79-80, ¶ 5).

[10]    It was only after the Denver meeting that Owens Corning was sufficiently informed about Mangan's program to undertake this analysis. (Hileman Aff. at B-20, ¶ 4.)

On May 30, 2000, Hileman – acting on behalf of the Roofing Systems Business[11] – recommended to Michael Thaman ("Thaman"), the Owens Corning CFO, that the company begin implementing a highly modified version of the PMCC program to hedge asphalt used in the manufacture of Owens Corning's shingles. (*Id.* ¶ 10). Thaman was not persuaded that the proposed program, even as modified, was desirable, and declined to proceed. *Id.* Hileman notified Mangan on June 2, 2000 that Owens Corning was terminating the Agreement effective thirty days thereafter. (*Id.*; B-25, Hileman Aff. Exh. 2). Before and after that date, Owens Corning never approved the proposed program, and never made any trades under the proposed program. (Hileman Aff. at B-22, ¶ 11).

E.     The PMCC Claim

On April 10, 2002, Mangan caused PMCC to file a Proof of Claim alleging breach of contract. (Claim No. 6923). In its claim, PMCC contended that if Owens Corning had immediately entered into all of the swap transactions that Mangan allegedly recommended in mid-March 1999, Owens Corning would have had a lower net cost of asphalt, and PMCC's share of "profits" would have amounted to $22,327,178.00.[12] *Id.* PMCC's position was that it was entitled to a profit share on trades that were never made because the Agreement had obligated Owens Corning to do whatever Mangan told it to do, and Owens Corning had breached the Agreement by failing to carry out Mangan's mid-March 1999 trading recommendation. (Claim No. 6923); (Response to Debtor's

---

[11]     At some point in the Summer of 2000, Owens Corning's Roofing Systems Business was split and the residential roofing and vinyl siding segments became a part of the Exterior Systems Business while the asphalt segment of the business stayed with the Roofing Systems Business. (Hileman Dep. at B-27-30).

[12]     In interrogatory answers served on January 14, 2004, PMCC revised its damage claim upwards to $26,502,542.56.

Objection to Claim No. 6923 of Price Management Control Corporation, Bankr. D.I. 9834); (Mangan Dep. at B-56-57; B-63).

PMCC supported its claim with an Affidavit from Mangan stating, in pertinent part, that the Agreement had "passed authority" to PMCC over all of Owens Corning's hedging decisions. (Claim No. 6923). Mangan testified at his deposition that there were no limits on this claimed transfer of authority (Mangan Dep. B-56); that Owens Corning had to do whatever he told it to do, even if Owens Corning was (for example) having a cash crunch or believed Mangan's instructions violated Owens Corning's policies (*Id.* at B-56-57); and that he, as Owens Corning's hedging czar, had the power to direct all of Owens Corning's employees, including its senior managers, to do his bidding. (*Id.* at B-62-63).

### III.    ARGUMENT

This twenty-six and one-half million dollar claim proceeding turns upon the meaning of a contract between Owens Corning and PMCC, a one-man business owned and operated by Mangan. Owens Corning says the parties had a straightforward services contract under which Owens Corning retained PMCC to develop a hedging program, and to help Owens Corning in implementing the methodology and control procedures that program if Owens Corning felt the program was worth pursuing. PMCC disagrees, describing the Agreement as a grant to Mangan of absolute power to invest Owens Corning's funds in accordance with whatever hedging program he developed, regardless of Owens Corning's assessment of or approval of the program or any recommended trading activities. In sum, Mangan says Owens Corning gave him a blank check to commit untold millions of dollars to trades under an undefined program.

The Bankruptcy Court ruled in Owens Corning's favor, finding the Agreement was an unambiguous services contract that imposed upon Owens Corning no obligation to adopt Mangan's program or to engage in any trading.[13] (Tr. at B-95-97). It found that Owens Corning's interpretation of the Agreement was mandated by the clear and plain meaning of the words in the contract. *Id.* It also concluded that PMCC's proposed interpretation was unreasonable as a matter of textual analysis, and unreasonable when considered in the context of commercial reality and corporate law. (Tr. at B-94). In these circumstances, the Bankruptcy Court issued summary judgment in Owens Corning's favor on PMCC's contract claim, and for related reasons granted summary judgment for Owens Corning on PMCC's non-contract claims.

On appeal, PMCC advances the same defective arguments that the Bankruptcy Court rejected. In Part A below, Owens Corning demonstrates why PMCC's contract claim fails as a matter of law. In Part B below, Owens Corning demonstrates why PMCC's non-contract claims also fail as a matter of law.

A.    Summary Judgment on PMCC's Contract Claim was Warranted.

The undisputed facts include the following: (1) Owens Corning and PMCC entered into the Agreement on or about October 23, 1998; (2) PMCC subsequently developed and delivered to Owens Corning a Hedging Manual, and explained the proposed program to Owens Corning at two training sessions; (3) Owens Corning paid PMCC the $22,500.00 fixed contract fee, and the amount PMCC billed for the two

---

[13]    The Bankruptcy Court issued its ruling from the bench on September 3, 2004, and that ruling was memorialized in its written Order dated October 7, 2004. Pertinent portions of the argument before, and the ruling of, the Bankruptcy Court are included in the Appendix at pages B-94-97. The Court's written order is also included in the Appendix at pages B-98-99. Owens Corning notes that PMCC's Opening Brief mischaracterizes the Bankruptcy Court's reasoning and decision.

training sessions it conducted; (4) Owens Corning studied the proposed hedging program, but never approved it, never implemented it, and never placed any trades under it; and (5) no trades were in place when the Agreement was terminated on July 2, 2000. These undisputed facts are dispositive of PMCC's contract claim under Colorado law, the law selected by the parties in paragraph 13 of the Agreement.

In pertinent part, Colorado law provides that a court must give effect to the mutual intent of the parties as expressed in their contract language. *See Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984). The contract language is to be construed in harmony with the plain and generally accepted meaning of the words, and with reference to all provisions of the agreement. *See Colorado Interstate Gas Co. v. Chemco, Inc.*, 833 P.2d 786, 788-9 (Colo. Ct. App. 1992). Where, as here, the contract language permits only one reasonable interpretation, the court's analysis is limited to the four corners of the contract. *See Pepcol Mfg. Co.*, 687 P.2d at 1314; *see also Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.*, 633 P.2d 1081, 1084 (Colo. 1981).

The Agreement is a straightforward services contract. More particularly, the Agreement expressly states that Owens Corning was engaging PMCC to perform the Services defined in Tasks 1-19, which meant Mangan was obliged to develop a Hedging Manual for Owens Corning (Tasks 1-18) and, to the extent called upon, to meet with Owens Corning managers to educate them on the proposed program (Task 19). In return, Owens Corning agreed to compensate PMCC for its Services. Owens Corning complied with this contractual obligation by paying the $22,500.00 fixed fee specified in the Agreement, and by paying PMCC's invoices for the two training sessions that Mangan conducted. Because Owens Corning never traded under the proposed program, it owed

PMCC no further compensation under the express terms of the Agreement. (Agmt. at B-6, ¶ 9). Owens Corning did not breach the Agreement, and the Bankruptcy Court's grant of summary judgment to Owens Corning on PMCC's breach of contract claim was fully warranted.

PMCC disagrees, arguing that the Agreement obligated Owens Corning not only to pay for its Services, but also to adopt and implement whatever program Mangan developed after the Agreement was signed, and to engage in whatever trades Mangan told it to pursue. PMCC cannot, however, point to any language in the Agreement in which Owens Corning affirmatively agreed to such undertakings: Owens Corning did not represent and warrant that it would adopt the hedging program Mangan was promising to develop, and/or that it would exempt that program from typical corporate processes of review, analysis and approval;[14] and Owens Corning did not represent and warrant that it would engage in any trading, or that Mangan was authorized to engage in any trading on its behalf, and/or that any of Mangan's trading recommendations would be exempt from typical corporate processes of review, analysis and approval.[15]  To the contrary, the Agreement expressly provided that Owens Corning's obligation was simply to pay for PMCC's Services in accordance with the Agreement's provisions on compensation, and that Owens Corning would have no further obligations to PMCC if no trades were in place at the time the Agreement ended.

PMCC argues that, despite this clear and express language, the Agreement implicitly granted him czar-like authority, and implicitly required Owens Corning to be

---

[14]    Mangan never asked Owens Corning to include those assurances in the Agreement, and if he had made such a request it would have been rejected.

[15]    *Id.*

his serf. PMCC tries to squeeze these facially unreasonable implications out of the first

sentence of the two sentence "Project" section found in Exhibit A to the Agreement.

That section reads as follows:

> To research, develop, design, implement, manage, and
> execute the methodology and control procedures of a
> Hedging Program for use in the Management of Pricing of
> Flux using Crude Oil Futures or Derivatives, Heating Oil
> Futures or Derivatives, Gasoline Futures or Derivates, or
> Custom Designed Derivative Instruments as the Hedging
> Instrument. The schedule of services to be provided,
> timetable, documentation and compensation are specified
> as follows and shall be acknowledged by all parties
> concerned, upon acceptance of this proposal, as the
> **TERMS OF AGREEMENT**.

(underlining added).

As discussed above, the schedule of Services that followed the above recital

required Mangan to design and develop a Hedging Manual (Tasks 1 through 18), and

required Mangan to be available to train Owens Corning personnel if, and to the extent,

Owens Corning requested such training (Task 19). There is nothing in this description of

PMCC's Services that even remotely suggests that Owens Corning "passed authority"

over its investment decisions to Mangan. PMCC tries to avoid this obvious conclusion,

arguing that the first sentence of the Project section defined Mangan's services more

broadly than they were defined in Tasks 1 through 19, and that this broader definition of

his services made him (by implication) a hedging czar, and (again by implication)

required Owens Corning to do whatever he told it to do. It is rare that anyone tries to

imply so much out of so little.

First, the initial sentence of the Project section does not (as PMCC's argument

assumes) define the Services that PMCC was contractually obligated to provide. In this

regard, the Agreement expressly states that the Services to be provided by PMCC were those described in its Exhibit A to the Agreement (Agmt. at B-4, ¶¶ 1, 3); Exhibit A expressly states that the Services to be provided by PMCC were those specified in the text <u>following</u> the "Project" section, i.e in Tasks 1-19; and Exhibit A also expressly states that only the provisions <u>following</u> the Project section, not the language in the Project section itself, were terms of the parties' agreement. Thus, the first sentence of the Project section did not define contractual Services, and most assuredly did not (as PMCC asserts) expand Mangan's contractual obligations beyond the specific definition of contract Services found in Tasks 1 through 19. *See Engineered Data Prods. Inc. v. Nova Office Furniture, Inc.*, 849 F. Supp. 1412, 1417 (D. Colo. 1994) (recitals cannot extend contractual stipulations); *Las Animas Consol. Canal Co. v. Hinderliades*, 100 Colo. 508, 68 P.2d 564, 566 (Colo. 1937) (recital cannot modify contractual specifications); Cf. *E-470 Public Highway Auth. v. Jagow*, 30 P. 3d 798, 801 (Colo. App. 2001) (more specific provisions control).

Second, PMCC's reliance on the first sentence in the Project section is unavailing because it fails to distinguish between PMCC's contractual obligations and its contractual rights. At most, the Project section of Exhibit A generally addresses PMCC's contractual obligation to be ready, willing and able to provide services to Owens Corning. Thus, PMCC had an <u>obligation</u> to develop a Manual and, to the extent called upon, an <u>obligation</u> to educate Owens Corning on the management and implementation of the methodology and control procedures of his proposed program. In contrast, PMCC's only contractual <u>right</u> was to be paid in accordance with the compensation provisions of the Agreement, which provided for a fixed fee, a charge for each training session, and a

percentage of any profits earned if hedges were placed and proved profitable in the
aggregate. PMCC's entitlement to such compensation constituted the totality of its
contractual rights, and PMCC's effort to turn its contractual obligation to provide
services into an implied contractual right to force program implementation and trading
activities upon an unwilling client finds no support in the law of Colorado or any other
jurisdiction. *See generally* 8 Catherine M. A. McCauliff, CORBIN ON CONTRACTS § 30.3
(rev. ed. 1999) (party's obligation to provide services or goods only creates right to
payment).

Third, PMCC's argument also appears to rest upon the false premise that a party
that engages someone to provide services has an implied obligation to use those services.
The law in Colorado and elsewhere does not support this novel proposition, as it is
axiomatic that a service provider has an obligation to make its services available, but the
other party remains free to decline to use those services if it decides it does not want or
need them. Like other parties in such circumstances, Owens Corning's contractual
obligation was not to use the services in question, but rather to pay in accordance with the
contract's compensation provisions for the services provider's readiness to provide those
services. *See generally, e.g., Aspen Highlands Skiing Corp. v. Apostolou*, 866 P.2d 1384
(Colo. 1994) (employer's duty is solely to compensate for services). As discussed,
Owens Corning paid PMCC in accordance with the compensation terms of the
Agreement, which expressly provided that the $22,500.00 fee and payment for training
sessions would be the only compensation due if no trades had been placed at the time the
Agreement ended. Owens Corning had no contractual obligation to do more than this.

In view of the structure and language of the Agreement, the Bankruptcy Court correctly ruled that PMCC's proposed contract interpretation was unreasonable as a purely textual matter. In addition, the Bankruptcy Court observed (*in dictum*) that PMCC's proposed reading of the contract offended commercial norms and common sense. The Bankruptcy Court did not find credible the proposition that any employee would have (or could have) committed Owens Corning to trade under a program it had never seen, or that Mangan might have believed that anyone at Owens Corning would have (or could have) agreed to any such undertaking. With good reason, the Bankruptcy Court was not prepared to countenance a commercially unreasonable contract interpretation unless the language of the Agreement compelled that interpretation. *See Atmel Corp. Vitesse Semiconductor Corp.*, 30 P.3d 789, 793 (Colo. Ct. App. 2001) (courts should never construe contracts in a way that yields absurd results, and may consider industry standards in contract interpretation); *Employment Television Enter. v. Barocas*, 100 P.3d 37, 42, 43 (Colo. Ct. App. 2004) (industry standards may be considered). Here, however, the contract language compelled the opposite interpretation.

For the foregoing reasons, Owens Corning respectfully asks this Court to affirm the Bankruptcy Court's grant of summary judgment on PMCC's breach of contract claim.

B.      Summary Judgment on PMCC's Non-Contract Claims was Warranted.

PMCC's Proof of Claim refers only to a breach of contract. In its Response to the Debtors' Objection, PMCC added theories of unjust enrichment, fraud and joint venture. As the Bankruptcy Court correctly determined, none of these non-contract theories is potentially viable as a matter of law.

1.      Unjust Enrichment -- According to PMCC, Owens Corning was unjustly enriched because Owens Corning received Mangan's Hedging Manual which (according

PMCC's fraud claims are based upon a strange view of the world. A fraudulent concealment claim can be prosecuted only if the other party has a duty to disclose. *E.g.*, *Berger v. Sec. Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1383 (Colo. Ct. App. 1990) (for fraudulent concealment or non-disclosure, defendant must have duty to disclose); *Bair v. Public Serv. Employees Credit Union*, 709 P.2d 961 (Colo. Ct. App. 1985) (adopting duty to disclose as provided in RESTATEMENT (SECOND) OF TORTS § 551(2) (1977)).[19] But in the world of commerce, a company such as Owens Corning has no duty to discuss or predict during contract negotiations the possible nature and scope of its future review of a program that has not yet been developed (or trades that have not yet been recommended). If a service provider who is going to develop a program wants information about post-contractual corporate review of his program, he has to ask about the corporate review that can reasonably be anticipated, and if he wants to get a contractual commitment limiting corporate review, he must write that limitation expressly and specifically into the contract and the corporation has to agree. None of that was done in this case.

Even though Owens Corning had no duty to discuss with Mangan what might happen after the program was delivered, Mitchell did happen to touch upon that subject in a September 27, 1998 letter. (Mitchell Supp. Aff. at B-101, ¶ 6). In that letter,

---

seeking, and PMCC would now be entitled to (at most) breach of contract damages. PMCC's fraud theories operate on the opposite premise, i.e. that the Agreement permitted Owens Corning to subject the proposed hedging program, and any trades thereunder, to corporate review.

19  Section 551(2) of the RESTATEMENT (SECOND) OF TORTS provides that a party is under a duty to exercise reasonable care to disclose to the other "facts basic to the transaction, if he knows that the other is about to enter it under a mistake and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect the disclosure of those facts."

Mitchell told Mangan that Owens Corning's ability to begin operating under the proposed program (once it was delivered) would depend upon senior management approval, and that certain items mentioned in the Proposal could not ever be considered because they were inconsistent with the Derivatives Policy of Owens Corning.[20]  *Id.*   This letter negates any suggestion that Mitchell could have been animated by a fraudulent intent, and further negates any suggestion that Mangan could have reasonably assumed that his program, once developed and delivered, would not have to be acceptable (initially and over time) to Owens Corning's management, and would not have to be consistent with Owens Corning's policies, including its Derivatives Policy.

Even though the Bankruptcy Court could have ruled in Owens Corning's favor for the above reasons, it decided this issue upon a different ground. The Bankruptcy Court recognized that PMCC's claim was that Mangan was led to believe that the contract he would be asked to sign would exempt his program from Owens Corning's corporate review and approval mechanisms. The Bankruptcy Court also found that the Agreement that Mangan signed clearly and plainly did not provide such an exemption, which meant Mangan knew or should have known (at least as of the time he reviewed and signed the Agreement) that his program, and any trades thereunder, would be subject to Owens Corning's review and approval. In such circumstances, the Bankruptcy Court correctly decided that PMCC could not show reasonable reliance or an actionable claim for fraud. *See, e.g., Branscum v. Am. Cmty. Mut. Ins.*, 984 P.2d 675, 680 (Colo. Ct. App. 1999)

---

[20]      Mangan acknowledges receiving this letter (Mangan Dep. at B-67-68).

(plaintiffs cannot reasonably rely on misrepresentation contradicted by written agreement).[21]

      3.    <u>Joint Venture</u> -- PMCC argues that the contracting parties established a joint venture to make trades in accordance with Mangan's yet to be developed hedging program,[22] and that Owens Corning violated its duties to its joint venturer (a) by failing to disclose to Mangan during contract negotiations that the program and any trades thereunder would require corporate approval, and (b) by permitting Mangan to sign the Agreement even though Owens Corning knew he labored under the misimpression that his program was to be contractually exempted from corporate review and approval. (Bankr. D.I. 9834).

      PMCC's joint venture argument is as meritless as its other claims. PMCC is correct that the Agreement includes a reference to a "joint venture" in paragraph 7. But that reference is of no import: whether a business relationship constitutes a joint venture depends entirely upon the economic realities of the relationship, not upon the word or words used to describe the relationship. *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 618-620 (Colo. 1999) (despite use of term "joint venture," contract did not create a joint venture); *Bettenson v. Call Auto and Equip. Sales, Inc.*, 645 P.2d 684, 686 (Utah

---

[21]      The court in *Branscum* also held that because the alleged misrepresentation involved a future act rather than an existing fact, it could not form the basis of a claim for negligent misrepresentation. *Branscum,* 984 P.2d at 680. In the instant case, PMCC contends that the alleged concealment impliedly communicated to Mangan that the contract would exempt his program from corporate review and approval. This proposition is utterly illogical and, in any event, involves an implied prediction of future events that would not be actionable under *Branscum*.

[22]      PMCC's theory seems to be that Owens Corning contributed $22,500.00 to the creation of the claimed joint venture, and PMCC contributed a Hedging Manual and future services with a supposed value in excess of $22,500.00.

1982) (use of the words "joint venture" not determinative if elements are missing (citation omitted)). The basic elements of a joint venture were not present in Owens Corning's relationship with PMCC.

Under the Agreement, only Owens Corning would be investing money in any trades that might be made, and only Owens Corning would have to absorb and pay for the net losses (if any) incurred in any trading activities. PMCC had the potential to make money on Owens Corning's trades, but was not obliged to cover any portion of net losses.[23] In these circumstances, all that existed was a contract for services with part of the service provider's potential compensation contingent upon a variety of factors. This was not a joint venture under Colorado law. *See* 46 Am. Jur. 2d, *Joint Ventures* §§ 17, 25, 51 and 57 (party with no proprietary interest in business except to share profits as compensation for services is not a joint venturer). *See also Breckenridge Co. v. Swales Mgmt. Corp.*, 522 P.2d 737 (Colo. 1974) (no joint venture without necessary elements, including sharing of losses); *Agland, Inc. v. Koch Truck Line, Inc.*, 757 P.2d 1138 (Colo. Ct. App. 1988) (cooperation alone does not create a joint venture).

Further, PMCC's argument fails even assuming *arguendo* the relationship of the parties qualified as a joint venture. If that were the case, then the Agreement itself spelled out the rights and obligations of the joint venturers, and (as the Bankruptcy Court found) PMCC received everything to which it was contractually entitled.

---

[23]     PMCC erroneously argues that both parties would share in losses (Open Br. at 23), apparently relying upon contractual language providing that profitability was to be determined in the aggregate, and that interim losses were to be offset against interim profits in calculating the aggregate result. That is hardly the same as saying (as PMCC asserts) that both parties would share in losses if trading occurred; in fact, as the Agreement makes perfectly clear, PMCC was entitled to share in the upside if aggregate profits were obtained, but had <u>no</u> responsibility whatsoever for sharing in losses if trading produced a loss in the aggregate.

## IV.  CONCLUSION

The undisputed facts show that the Bankruptcy Court was correct in entering

summary judgment in Owens Corning's favor.  Owens Corning respectfully asks this

Court to affirm that ruling.

<div style="margin-left:40%">

Respectfully submitted,

SAUL EWING LLP

By:  _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6800

and

Charles O. Monk, II, Esquire
Daniel R. Chemers, Esquire
100 South Charles Street
Baltimore, MD  21201
(410) 332-8600

Counsel to Owens Corning, *et al.*

</div>

Dated:  June 15, 2005

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| **OWENS CORNING**, *et al.*, | : | **Case No. 04-cv-1359 (JPF)** |
| | : | |
| Debtors. | : | |
| | : | |
| _____ | : | |
| | : | |
| **PRICE MANAGEMENT CONTROL** | : | |
| **CORPORATION,** | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| **OWENS CORNING**, *et al.*, | : | |
| | : | |
| Appellee. | : | |

### CERTIFICATE OF SERVICE

I, J. Kate Stickles, Esquire hereby certify that on June 15, 2005, a copy of foregoing

**Brief of Appellee** was served on the following in the manner indicated:

#### *BY HAND DELIVERY*
Richard H. Cross, Jr., Esquire
Cross & Simon, LLC
913 North Market Street; Suite 1001
Wilmington, DE 19899—1380

Frank J. Perch, III, Esquire
David Klauder, Esquire
United States Trustee
844 King Street, Suite 2313
Wilmington, DE 19801

#### *BY FEDERAL EXPRESS*
The Honorable John P. Fullam
U.S. District Court for the Eastern District of PA
U.S. Courthouse
601 Market Street
Room 15614
Philadelphia, PA 19106-1780

M. Shane Edgington, Esquire
Hensley, Kim & Edgington, LLC
1560 Broadway; Suite 2000
Denver, CO 80202

SAUL EWING LLP

By: _____
J. Kate Stickles (No. 2917)
222 Delaware Avenue, Suite 1200
Wilmington, DE 19899-1266
(302) 421-6800

522609.2