## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                                  :
**OWENS CORNING, *et al.,***
                                        :        **Case No. 04-cv-1359 (JPF)**
   Debtors.
                                        :

----

**PRICE MANAGEMENT CONTROL**            :
**CORPORATION,**
                                        :
   Appellant,
                                        :
v.
                                        :
**OWENS CORNING,**
                                        :
   Appellee.
                                        :

----

## APPENDIX TO BRIEF OF APPELLEE

Dated: June 15, 2005

SAUL EWING LLP

Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
222 Delaware Avenue, Suite 1200
Wilmington, DE 19899
(302) 421-6800
(302) 421-5879 (Fax)

and

Charles O. Monk, II
Daniel R. Chemers
100 South Charles Street
Baltimore, MD 21201
(410) 332-8600

Counsel for Owens Corning, *et al.*,
Debtors and Debtors-in-Possession

# APPENDIX TABLE OF CONTENTS

1.    Affidavit of Michael G. Mitchell, with exhibits, executed
      on May 7, 2004 ........................................................................................... B1-19

      A.    Mitchell Affidavit Exhibit 1 – Agreement and Proposal ............................... B3-19

2.    Affidavit of James S. Hileman, with exhibits, executed on
      May 12, 2004 .......................................................................................... B20-25

      A.    Hileman Affidavit Exhibit 1 – Owens Corning Derivatives
            Policy dated February 1, 1995 .................................................................. B23-24

      B.    Hileman Affidavit Exhibit 2 – Letter dated June 2, 2000  from
            J. Hileman to D. Mangan ............................................................................... B25

3.    Excerpts of the Deposition of James S. Hileman taken on
      March 31, 2004 ....................................................................................... B26-31

4.    Excerpts of the Deposition of Joseph Dennis Mangan taken
      on February 10, 2004 ............................................................................. B32-74A

5.    Excerpts of the Deposition of Robert Zoller taken on February 9, 2004 ................. B75-78

6.    Affidavit of Gary W. Dorris, with exhibits, executed on June 28, 2004 ................. B79-91

      A.    Dorris Affidavit Exhibit 1 – Curriculum Vitae of Garry
            W. Dorris ............................................................................................... B81-91

7.    Excerpt of the transcript of the hearing held on September 3, 2004
      before The Honorable Judith K. Fitzgerald, United States
      Bankruptcy Court Judge ............................................................................ B92-97

8.    Order of October 7, 2004 by The Honorable Judith K. Fitzgerald,
      United States Bankruptcy Court Judge granting Motion for Summary
      Judgment by Owens Corning against PMCC ......................................................... B98-99

9.    Supplemental Affidavit of Michael G. Mitchell, with exhibits,
      executed on June 25, 2004 ........................................................................ B100-121

      A.    Mitchell Supplemental Affidavit Exhibit 1 – Consulting Proposal
            dated November 21, 1997 for Owens Corning by PMCC ....................... B102-119

      B.    Mitchell Supplemental Affidavit Exhibit 2 – Letter dated
            September 27, 1998 from M. Mitchell to D. Mangan ............................ B120-121

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| **OWENS CORNING, *et al.*** | : | **Case Nos. 00-3837 (JKF)** |
| **Debtors.** | : | **(Jointly Administered)** |
| | | Related to Docket Nos.: 9344 and 9834 |

### AFFIDAVIT OF MICHAEL G. MITCHELL

1.      I, Michael G. Mitchell, am more than eighteen years of age, am competent to testify as a witness, and have personal knowledge of the facts set forth below.

2.      I have worked for Owens Corning since 1969 and am currently the International Supply Manager for the Trumbull Asphalt Division of Owens Corning. In my position as International Supply Manager, I am responsible for acquiring asphalt for Owens Corning's east coast plants. I have held my current position since 1996.

3.      Asphalt is a by-product of the refining of crude oil. Owens Corning purchases the great majority of its asphalt from crude oil refiners. That asphalt, after processing, is primarily used in the manufacture of shingles.

4.      Robert Zoller of Zoller Energy, Inc. introduced me to Dennis Mangan of Price Management Control Corporation ("PMCC") in the Spring of 1997.

5.      I, along with others at Owens Corning, wanted to see if there were acceptable hedging programs that would make Owens Corning's procurement costs of asphalt more predictable. Mr. Mangan represented himself as an expert in commodity hedging with substantial work experience with corporate entities. He said he could develop a hedging program for asphalt.

B-1

6.    I did not know if the hedging program that Mr. Mangan was offering to develop would meet Owens Corning's needs and corporate policies.

7.    A genuine copy of the October 23, 1998 Agreement between Owens Corning and PMCC (the "Agreement") is attached as Exhibit 1.

8.    Mr. Mangan began delivering portions of his Hedging Manual at some point after the Agreement was signed. He completed delivery in late December 1998 or early January 1999. He came to Toledo, Ohio in January 1999 to try to explain the Hedging Manual, and he conducted a second training session in Denver, Colorado on March 10-11, 1999. After that Denver training session, Jim Hileman, the Controller of the Roofing Systems Business of Owens Corning, was in a position to begin his assessment of the potential financial implications of the hedging program.

9.    Owens Corning paid PMCC the $22,500 contractual fixed fee, and it paid PMCC's invoices for the training meetings held in Toledo, Ohio and Denver, Colorado.

I declare under the penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

Date:  _____          _____

MICHAEL G. MITCHELL

**OWENS CORNING WORLD HEADQUARTERS**
ONE OWENS CORNING PARKWAY
TOLEDO OHIO 43659



November 4, 1998

Mr. Dennis Mangan
Price Management Control Corporation
4500 South Monaco Street, Suite 1614
Denver CO 80237

Dennis:

Here is a an executed copy of the Agreement.

Since the agreement references your July 30, 1998 proposal, I kept that date but substituted page 10 from the October 23 version as it more closely defines the time line to complete the work you need to do.

Please keep me tuned in on your timing for completion so we can schedule a training session.

Please call with any questions.

Regards

Michael G. Mitchell
International Supply Manager

pmcc 11498

**Mitchell Aff. Exh. 1**

OC/PMCC 0036

OWENS CORNING

**B-3**

## AGREEMENT

This Agreement is made and entered into as of this 23 day of October, 1998, by and between OWENS CORNING, (hereafter referred to as "OC"), a Delaware corporation, with its principal place of business at One Owens Corning Parkway, Toledo, Ohio 43659 and PRICE MANAGEMENT CONTROL CORPORATION, (hereafter referred to as "PMCC"), a Delaware corporation, with its principal place of business at 4500 South Monaco Street, Suite 1614, Denver, Colorado: 80237.

### WITNESSETH:

WHEREAS, PMCC is qualified to perform certain services (referred to herein as the "Services") as described in the proposal dated July 30, 1998 which is attached hereto as Exhibit A (the "Proposal") and desires to perform the Services in conjunction with and for the mutual benefit of OC and PMCC; and

WHEREAS, OC desires to engage PMCC, in the capacity as independent Consultant rather than as an employee, to perform the Services in conjunction with and for the mutual benefit of OC and PMCC.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties PMCC and OC agree as follows:

1. OC hereby engages PMCC to perform the Services as described in the PMCC Proposal, of July 30, 1998, as well as any other services that are in PMCC's area of expertise that the parties may hereafter mutually agree upon.

2. The term of this Agreement shall begin on the date hereof and shall continue in effect until terminated by OC in accordance with Section 10 below. In no event shall this agreement continue for more than three (3) years after the date hereof unless the parties have agreed in writing to an extension.

3. OC agrees to pay PMCC for the performance of the Services according to the "Compensation and Terms of Payment" section of the Proposal.

4. OC shall in no way be responsible for any Vacation, sick leave, insurance and payroll taxes of PMCC. Those shall be the sole responsibility of the PMCC.

OC/PMCC 0037

5.  PMCC agrees to inform OC of any data, devices, operations, patents, publications and other information coming to the attention of PMCC which PMCC believes is or may be pertinent to any aspect of OC's operations. OC agrees to inform PMCC of any data, hedging trade executions, hedging operations, and other information coming to the attention of OC which is directly related to the hedging program which PMCC is facilitating for OC hereunder. However, OC shall not be required to disclose any data, devices, operations, patents, publications and other information coming to the attention of OC which OC considers to be confidential or proprietary.

6.  PMCC agrees to retain in confidence the nature of any Services which he is performing for OC hereunder, the identify of OC's customers and suppliers and any other advice, opinions, data and information furnished to PMCC by OC or produced by PMCC for OC which is not generally known to the public at the time of its disclosure to, or development by PMCC ("Confidential Information"), and to maintain any such Confidential Information in a confidential manner until such time as it is published by OC or otherwise becomes generally known by the public through sources other than PMCC, and PMCC agrees to use the Confidential Information solely in connection with the performance of Services hereunder. PMCC further agrees that any such Confidential Information is and shall remain the sole property of OC and any printed material regarding such property of OC which has been provided to, or obtained by, PMCC shall be returned to OC upon the termination of this Agreement.

7.  PMCC is an independent contractor with respect to the performance of all Service contained in this Agreement. PMCC shall not be deemed for any purpose to be the employee, agent, servant, or representative of OC in the performance of any Service or part thereof in any manner dealt with herein. OC has and shall have no direction or control of PMCC except in the result to be obtained within this joint venture agreement. The Services herein shall meet the contractual offering of July 30, 1998. The actual performance of the Services shall be by PMCC, and OC's representatives shall have reasonable access to the operations to determine whether the Service is being performed by PMCC in accordance with all the provisions of this July 30, 1998 offering.

8.  PMCC shall indemnify and hold harmless OC against any claims, liabilities, and damages arising or resulting from (a) allegations that PMCC is an employee of OC or is entitled, as a result of performing Services hereunder, to benefits as an employee of OC, (b) the negligence of PMCC, (c) the failure of PMCC to comply with the terms of this Agreement, (d) any illegal acts performed by PMCC, and (e) any misrepresentations made by PMCC. OC shall indemnify and hold harmless PMCC against any claims, liabilities, and damages arising or resulting from (f) the negligence of OC, (g) the failure of

OC/PMCC 0038

2

OC to comply with the terms of this Agreement, (h) any illegal acts performed by OC, and (i) any misrepresentations made by OC.

9. OC may terminate this Agreement upon thirty (30) days prior written notice of intent to terminate delivered to PMCC, by certified or registered mail. PMCC may not terminate this Agreement prior to the scheduled termination date. Upon termination of this Agreement one of two situations will exist.

> **a)** There will be no hedges in place at the time of termination. Under this situation, OC will only owe PMCC the original fee of $22,500.00 and if that has been paid in full OC shall have no further obligation to PMCC.

> **b)** There will be hedges in place at the time of termination. Under this situation, OC and PMCC agree that an accounting of all open positions shall be accomplished. The following shall occur:

>> **i)** All payments for closed hedge positions shall be made to PMCC by OC.

>> **ii)** All open Profits and Losses shall be accounted for as of the effective date of termination. This accounting will occur within a period of five (5) business days following that date. At that time PMCC shall have the option to:

>>> **A)** Take its 2.5% profit sharing of open profits at that time.

>>> **B)** To carry forward its interest in the open positions until they would have been liquidated at maturity.

>>> **C)** (ii)A is chosen by PMCC, OC shall transfer all monies owed to PMCC.

>>> **D)** If (ii)D is chosen by PMCC, OC shall each month forward to PMCC its 2.5% share of the profits.

All payments to PMCC shall be forwarded to OC to PMCC via the Federal Reserve Wire within thirty (30) days of payments being received by OC.

10. Following termination of this Agreement, covenants and agreements contained in Paragraphs 6 and 8 above shall survive in accordance with their respective terms.

OC/PMCC 0039

11. This Agreement may not be assigned by either PMCC or OC, to any other party, without the express written consent of both PMCC and OC. This Agreement and the proposal dated July 30, 1998 contains the entire agreement of the parties and may not be amended, except as mutually agreed upon, or modified except in a writing signed by both parties.

12. All notices to be given hereunder shall be in writing and addressed to each party at its address set forth on the first page of this Agreement or to any other address provided by either party to the other in writing. Notice shall be sent by registered or certified mail and the date of each notice shall be deemed to be the date of dispatch.

13. This Agreement shall be interpreted and construed in accordance with the laws of the State of Colorado.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first above written.

OWENS CORNING

By: _E Mirra J_

Name: _E. MIRRA JR_

Title: _VP Trumbull OC_

PRICE MANAGEMENT
CONTROL CORPORATION

By: _Dennis Morgan_

Name: _DENNIS Morgan_

Title: _President, PMCC_

OC/PMCC 0040

## EXHIBIT A

## CONSULTANT'S PROPOSAL

(Attached)

OC/PMCC 0041

5

# Research and Management Proposal
for
## Owens Corning
One Owens Corning Parkway
Toledo, Ohio
43659

**Attention: Michael G. Mitchell**

**Date: July 30, 1998**

## PARTIES TO THIS AGREEMENT:

The parties to this agreement are **Owens Corning** with principal business offices at One Owens Corning Parkway; Toledo, Ohio, and, **Dennis Mangan of Price Management Control Corporation** with principal business offices at 4500 South Monaco Street; Suite 1614; Denver, Colorado.

## PROJECT:

To research, develop, design, implement, manage, and execute the methodology and control procedures of a Hedging Program for use in the Management of Pricing of Flux using Crude Oil Futures or Derivatives, Heating Oil Futures or Derivatives, Gasoline Futures or Derivatives or, Custom Designed Derivative Instruments as the Hedging Instrument. The schedule of services to be provided, timetable, documentation and compensation are specified as follows and shall be acknowledged by all parties concerned, upon acceptance of this proposal, as the **TERMS OF AGREEMENT.**

## TASK 1:

Create reference documentation with appropriate graphics for various Contracts and Methods of Pricing. This to include:

1. Cash Forward Contracts
2. Cash Flow Swap Contracts
3. Futures Contracts
4. Futures Call Options
5. Basis Contracts
6. Cap and Floor Contracts
7. No Cost Collar Contracts
8. Leveraged Put and Call Option Contracts
9. Custom Designed Derivatives

OC/PMCC 0042

## TASK 2:

Creation of the Basis Matrix Scenarios and Financial Implications Tables and Graphic Presentation of all Procurement Basis that the company can face in a Hedging Program.

## TASK 3:

Guidelines and discussion for Procurement Hedging.

## TASK 4:

Setting of Target Prices.

## TASK 5:

Cash Price History Analysis and creation of analysis for measurement of Cash Prices to include the following:
1. Locational Symbols and Cities Represented by those Symbols
2. Locational Prices of Flux Monthly with Systemic High-Low-Weighted Usage Average
3. Graphic Presentation - Monthly Locational High-Lo-Average, January. 1985-Deccember, 1997
4. Systemic Monthly Flux Prices 1985-1997 with Graphic
5. Yearly Cash Monthly Flux Prices by Month and by Year 1985-1997 with Graphics
6. Flux Prices Dispersion Table January, 1985 to December, 1997 with Graphic
7. Twelve Month Forward Flux Price Dispersion Tables with Graphic
8. Comparison of Twelve Month Forward Flux Price Dispersion Tables Table #1 through Table #5

## TASK 6:

Crude Oil Futures History Analysis and creation of analysis for measurement of Crude Oil Prices to include the following:
1. Explanation of Symbols and Formulas
2. Crude Oil Futures Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3. Graphic Presentation of the Above
4. Table of January to December Prices with associated Graphics 1985-1997
5. Tables of Dispersion for Contract C-1 and 12 Month Swap Prices 1985-1997
6. Graphic Presentation of Dispersion Table for Contract 1 1985-1997
7. Graphic Presentation of Dispersion Table for Contract 12 Month Swap 1985-1997
8. Graphic Presentation of Dispersion Table for Contract 1 and 12 Month Swap1985-1997
9. Table of Prices C-1, 12 Month Swap and Spread Difference Contract 1-12 Month Swap
10. Graphic Presentation of Price C-1 and 12 Month Swap 1985-1997
11. Graphic Presentation of Spread Difference of C-1 and 12 Month Swap 1985-1997
12. Dispersion Table of Spread C-1 - 12 Month Swap

OC/PMCC 0043

13.   Graphic Presentation of Dispersion Table of Spread C-1 - 12 Month Swap

## TASK 7:

Crude Oil Basis History Analysis and creation of analysis for measurement of Basis Price Differences to include the following:

1     Explanation of Symbols and Formulas
2.    Basis Price Differentials = Flux - Crude Oil Futures Contracts 1 and 12 Month Strip 1985-1997
3     Graphic Presentation Cash, C-1 and 12 Mo. Strip 1985-1997
4     Graphic Presentation Monthly Basis Prices C-1 and 12 Mo. Basis 1985-1997
5.    Graphic Presentation Average Basis Differences C-1 and 12 Mo. Basis 1985-1997
6     Graphic Presentation of Basis in Percentage Yield Format C-1 and 12 Mo. Strip 1985-1997
7.    Graphic Presentation Average Basis Yield Differences C-1 and 12 Mo. Basis 1985-1997
8.    Table of January to December Cash, C-1, 12 Mo. Strip, Basis and % Basis with associated Graphics 1985-1997
9.    Monthly Correlation's for Cash to C-1 & Cash to 12 Mo. Strip with Graphic
10.   Tables of Dispersion for Basis Differences Contract C-1 and 12 Month Swap Prices
11.   Graphic Presentation C-1 Basis Differences 1985-1997
12.   Graphic Presentation 12 Month Swap Basis Differences 1985-1997
13.   Graphic Presentation C-1 % Basis Differences 1985-1997
14.   Graphic Presentation 12 Month Swap % Basis Differences 1985-1997

## TASK 8:

Heating Oil Futures History Analysis and creation of analysis for measurement of Heating Oil Prices to include the following:

1.    Explanation of Symbols and Formulas
2.    Heating Oil Futures Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3     Graphic Presentation of the Above Item #2
4     Table of Prices January through December with associated Graphics 1985-1997
5.    Tables of Dispersion for Contract C-1 and 12 Month Swap Prices 1985-1997
6.    Graphic Presentation of Dispersion Table for Contract 1 1985-1997
7.    Graphic Presentation of Dispersion Table for Contract 12 Month Swap 1985-1997
8     Graphic Presentation of Dispersion Table for Contract 1 and 12 Month Swap 1985-1997
9     Table of Prices C-1, 12 Month Swap and Spread Difference Contract 1 - 12 Month Swap
10.   Graphic Presentation of Price C-1 and 12 Month Swap 1985-1997
11.   Graphic Presentation of Spread Difference of C-1 and 12 Month Swap 1985-1997
12    Dispersion Table of Spread C-1 - 12 Month Swap
13    Graphic Presentation of Dispersion Table of Spread C-1 - 12 Month Swap

OC/PMCC 0044

## TASK 9:

Heating Oil Basis History Analysis and creation of analysis for measurement of Basis Price Differences to include the following:

1.  Explanation of Symbols and Formulas
2.  Basis Price Differentials = Flux - Heating Oil Futures Contracts 1 and 12 Month Strip 1985-1997
3.  Graphic Presentation Cash, C-1 and 12 Mo. Strip 1985-1997
4.  Graphic Presentation Monthly Basis Prices C-1 and 12 Mo. Basis 1985-1997
5.  Graphic Presentation Average Basis Differences C-1 and 12 Mo. Basis 1985-1997
6.  Graphic Presentation of Basis in Percentage Yield Format C-1 and 12 Mo. Strip 1985-1997
7.  Graphic Presentation Average Basis Yield Differences C-1 and 12 Mo. Basis 1985-1997
8.  Table of January to December Cash. C-1, 12 Mo. Strip, Basis and % Basis with associated Graphics 1985-1997
9.  Monthly Correlation's for Cash to C-1 & Cash to 12 Mo Strip with Graphic
10. Tables of Dispersion for Basis Differences Contract C-1 and 12 Month Swap Prices
11. Graphic Presentation C-1 Basis Differences 1985-1997
12. Graphic Presentation 12 Month Swap Basis Differences 1985-1997
13. Graphic Presentation C-1 % Basis Differences 1985-1997
14. Graphic Presentation 12 Month Swap % Basis Differences 1985-1997

## TASK 10:

Gasoline Futures History Analysis and creation of analysis for measurement of Gasoline Prices to include the following:

1.  Explanation of Symbols and Formulas
2.  Gasoline Futures Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3.  Graphic Presentation of the Above Item #2
4.  Table of Prices January through December with associated Graphics 1985-1997
5.  Tables of Dispersion for Contract C-1 and 12 Month Swap Prices 1985-1997
6.  Graphic Presentation of Dispersion Table for Contract 1 1985-1997
7.  Graphic Presentation of Dispersion Table for Contract 12 Month Swap 1985-1997
8.  Graphic Presentation of Dispersion Table for Contract 1 and 12 Month Swap 1985-1997
9.  Table of Prices C-1, 12 Month Swap and Spread Difference Contract 1 - 12 Month Swap
10. Graphic Presentation of Price C-1 and 12 Month Swap 1985-1997
11. Graphic Presentation of Spread Difference of C-1 and 12 Month Swap 1985-1997
12. Dispersion Table of Spread C-1 - 12 Month Swap
13. Graphic Presentation of Dispersion Table of Spread C-1 - 12 Month Swap

OCI/PMCC 0045

## TASK 11:

Gasoline Basis History Analysis and creation of analysis for measurement of Basis Price Differences to include the following:

1.  Explanation of Symbols and Formulas
2.  Basis Price Differentials = Flux - Gasoline Futures Contracts 1 and 12 Month Strip 1985-1997
3.  Graphic Presentation Cash, C-1 and 12 Mo. Strip 1985-1997
4.  Graphic Presentation Monthly Basis Prices C-1 and 12 Mo. Basis 1985-1997
5.  Graphic Presentation Average Basis Differences C-1 and 12 Mo. Basis 1985-1997
6.  Graphic Presentation of Basis in Percentage Yield Format C-1 and 12 Mo. Strip 1985-1997
7.  Graphic Presentation Average Basis Yield Differences C-1 and 12 Mo. Basis 1985-1997
8.  Table of January to December Cash, C-1, 12 Mo. Strip, Basis and % Basis with associated Graphics 1985-1997
9.  Monthly Correlation's for Cash to C-1 & Cash to 12 Mo. Strip with Graphic
10. Tables of Dispersion for Basis Differences Contract C-1 and 12 Month Swap Prices
11. Graphic Presentation C-1 Basis Differences 1985-1997
12. Graphic Presentation 12 Month Swap Basis Differences 1985-1997
13. Graphic Presentation C-1 % Basis Differences 1985-1997
14. Graphic Presentation 12 Month Swap % Basis Differences 1985-1997

## TASK 12:

Volatility of Cash, Crude Oil Futures, Heating Oil Futures, Gasoline Futures and appropriate Hedging Ratios for the use of Crude Oil Futures, Heating Oil Futures, Gasoline Futures as the Hedging instrument for Flux procurement.

1.  Discussion
2.  Table of Volatility of Flux, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
3.  Table of Comparison and Hedge Multiplier Numbers with Graphic
4.  Table of 3 Month, 6 Month and 12 Month Floating Price Deltas for Flux, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
5.  Graphic Presentation of 3 Month Delta Comparisons for Flux, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
6.  Graphic Presentation of 6 Month Delta Comparisons for Flux, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
7.  Graphic Presentation of 12 Month Delta Comparisons for Flux, Crude Oil Futures, Heating Oil Futures and Gasoline Futures

OC/PMCC 0046

## TASK 13:

Correlational Comparison Effect of Cash, Crude Oil Futures, Heating Oil Futures, and Gasoline Futures.

1. Discussion
2. Table of Correlation of Flux to Crude Oil Futures, Heating Oil Futures and Gasoline Futures
3. Table of Comparison and Hedge Multiplier Numbers with Graphic
4. Table of 3 Month, 6 Month and 12 Month Floating Price Correlation for Flux to Crude Oil Futures, Heating Oil Futures and Gasoline Futures
5. Graphic Presentation of 3 Month Correlation of Flux to Crude Oil Futures, Heating Oil Futures and Gasoline Futures
6. Graphic Presentation of 6 Month Correlation of Flux to Crude Oil Futures, Heating Oil Futures and Gasoline Futures
7. Graphic Presentation of 12 Month Correlation of Flux to Crude Oil Futures, Heating Oil Futures and Gasoline Futures

## TASK 14:

Heating Oil Crack Spread

1. Explanation of Symbols and Formulas
2. Heating Oil Crack Spread Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3. Graphic Presentation of the Above Item #2
4. Table of Prices January through December with associated Graphics 1985-1997
5. Tables of Dispersion for Crack Spread C-1 and 12 Month Crack Spread Swap Prices 1985-1997
6. Graphic Presentation of Dispersion Table for Crack Spread C-1 1985-1997
7. Graphic Presentation of Dispersion Table for Crack Spread 12 Month Swap Crack Spread 1985-1997
8. Graphic Presentation of Dispersion Table for Crack Spread C-1 and 12 Month Swap Crack Spread 1985-1997
9. Table of Prices Crack Spread C-1, 12 Month Swap and Spread Difference Crack Spread C-1 - 12 Month Swap Crack Spread
10. Graphic Presentation of Crack Spread C-1 and 12 Month Swap 1985-1997
11. Graphic Presentation of Spread Difference of Crack Spread C-1 and 12 Month Swap Crack Spread 1985-1997
12. Dispersion Table of Spread Crack Spread C-1 - 12 Month Swap Crack Spread
13. Graphic Presentation of Dispersion Table of Crack Spread C-1 - 12 Month Swap Crack Spread

OC/PMCC 0047

## TASK 15:

Gasoline Crack Spread:

1.  Explanation of Symbols and Formulas
2.  Gasoline Crack Spread Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3.  Graphic Presentation of the Above Item #2
4.  Table of Prices January through December with associated Graphics 1985-1997
5.  Tables of Dispersion for Crack Spread C-1 and 12 Month Crack Spread Swap Prices 1985-1997
6.  Graphic Presentation of Dispersion Table for Crack Spread C-1 1985-1997
7.  Graphic Presentation of Dispersion Table for Crack Spread 12 Month Swap Crack Spread 1985-1997
8.  Graphic Presentation of Dispersion Table for Crack Spread C-1 and 12 Month Swap Crack Spread 1985-1997
9.  Table of Prices Crack Spread C-1, 12 Month Swap and Spread Difference Crack Spread C-1 - 12 Month Swap Crack Spread
10. Graphic Presentation of Crack Spread C-1 and 12 Month Swap 1985-1997
11. Graphic Presentation of Spread Difference of Crack Spread C-1 and 12 Month Swap Crack Spread 1985-1997
12. Dispersion Table of Spread Crack Spread C-1 - 12 Month Swap Crack Spread
13. Graphic Presentation of Dispersion Table of Crack Spread C-1 - 12 Month Swap Crack Spread

## TASK 16:

Crude:Gasoline:Heating Oil (3:2:1) Crack Spread

1.  Explanation of Symbols and Formulas
2.  (3:2:1) Crack Spread Futures Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3.  Graphic Presentation of the Above Item #2
4.  Table of Prices January through December with associated Graphics 1985-1997
5.  Tables of Dispersion for Contract C-1 and 12 Month Swap Prices 1985-1997
6.  Graphic Presentation of Dispersion Table for Contract 1 1985-1997
7.  Graphic Presentation of Dispersion Table for Contract 12 Month Swap 1985-1997
8.  Graphic Presentation of Dispersion Table for Contract 1 and 12 Month Swap 1985-1997
9.  Table of Prices C-1, 12 Month Swap and Spread Difference Contract 1 - 12 Month Swap
10. Graphic Presentation of Price C-1 and 12 Month Swap 1985-1997
11. Graphic Presentation of Spread Difference of C-1 and 12 Month Swap 1985-1997
12. Dispersion Table of Spread C-1 - 12 Month Swap
13. Graphic Presentation of Dispersion Table of Spread C-1 - 12 Month Swap

DC/PMCC 0048

## TASK 17:

Statistical Tables of Dispersion Volatility of Price Change for Cash, Crude Oil Futures, Heating Oil Futures, Gasoline Futures, Heating Oil Crack Spread, Gasoline Crack Spread, and 3:2:1 Crack Spread (3 Crude)-(2 Gasoline+1 Heating Oil).

## TASK 18:

Construction of the Crude Oil Futures, Heating Oil Futures, Gasoline Futures DataBase and Manual. This to include the following for each Individual Flux Pricing Location and for the Systemic Flux Cost usage as a whole.

A. Chronological Price data History from January, 1985 to December, 1997, including the following using a Monthly Average Format:
1. Cash
2. Cash Delta (Price Change)
3. Crude Oil Contract C-1 (Spot Contract)
4. Crude Oil Contract C-2 (Second to the Spot Contract)
5. Crude Oil Delta (Price Change Month to Month of C-1 vs. C-2 previous Month)
6. Crude Oil Basis (Cash- Crude Oil Contract C-1)
7. Crude Oil % Basis (Cash/ Crude Oil Contract C-1)
8. Crude Oil Basis Delta (Change month to Month of the Basis)
9. Gasoline Contract C-1 (Spot Contract)
10. Gasoline Contract C-2 (Second to the Spot Contract)
11. Gasoline Delta (Price Change Month to Month of C-1 vs. C-2 previous Month)
12. Gasoline Basis (Cash- Gasoline Contract C-1)
13. Gasoline % Basis (Cash/ Gasoline Contract C-1)
14. Gasoline Basis Delta (Change month to Month of the Basis)
15. Heating Oil Contract C-1 (Spot Contract)
16. Heating Oil Contract C-2 (Second to the Spot Contract)
17. Heating Oil Delta (Price Change Month to Month of C-1 vs. C-2 previous Month)
18. Heating Oil Basis (Cash-Heating Oil Contract C-1)
19. Heating Oil % Basis (Cash/Heating Oil Contract C-1)
20. Heating Oil Basis Delta (Change month to Month of the Basis)

B. Graphical Presentation from Item A of:
1. Locational Monthly Average Price
2. Crude Oil Futures Monthly Average Price
3. Heating Oil Futures Monthly Average Price
4. Gasoline Futures Monthly Average Price
5. Crude Oil Basis (Cash- Crude Oil Contract C-1)
6. Heating Oil Basis (Cash- Heating Oil Contract C-1)
7. Gasoline Basis (Cash- Gasoline Contract C-1)
8. Crude Oil % Basis (Cash/Crude Oil Contract C-1)
9. Heating Oil % Basis (Cash/Heating Oil Contract C-1)
10. Gasoline % Basis (Cash/Gasoline Contract C-1)

OC/PMCC 0049

x

C. Price Rank and Percentiles of Items 1-3, 5-9, 11-15, and 16-20 from Part A.

D. Graphical Presentation of Percentile Rankings of:
1. Cash Price
2. Crude Oil Contract C-1
3. Heating Oil Contract C-1
4. Gasoline Contract C-1
5. Crude Oil Basis (Cash-Crude Oil C-1)
6. Heating Oil Basis (Cash-Heating Oil C-1)
7. Gasoline Basis (Cash- Gasoline C-1)
8. Crude Oil Percent Basis (Cash/Crude Oil C-1)
9. Heating Oil Percent Basis (Cash/Heating Oil C-1)
10. Gasoline Percent Basis (Cash/Crude Oil C-1)

## TASK 19: Meetings with Corporate personnel as follows:

**Meetings with Corporate personnel as follows:**
1. Meetings to discuss and help implement the Hedging Program with appropriate management staff personnel. These meetings to be basically 4-6 hours each. These meetings will be structured so as to go over the Hedging Manual methods and activities. The activity to within these meetings is to give an in depth explanation of the hedging program and a question and answer period so as to give management a thorough understanding of the Hedging Program.
2. Other meetings may be scheduled by client as needed to resolve any additional questions and to give any further advice to client.

(Included in this is the fact that company personnel may call at any time to discuss questions or problems.)
All meetings will be billed separately as follows:
Client will be billed as follows:
1. Round trip airfare from Denver, Colorado to Toledo, Ohio.
2. Hotel Accommodations
3. Fee of $600 per day ($75.00 per hour) for meetings.

## RESTRICTIONS ON USE OF MATERIALS:

Materials developed for this program by **PRICE MANAGEMENT CONTROL CORPORATION** are for the express and singular use of **OWENS CORNING**, the Client, and cannot be released to any third party under any circumstances whatsoever. Information owned by the Client, **OWENS CORNING** may only be used by **PRICE MANAGEMENT CONTROL CORPORATION** for the purposes of carrying out the Tasks involved in the implementation and execution of this proposal. All information owned by the Client, **OWENS CORNING** under these Terms of Agreement cannot be released to any third party by **PRICE MANAGEMENT CONTROL CORPORATION** under any circumstances whatsoever.

OC/PMCC 0050

**B-17**

## SCHEDULE OF COMPLETION:

Consultant agrees to complete Tasks 1-19 of this agreement as outlined in the following table. These dates are considered to be the due date as long as the cash data needed by the Consultant is available to the Consultant no later than 7 days after the signing of this agreement. For each day after that date the data is delayed shall add 1 day to the completion date agreement.

| Task Number | Completion Date | Hours For This Task |
|---|---|---|
| 1 | November 7, 1998 | 5 |
| 2 | November 7, 1998 | 5 |
| 3 | November 7, 1998 | 5 |
| 4 | November 7, 1998 | 5 |
| 5 | November 18, 1998 | 95 |
| 6 | November 23, 1998 | 35 |
| 7 | November 28, 1998 | 40 |
| 8 | December 3, 1998 | 35 |
| 9 | December 7, 1998 | 40 |
| 10 | December 12, 1998 | 35 |
| 11 | December 17, 1998 | 40 |
| 12 | December 21, 1998 | 25 |
| 13 | December 26, 1998 | 35 |
| 14 | January 2, 1999 | 45 |
| 15 | January 7, 1999 | 45 |
| 16 | January 12, 1998 | 45 |
| 17 | January 16, 1998 | 35 |
| 18 | January 30, 1998 | 90 |
| 19* | As determined | |
| Total | | 660 |

* - Client will be billed separately for all meetings

## COMPENSATION AND TERMS OF PAYMENT:

Compensations for the above project shall be a combination of payment for services and profit sharing from the hedging. Payment shall be as follows.

1. Compensation for the above project shall be a payment of $22,250.00  The payments shall be $7,500.00 upon contract signing, $7,500.00 on September 15, 1998 and $7,250.00 on October 30, 1998.

2. Payment of 5% of the profits from the hedging program transactions up to payments of $500,000 and then continuing payments of 2.5% on all further profits from the hedging program. Payments shall be on a net amount and any losses from a month shall be accrued and carried forward until those losses have been recovered. Settlement shall be monthly.

3. All payments shall be wire transferred via the Federal Reserve on or before the fifth business day of the following month after the conclusion of business of the previous month. Account and wiring instructions shall be given to the client at a future date.

OC/PMCC 0051

**B-18**

## AGREEMENT INITIATION:

This agreement shall be consummated and initiated by the signatures of the parties and/or the representatives of the parties.

**IN WITNESS WHEREOF,** the parties have signed and agreed to these **TERMS OF AGREEMENT.**

**SUBMITTED BY:**

_____   Date: July 30, 1998
Dennis Mangan
Price Management Control Corporation
4500 South Monaco Street, Suite 1614
Denver, Colorado 80237

## AGREED TO AND ACCEPTED BY THE CLIENT:

_____ Date:_____

Name

_____

Title
Owens Corning
One Owens Corning Parkway
Toledo, Ohio 43659

OC/PMCC 0052

11

**B-19**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| OWENS CORNING, *et al* | : | Case Nos. 00-3837 (JKF) |
| Debtors. | : | (Jointly Administered) |

Related to Docket Nos.: 9344 and 9834

## AFFIDAVIT OF JAMES S. HILEMAN

1.  I, James S. Hileman, am more than eighteen years of age, am competent to testify as a witness, and have personal knowledge of the facts set forth below.

2.  I have worked for Owens Corning since May of 1984 and am currently Vice President and Controller of the Exterior Systems Business of Owens Corning. I and all other employees of Owens Corning are governed by the company's policies and procedures including its limitations on spending authority. No one at Owens Corning (including the Chief Executive Officer) has unlimited spending authority.

3.  I first had contact with Dennis Mangan of Price Management Control Corporation ("PMCC") in 1999 when I became Controller of the Roofing Systems Business of Owens Corning.

4.  Based upon my review of the Hedging Manual delivered to Owens Corning by Mr. Mangan and his explanation of the proposed program at a March 10-11, 1999 training session in Denver, Colorado, I was in a position to begin an assessment of the potential financial implications of the proposed program. Owens Corning could not even consider using the proposed program to any extent without studying it fully, and without evaluating (among other things) its potential financial implications. I began a detailed analysis and assessment of the proposed program in mid-March 1999.

5.    The type of trading Mr. Mangan was proposing was covered by Owens Corning's Derivatives Policy and, therefore, would ultimately require Chief Financial Officer ("CFO") approval if the program seemed appropriate to any extent to those engaged in its program evaluation.  A copy of Owens Corning's Derivatives Policy is attached as Exhibit 1.  My job was to engage in sufficient analysis of the program so that I would be able to make an informed assessment of the program and an informed recommendation to others in the Roofing Systems Business and, if appropriate, to the CFO.

6.    As I understand it, hedging is a tool used to produce increased cost predictability. Hedging a commodity in which there is a recognized market is far easier and less risky than trying to hedge a commodity like asphalt, where no recognized market exists.

7.    I studied various aspects of the proposed program.  My review included a highly detailed analysis of what the impact of the program would have been on an earnings per share basis if it had been in effect for Owens Corning's internal usage of asphalt during the years 1986 through 1999.

8.    During the late 1990's, the Owens Corning was (according to its records) procuring around 15 million barrels of asphalt annually.  Of that total, Owens Corning was using approximately 4-5 million barrels of asphalt (after processing) in the manufacture of Owens Corning's shingles.  This was its internal usage.  Owens Corning was selling the remaining portion of its processed asphalt to other shingle manufacturers and industrial customers.

9.    Owens Corning has historically been able to pass on asphalt cost increases to other manufacturers and industrial customers, but has not been able to increase prices as promptly on the shingles it manufactures.  As to the latter, Owens Corning has faced a degree of commercial exposure from asphalt price volatility, and it was that exposure that we focused on

804352.2 513/64

-2-

B-21

when assessing PMCC's proposed program. That is why my earnings per share analysis dealt with internal usage.

10.   In May of 2000, I recommended to Michael Thaman, the Owens Corning CFO at the time, that a highly modified version of Mr. Mangan's program be used in connection with some portion of Owens Corning's internal asphalt usage. Mr. Thaman was not persuaded and decided not to proceed with further analysis. Following that determination, I sent Mr. Mangan the letter, attached as Exhibit 2, terminating the agreement between Owens Corning and PMCC effective thirty days thereafter (i.e. on July 2, 2000).

11.   Owens Corning never approved and never engaged in any trading under PMCC's proposed program.

I declare under the penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

Date: ___5/12/04___

JAMES S. HILEMAN

-3-

B-22

MAR 10'97 17:29 FR OCF IOL 1-5 TREASURY          TO 5025004          PAGE 04



corporate level
policy

date: 2/1/95

Subject: **DERIVATIVES POLICY**

**Definition**
A derivative instrument is a security or contract whose value is based upon or derived from some underlying item such as an index, a currency exchange rate, an interest rate, a commodity value or the value of another security.

Types of derivative instruments include currency and interest-rate swap contracts, options, "swaptions," forward purchase or sale contracts, regulated future contracts, option-based instruments such as caps, floors and collars, and a variety of securities that are subject to an embedded option right such as warrants and convertibles.

**Permitted Purposes and Objectives**
It is the policy of the Company that derivative instruments and securities will be used only for purposes of optimizing capital structure and managing financial risk.

Optimization of capital structure for purposes of this policy is limited to modification of existing Company debt obligations such that (a) the stated currency is effectively redenominated into either U.S. dollars or the currency of the cash flows that will satisfy the obligation, or (b) the term upon which the interest rate is based is altered (e.g., fixed into floating) provided, however, that such alteration does not result in the Company's floating rate debt being in excess of 50% of total debt at that time.

Management of financial risk is limited to transactions for purposes of hedging recorded assets, liabilities and economic or cash cash flow exposures which are contractually committed or anticipated with high probability.

**Allowable Types of Derivative Instruments**
Allowable derivative instruments will be limited to the following:

- Forward purchase and sale contracts
- Purchased option contracts
- Spread option arrangements (linked purchase/written)
- Swap contracts
- Interest rate caps, floors and collars
- Future contracts

Except for the above allowed option instruments, the Company will not enter into arrangements which involve "leveraged" derivatives or naked written options (not

Hileman Aff. Exh. 1

OC/PMCC2000028

including options with respect to the Company's own outstanding debt and equity securities).

## Counterparty Credit Risk Parameters

Derivative transactions involving potential counterparty risk will be allowed only if at the time the transaction is entered into such counterparty is a financial institution having a Standard & Poors debt rating of "A" or better ("AA-" or better if the term of the derivative exceeds one year).

If at any time the aggregate exit value exposure of any institution to the Company with respect to all derivative transactions to which it is a party exceeds $20 million in amount and such institution is rated less the "AA-" by Standard & Poors, the Company will take appropriate steps to secure, collateralize, offset or collect such position.

## Authority and Approval Structure

Approval for entering into a derivative contract or acquiring a derivative instrument is limited to the following:

- Forward foreign exchange contracts not exceeding one year in term must be approved in advance by the Treasurer or any Assistant Treasurer.

- Interest rate caps, collars, floors and similar instruments must be approved by the Treasurer.

- Purchased foreign currency option contracts must be approved by the Treasurer provided that the aggregate cost for all such options do not exceed $500,000 in any one calendar year.

- All other derivative contracts or acquisitions of derivative instruments must be approved in advance by the Company's Chief Financial Officer.

## Monitoring and Reporting Requirements

The status of all derivative instruments (excluding currency forward contracts having a term of less than 3 months) including "exit" or market values will be reported to the Chief Financial Officer on a monthly basis.

A report on the status of the Company's derivative portfolio will be made at least semiannually to the Finance Committee of the Company's Board of Directors.

Senior Vice President
and Chief Financial Officer

Vice President & Treasurer

OC/PMCC2000029

**OWENS CORNING WORLD HEADQUARTERS**
ONE OWENS CORNING PARKWAY
TOLEDO, OHIO 43659
419.248.8000



June 2, 2000

<u>VIA FAX & CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

Mr. Dennis Mangan
Price Management Control Corporation
4500 South Monaco Street, Suite 1614
Denver, CO 80237

Dear Dennis:

As we discussed at Tuesday's meeting, Owens Corning will not be implementing the Asphalt Hedging program proposed by Price Management Control Corporation. As such, pursuant to paragraph 9(a) of the October 23, 1998 Agreement between Price Management Control Corporation and Owens Corning ("Agreement"), Owens Corning hereby provides Price Management Control Corporation with thirty days written notice of termination of the Agreement. Termination of the Agreement will be effective thirty days after your receipt of this notice of termination.

During our meeting you expressed concern over lost "profits" from Owens Corning's failure to implement the hedging program and you suggested that significant funds would be owed to Price Management Control if the hedges had been placed. Moreover, the Special Report dated May 30, 2000 you provided on Tuesday states that you are "owed" millions of dollars based on the "profits" of the hedging program. As you know, Owens Corning never implemented any of the hedge positions recommended by Price Management Control. As a result, Owens Corning has not realized any "profits" from the hedging program and no funds are owed to Price Management Control at this time.

We appreciate the efforts you have made on Owens Corning's behalf and would be interested in discussing the possibility of a future business relationship between our companies.

Sincerely,

Jim Hileman

cc:    Tom Lecorchick

Hileman Aff. Exh. 2

PMCC-00426

OWENS CORNING

B-25

COPY

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

IN RE:                          : Chapter 11
                                : Case Nos. 00-3837(JKF)
OWENS CORNING, et al.,          : (Jointly Administered)
                                : Related to Docket Nos.
        Debtors.                : 9344 & 9834
                                :
              - - -

        Deposition of JAMES S. HILEMAN, a Witness

herein, called as upon Cross Examination, pursuant

to the Federal Rules of Civil Procedure, taken

before Nicole D. Blaker, Registered Professional

Reporter and Notary Public in and for the State of

Ohio, at One SeaGate, 16th Floor, Toledo, Ohio, on

Wednesday, March 31, 2004, commencing at 1:00 p.m.

              - - -



**SEAGATE**

Reporting Service, Inc.

405 Madison Avenue, Suite 900 ~ Toledo, OH 43604

PHONE: 419-241-2070   TOLL FREE: 888-419-2070   FAX: 419-241-4718   WEB: www.seagatereporting.com

B-26

14

1   A   Corporate accounting.

2   Q   What were your responsibilities?

3   A   I was accountable for internal and external

4       reporting for the corporation.

5   Q   Reporting to who?  When you say internal and

6       external reporting, can you explain that a little

7       bit?

8   A   Is the question to explain what my

9       accountabilities were?

10  Q   No.  Explain -- you said one of the

11      responsibilities was internal and external

12      reporting.  Can you just explain what you mean by

13      that?

14  A   The external reporting was all SEC reporting.  The

15      internal reporting was to the financial community

16      related to our business performance, variance

17      analysis, month end closing, specific projects.

18  Q   How long did you hold that position?

19  A   One year.

20  Q   So '99?

21  A   '98.

22  Q   '98, okay.  And your next position at Owens

23      Corning?

24  A   Controller, roofing systems business, February,

25      1999.

15

1    Q    What were your responsibilities as the controller

2         for the roofing services business?

3              MR. CHEMERS:    I believe the witness

4              said roofing systems.  Mr. Edgington said

5              roofing services.

6    A    Roofing systems business.

7    Q    Thank you.  What were your responsibilities in

8         that position?

9    A    Led all accounting functions within the business.

10   Q    Who did you report to?

11   A    The roofing systems business president, Rhonda

12        Brooks.

13   Q    I'm sorry, I didn't hear you.

14   A    Would you like to know the name of the individual?

15   Q    Yes, please.

16   A    Rhonda Brooks.

17   Q    Do you know who preceded you in that position?

18   A    Yes.

19   Q    Who was that?

20   A    Patrick Knittle.

21   Q    Do you know where Mr. -- is it Knittle?

22   A    (Indicated affirmatively.)

23   Q    Do you know where Mr. Knittle went when he left

24        that position?

25   A    Yes.

16

1   Q   Where?

2   A   Controller, exterior systems business.

3   Q   Were you still the controller for the roofing

4       systems business?

5   A   No.

6   Q   When did you leave that position?

7   A   The organization has changed.

8   Q   Okay.  What was your next position within Owens

9       Corning?

10  A   Vice-president, controller, exterior systems

11      business.

12  Q   Is that the position that you currently hold?

13  A   Yes.

14  Q   When did the organization change as you put it?

15  A   The summer of 2000.

16  Q   Is that when you took that vice-president,

17      controller position?

18  A   Yes.

19  Q   Prior to your present position, I believe you said

20      you were controller for the roofing systems

21      business.  Did that position go away, what was the

22      change?

23  A   Roofing systems business consisted of the

24      residential roofing segment and asphalt segment.

25  Q   Okay.  And somehow that changed?

17

1    A    (Indicated affirmatively.)

2    Q    How?

3    A    Roofing systems business became Trumbull asphalt

4         and glass.  The exterior systems business became

5         residential roofing and vinyl siding.

6    Q    So did the -- roofing systems business became

7         Trumbull asphalt; is that accurate?

8    A    And glass.

9    Q    And glass, okay.  So the asphalt component that

10        was under the roofing systems business went to

11        Trumbull asphalt; is that accurate?

12             MR. CHEMERS:      Objection.

13   Q    I believe you described roofing system business

14        consisted of residential roofing and asphalt.  You

15        said residential roofing went to the exterior

16        systems, so where did asphalt go?

17   A    To the roofing systems business.

18   Q    Okay, it just went with -- okay.  Are you familiar

19        with the contract that's at issue in this case?

20   A    Yes.

21   Q    When did you first become aware of that contract?

22   A    Could you repeat the question?

23   Q    Sure.  When did you first become aware that the

24        contract existed?

25             MR. CHEMERS:      Objection.  You can

45

1    a refining byproduct, and prices move upward and

2    downward much more frequently than residential

3    roofing.

4  Q  The next bullet point says proposed hedging volume

5    is four to five million barrels on an annual

6    basis.  Do you see that?

7  A  Yes.

8  Q  Where did that number come from?

9  A  That's an estimate of our internal consumption for

10    the residential roofing business.

11  Q  Historically has it been in that range, to your

12    knowledge?

13  A  From a historical standpoint, I believe it has

14    been in that range.

15  Q  At the March, '99 meeting with PMCC, did you

16    discuss the volume of -- I guess did you discuss a

17    proposed hedging volume with PMCC?

18  A  We discussed the concept of only hedging internal

19    consumption consistent with the concepts that we

20    just discussed related to the Exhibit 59.

21  Q  Do you recall what Mr. Mangan's reaction was to

22    that discussion?

23  A  I don't recall.

24  Q  Do you recall discussing specific volumes of that

25    or just that it would only relate to Owens

1

1    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE DISTRICT OF COLORADO

2

Bankruptcy No. 00-3837 (JKF)

3

In Re:                              ORIGINAL

4

OWENS CORNING, et al.,

5

Debtors.

6

_____

7    DEPOSITION OF:   JOSEPH DENNIS MANGAN - February 10, 2004

8           PURSUANT TO NOTICE AND AGREEMENT, the deposition

9    of JOSEPH DENNIS MANGAN was taken on behalf of the Debtor
     Owens Corning at 1050 17th Street, Suite 2300,

10   Denver, Colorado 80265, on February 10, 2004, at 9:05 a.m.,
     before Christine Marcum, Registered Professional Reporter

11   and Notary Public within Colorado.

12              A P P E A R A N C E S

13   For the Debtor          DANIEL R. CHEMERS, ESQ
                             KARISSA D. BRIDGES, ESQ.
14                           Saul Ewing, LLP
                             100 South Charles Street
15                           Baltimore, Maryland 21203-2773

16   For the Deponent:       M. SHANE EDGINGTON, ESQ.
                             Hensley Kim & Edgington, LLC
17                           1560 Broadway, Suite 2000
                             Denver, Colorado 80202

18

19

20

21

22

23

24

25

JOSEPH DENNIS MANGAN

5

1      A.   Yes.   1974.

2      Q.   Did you have any further education beyond the

3  University of Maryland?

4      A.   No.

5      Q.   And what type of degree did you get from the

6  University of Maryland?

7      A.   Business.

8      Q.   Did you ever attend the Massachusetts Institute of

9  Technology?

10     A.   No.

11     Q.   Where are you currently employed?

12     A.   I am self-employed.  I have my own corporation,

13  Price Management Control Corporation.

14     Q.   And for ease, we'll refer to that as PMCC.  Okay?

15     A.   Sure, that's fine.

16     Q.   Does PMCC have any other employees?

17     A.   No, just me.

18     Q.   Who owns it?

19     A.   I do, 100 percent of the stock.

20     Q.   Any directors?

21     A.   Just myself.

22     Q.   When was PMCC formed?

23     A.   I believe 1994 or 1995.  I can't remember.

24     Q.   Where was it formed?

25     A.   It is a Delaware corporation.

JOSEPH DENNIS MANGAN

6

1    Q.  Why Delaware?

2    A.  Tax laws.

3    Q.  Does it have a board of directors at all?

4    A.  No.  Just me.

5    Q.  From the period from 1994 to date, have you been

6  the sole owner of stock in PMCC?

7    A.  Yes.

8    Q.  Is it a stock corporation?

9    A.  Yes.

10   Q.  Have you been the sole employee of PMCC during

11  that period?

12   A.  Yes.

13   Q.  Have you been the sole director of PMCC during

14  that period?

15   A.  Yes.

16   Q.  Has there been anyone else that's been a

17  consultant for PMCC during that period?

18   A.  No.

19   Q.  Has PMCC paid any other company for services  .

20  during that period?

21   A.  Yes.

22   Q.  Okay.  Which companies has it used?

23   A.  Zoller Energy.  I paid them for natural gas data

24  and probably bought some other data from a couple of other

25  companies early in the setup in crude oil, heating oil, and

JOSEPH DENNIS MANGAN

10

1   A.   Yes.

2   Q.   And where were the divorce proceedings?

3   A.   Colorado Springs, Colorado.

4   Q.   Any children?

5   A.   No.

6   Q.   I'd like to try to get a short description of your

7   activities between 1974, when you graduated from the

8   University of Maryland, and 1994 or 1995 when you formed

9   PMCC.

10  A.   Uh-huh.

11  Q.   So let's start back in the early days upon

12  graduation.  What did you do after graduation from the

13  University of Maryland?

14  A.   I worked for the university -- or, the university.

15  I worked for Chicago Northwestern Railroad.

16  Q.   Where were you based?

17  A.   Clinton, Iowa.

18  Q.   What was your job there?

19  A.   Laborer.

20  Q.   Labor?

21  A.   Yeah.

22  Q.   What do you mean, "labor"?

23  A.   Switchman.

24  Q.   So you were a laborer for the railroad?

25  A.   Yes.

JOSEPH DENNIS MANGAN

11

1    Q.    How long did you do that?

2    A.    About a year.

3    Q.    What did you do next?

4    A.    I went to work for Lamson Bros. & Company.

5    Q.    How do you spell that?

6    A.    L-a-m-s-o-n, Bros., B-r-o-s, and Company.

7    Q.    Where was Lamson located at that time?

8    A.    Well, it was a brokerage firm, so I think you know

9   how they got wrapped up.  Lamson Bros. at that time was

10  located out of their headquarters in Chicago.  I was in

11  Davenport, Iowa.

12    Q.    What was your position with Lamson Bros.?

13    A.    Commodity broker.

14    Q.    Did you have any experience in commodity brokering

15  before that time?

16    A.    No.

17    Q.    That's where you were trained?

18    A.    Yes.

19    Q.    And how long did you stay with Lamson Bros.?

20    A.    About a little bit over a year.

21    Q.    That would take you up to about 1976 or so?

22    A.    Yeah.

23    Q.    '76 or '77?

24    A.    Yeah, then I went to work for R.J. O'Brien.

25    Q.    What kind of work were you doing as a commodity

JOSEPH DENNIS MANGAN

12

1  broker with Lamson Bros.

2       A.    Calling on farmers, speculators, commercial

3  accounts:  Cattle, grain.

4       Q.    And you say your next employer was?

5       A.    R.J. O'Brien.

6       Q.    What business was R.J. O'Brien in?

7       A.    Same thing, commodity brokerage.  They are still

8  in existence in Chicago.

9       Q.    You were in Chicago?

10      A.    I was in Colorado Springs.

11      Q.    They were based in Chicago?

12      A.    Yes.

13      Q.    And you were in Colorado Springs in an office?

14      A.    Right.

15      Q.    Were you working as a commodities broker?

16      A.    Right.

17      Q.    Which commodities were you dealing with?

18      A.    Mostly cattle and corn, minor amounts in hogs,

19  pork bellies.

20      Q.    How long did you do that?

21      A.    Oh, I stayed with O'Brien for three years, and

22  then moved to G.H. Miller & Company.

23      Q.    Where was G.H. Miller located?

24      A.    Actually -- G.H. Miller is also located in

25  Chicago.  That's where their headquarters are.

JOSEPH DENNIS MANGAN

13

1    Q.    Where were you working for them?

2    A.    The Colorado Springs office.  Basically, that

3  office was run by me by the time I moved over to

4  G.H. Miller.

5    Q.    And the G.H. Miller office was run by you,

6  basically?

7    A.    Yes.

8    Q.    How large was that office?

9    A.    Started off myself and a secretary.

10    Q.    So when you say you were running it, you were

11  running yourself and a secretary?

12    A.    Yeah.

13    Q.    And were you operating as a commodities broker?

14    A.    Yes.

15    Q.    How long did you stay there?

16    A.    About two years, two and a half maybe.

17    Q.    When you left, how large was the office?

18    A.    Well, there was more people in it.  But it's not

19  like a normal brokerage office.  This is what's called a

20  local clearing firm versus like a Merrill Lynch.  There was

21  two other people in it, but they also had their own deals

22  with Miller, so they didn't really work with me.

23    Q.    So the office you were running, you were running

24  yourself?

25    A.    Right.  And then these guys had office space.

JOSEPH DENNIS MANGAN

14

1    Q.    Why did you leave your first job at the railroad?

2    A.    Oh, I wanted to get into the brokerage business.

3    Q.    Did you have any experience in it before that

4    time?

5    A.    Well, I grew up on a farm, so that's all you heard

6    about on the farm was prices:  corn price, cattle price, hog

7    price, soybean price.

8    Q.    How were you able to get your job with Lamson

9    Bros., your first job?

10   A.    I just went down and talked with them, said this

11   is what I want to do, are you guys hiring, do you have any

12   interest?

13   Q.    Why did you leave after one year or so?

14   A.    The payout at R.J. O'Brien was higher.  At Lamson

15   Bros. it was about 35 percent, at R.J. O'Brien you got about

16   50 percent.

17   Q.    Why did you leave R.J. O'Brien?

18   A.    The guy that I had as a floor broker down on the

19   trading floor in Chicago was moving over to G.H. Miller.

20   Q.    Why did you leave G.H. Miller?

21   A.    The guy that I was using down there decided to

22   retire, and I didn't get along very well with Gil Miller.

23   Q.    And who is Gil Miller?

24   A.    He owns G.H. Miller.  Or he did.  He's dead now.

25   Q.    Did Mr. Miller ask you to leave the company?

JOSEPH DENNIS MANGAN

15

1    A.    No.

2    Q.    Where did you go next?

3    A.    Merrill Lynch.

4    Q.    Which office?

5    A.    Colorado Springs.

6    Q.    How long did you stay there?

7    A.    A little bit over a year.  Probably '81, '82, I

8  believe.

9    Q.    What did you do with Merrill Lynch?

10    A.    The same thing.

11    Q.    Why did you leave after a year?

12    A.    I went to work for E.F. Hutton.

13    Q.    Why did you go to Hutton from Merrill Lynch?

14    A.    A better deal.

15    Q.    What do you mean by, a better deal?

16    A.    Better payout.  And they gave me a signing bonus

17  to come over.

18    Q.    How large was the Merrill Lynch office in Colorado

19  Springs?

20    A.    Oh, jeepers.

21    Q.    Approximately.

22    A.    25 to 35.  Is that okay?

23    Q.    Yes.  E.F. Hutton, was that in Colorado Springs?

24    A.    Yes.

25    Q.    Still a commodities broker?

JOSEPH DENNIS MANGAN

16

1    A.    Uh-huh.

2    Q.    You say the deal was a better deal?

3    A.    Yes.

4    Q.    Was there a signing bonus, you said?

5    A.    Yes.

6    Q.    Do you recall how much?

7    A.    Yes.

8    Q.    How much?

9    A.    100,000.

10    Q.    How long did you stay there?

11    A.    A little bit over -- I was probably there from

12    somewhere in '81 to early '83.

13    Q.    And were the commodities that you were dealing

14    with still the same commodities you described earlier?

15    A.    Yeah.  Probably the inclusion there at Hutton was

16    I was attempting to move over much more into interest rate

17    futures.

18    Q.    Where did you go from Hutton?

19    A.    I went into consulting from Hutton.  That would

20    have been late '82, '83.

21    Q.    Why did you leave Hutton?

22    A.    I didn't get along with the manager.

23    Q.    Who was the manager?

24    A.    I knew you were going to ask me that.  I can't

25    remember his name.

JOSEPH DENNIS MANGAN

17

1     Q.    What do you mean, you didn't get along with him?

2     A.    I was hired by the regional manager.  And the

3     local manager, I think, felt insulted that the regional

4     manager didn't okay it through him.  Because my office was

5     right inside, and the regional manager was also there.

6     Q.    What manifestations were there to the fact that

7     you didn't get along with him?  Did you guys have fights?

8     A.    I think just a disagreement on what I wanted to do

9     and what -- he was interested strictly on commission

10    production and I was attempting to move my business over to

11    interest rates.  Because during that time frame, as you

12    remember, interest rates were wildly erratic.  I mean, do

13    you remember the early '80s?

14          MR. CHEMERS:  Off the record.

15          (Discussion off the record.)

16          MR. CHEMERS:  Back on the record.

17    A.    Anyway, back on the record.  Interest rates were

18    extremely erratic and the cattle and grain business had

19    begun to turn extremely quiet so I thought this was an

20    opportunity to go in a different business which was much

21    broader based and much larger.

22    Q.    (BY MR. CHEMERS)  Did you go into the consulting

23    business at that time?

24    A.    Yes, when I left Hutton, I went into the

25    consulting business.

JOSEPH DENNIS MANGAN

18

1    Q.   Did you do it on your own or with some company?

2    A.   No, on my own.

3    Q.   Did you incorporate?

4    A.   No.  It was in my name for a while.

5    Q.   What was the name of that business?

6    A.   Just Dennis Mangan.

7    Q.   The business was called Dennis Mangan?

8    A.   No.  It really wasn't called anything, but if they

9    were hiring me and paying me, the checks were made out to

10   Dennis Mangan.

11   Q.   So you operated as a consultant?

12   A.   Yeah.

13   Q.   How long were you in this consulting business?

14   A.   To the fall of 1990.

15   Q.   So that was about six or seven years?

16   A.   Yeah, about seven years.

17   Q.   Was this in Colorado Springs?

18   A.   Well, part of the time in Colorado Springs and

19   part of the time up here.  I think I moved up here in 1988.

20   Q.   Describe what it is you did in that consulting

21   business.

22   A.   Gave advice on interest rates, hedging to home

23   builders.  And I also had a cattle account that I worked

24   with.  A number of home builders.  Also gave advice on

25   lumber prices.

JOSEPH DENNIS MANGAN

19

1       Q.    Who did you give that advice to?

2       A.    Home builders.

3       Q.    What kind of income did you average during that

4    period?

5       A.    Oh, I don't know.  Probably anywhere from, let's

6    say, 30,000 to 60,000.

7       Q.    Gross or net?

8       A.    Gross.

9       Q.    And that's an annual figure, I take it?

10      A.    Yeah.

11      Q.    At some point in time did you decide to change

12   from the consulting business and do something else?

13      A.    Yeah.  Bob called me up.  He was in Kansas City at

14   that time.

15      Q.    Who is Bob?

16      A.    Bob Zoller.

17      Q.    That's Z-o-l-l-e-r?

18      A.    Yes.

19      Q.    He called you and what'd he say?

20      A.    Merrill Lynch had just created this swap business.

21   And he said you really ought to talk to the office manager

22   here because this is really a good business.

23      Q.    And where did you know Mr. Zoller from?

24      A.    Colorado Springs Merrill Lynch office.

25      Q.    You were a friend of Mr. Zoller; is that right?

JOSEPH DENNIS MANGAN

20

1    A.    Yes.

2    Q.    Had you discussed with him how you were doing in

3    the consulting business?

4    A.    I just told him it was slow.

5    Q.    And he was alerting you to a possible opportunity?

6    A.    Yeah.

7    Q.    And this possible opportunity with Merrill Lynch,

8    was that in Kansas?

9    A.    Yes.

10   Q.    Had you just been divorced at this point in time?

11   A.    I was divorced in '87.

12   Q.    And what happened after he gave you that call and

13   told you that the Merrill Lynch office had created this swap

14   business?  Did you go for an interview?

15   A.    Yeah, I called up their manager and chatted with

16   him.  And he said, Why don't you come out and we'll sit down

17   and talk and go to lunch, see if you have any interest in

18   this and I have any interest in you.

19   Q.    Do you remember who the manager was?

20   A.    Yes, his name is Deek Smith, D-e-e-k, Smith.  But

21   Deek is a nickname.  And I don't remember his real first

22   name.  I don't even know if anybody said it.

23   Q.    You met with Mr. Smith?

24   A.    Yes.

25   Q.    Did you take a job?

JOSEPH DENNIS MANGAN

21

1    A.    Yes.

2    Q.    What type of job were you hired to perform?

3    A.    Commodity brokerage again.

4    Q.    Which commodities?

5    A.    Basically, any and all.

6    Q.    How long did you stay at Merrill Lynch?

7    A.    About a year and a half.

8    Q.    Was Mr. Zoller there?

9    A.    Yes.

10   Q.    So you moved, I take it, to Kansas, to take this

11   job in Merrill Lynch; is that right?

12   A.    Uh-huh.

13   Q.    Did you then remain in Kansas until you moved to

14   Colorado; is that right?

15   A.    Back, right.

16   Q.    That was sometime in the later 1990s?

17   A.    It was the spring of 1997 after my mother died.

18   She lived in Iowa.  She wasn't in good health the last few

19   years, so I wanted to stay close to her.

20   Q.    Why did you leave Merrill Lynch?

21   A.    I didn't like it; they didn't like me.

22   Q.    Why?

23   A.    I had set up a number of the deals there.  And

24   every time I set up a deal somebody in New York was paid for

25   it or interfered or screwed it up.

JOSEPH DENNIS MANGAN

22

1      Q.    How did they screw it up?

2      A.    Oh, I set up a large financing structure for a

3  large cattle company on borrowings of about $500 million to

4  feed cattle.  And that company, which was located in

5  Northern Colorado, was owned by a company in New York.  A

6  New York broker, who knew the owner of the New York company,

7  ran into him.  And the guy told him, Yeah, we're talking to

8  Merrill Lynch about doing a finance deal.  So he immediately

9  hopped into the middle of it and said, Wait a minute, that's

10  my account.  To which I said, Well, they haven't talked to

11  you for seven years.  If it's your account, why didn't you

12  show them this.  He said, Well, it's still my account and

13  I'm taking the money.

14      Q.    Is that how they screwed up the deal?

15      A.    Yeah.

16      Q.    Did the deal go ahead --

17      A.    No, the guy called me --

18      Q.    -- with anybody else?

19      A.    With anybody else or with anybody at Merrill

20  Lynch?

21      Q.    Yes, with anybody else at Merrill Lynch.

22      A.    No.

23      Q.    Why didn't they like you?

24      A.    I told them I thought that if the guy hadn't

25  called them in seven years, you know, he wasn't doing a very

**B-47**

JOSEPH DENNIS MANGAN

23

1   good job of servicing the account.  And I guess I pushed a

2   little bit too hard on that one, so they didn't like that.

3       Q.   How do you know they didn't like it?  Did they

4   tell you?

5       A.   Yes.

6       Q.   What did they say to you?

7       A.   The guy who was in New York who was in charge of

8   doing these finance transactions told me, You're making a

9   few too many waves with the gal who runs the New York

10  office.  It's the largest office in the world.  And when it

11  comes down to you getting paid or him getting paid, he's

12  going to get paid.

13      Q.   Anything else said to you?

14      A.   I said, Well, that's a bit unfair.  And he said,

15  Yeah, I know.

16      Q.   Did they terminate you?

17      A.   Yes.

18      Q.   What did you do next?

19      A.   Went back into the consulting business.

20      Q.   Did you look for a job elsewhere?

21      A.   No.

22      Q.   This is 1992 or so?

23      A.   Yeah, '92, I think.

24      Q.   Were you trading as Dennis Mangan, trading as

25  Dennis Mangan in the consulting business at this time?

JOSEPH DENNIS MANGAN

24

1     A.    In the beginning, yeah.  But probably within the
2  next year or two I formed the corporation.
3     Q.    And the corporation you're referring to is PMCC?
4     A.    Right.
5     Q.    And what kind of consulting did you start doing in
6  1992 or so in Kansas?
7     A.    I did some consulting work for National Packing
8  Company.
9     Q.    What is the business of National Packing?
10    A.    They are a large packing company, cattle
11  slaughtering operation.
12    Q.    What kind of work did you do for them?
13    A.    Analyzed futures prices and how it related to
14  their large inventory of live cattle and beef.
15    Q.    What other kind of consulting did you do?
16    A.    Then I began consulting with Yellow Freight.
17    Q.    When did you begin consulting with Yellow Freight?
18    A.    I'm going to say mid to late '92.
19    Q.    Was that a relationship that developed through
20  Mr. Zoller?
21    A.    Yes.
22    Q.    Where was Mr. Zoller at that time?
23    A.    Merrill Lynch.
24    Q.    And Yellow Freight was a Merrill Lynch account?
25    A.    Yeah, he had been doing business with them.

JOSEPH DENNIS MANGAN

25

1    Q.    Did Mr. Zoller advise Merrill Lynch that he was

2  bringing you in to help service the account?

3    A.    Well, he wasn't really bringing me in.  He would

4  do all the servicing of the account.  I would just give them

5  advice, set up the hedging program, which is what I did.

6  The same type of manual that I produced for Owens Corning.

7    Q.    Did Merrill Lynch have any type of consulting or

8  advising services?

9    A.    I don't know.

10    Q.    When you say that Mr. Zoller was servicing the

11  account, what do you mean?

12    A.    Well, if they had trades to make, he would be one

13  of the brokers that they would potentially put the trades

14  on.  And they had many other financial entities they were

15  doing business with too.

16    Q.    I take it you talked to Mr. Zoller before you went

17  to visit Yellow Freight?

18    A.    Yes.

19    Q.    What did he tell you about them?

20    A.    He said, Well, they are a big trucking company.

21  They haven't done much.  He says, I just think they don't

22  understand what they are doing or how they are supposed to

23  do it.  He says, You know, they are just kind of lost.  They

24  know they need to do something.  They just don't know how to

25  do it so they won't get themselves in a jam.

JOSEPH DENNIS MANGAN

26

1    Q.   You went and talked with Yellow Freight, I take

2  it?

3    A.   Uh-huh.

4    Q.   Who did you meet with there?

5    A.   One guy was the field procurement manager.  I

6  don't recall his name.  And the other guy was in the

7  treasury, Rick O'Dell.

8    Q.   Were you hired to do anything?

9    A.   Yes, I was hired to create a hedging program for

10  Yellow Freight for their diesel fuel consumption.

11    Q.   And when you refer to a hedging program, what are

12  you referring to?

13    A.   How to determine when to buy, how much to buy, for

14  what terms and periods, what commodity it needs.

15    Q.   For Yellow Freight was there any type of

16  documentation created that was an expression of the program?

17    A.   Yes.  The hedging manual.  The same type of thing

18  as Owens Corning.  Have you seen the hedging manual that

19  Owens Corning has?

20    Q.   Yes.

21    A.   It is the same thing.

22    Q.   Were you retained to produce a hedging manual for

23  Yellow Freight?

24    A.   Yes.

25    Q.   And that retention included the production of that

JOSEPH DENNIS MANGAN

50

1    Q.    What did he say to you?

2    A.    He said, Well, yeah, I remember somebody calling

3   me.  But you've had a number of people call me for

4   references.  He said, I don't really know what I can say,

5   other than I told people to go ahead and do business with

6   you.

7    Q.    Have you had any further calls with him?

8    A.    I chat with him from time to time.

9    Q.    About the lawsuit?

10    A.    No, about Yellow Freight.  They just purchased

11   Roadway.

12    Q.    Are you still doing business with Yellow Freight?

13    A.    No.

14    Q.    When did you stop doing business with Yellow

15   Freight?

16    A.    I believe 1997 or '98.

17    Q.    What led to the cessation of business between your

18   company and Yellow Freight?

19    A.    They terminated all consultants they had in every

20   area when they went on strike in '97 or '98 for 40 or 60

21   days because they were in a huge cash crunch.

22    Q.    Have you tried to start business with them since

23   that time?

24    A.    The markets, after the spring of '99, have been

25   too high to do any hedging.  So it wouldn't make any sense

JOSEPH DENNIS MANGAN

51

1    to try to do anything.  The price is too high.

2        Q.    And the market you're referring to as being too

3    high for hedging would be which markets?

4        A.    The petroleum markets.

5        Q.    And when did the markets get too high to make

6    hedging appropriate?

7        A.    Well, they took off from the March low, ran up

8    sharply, then reacted down.  I would say probably from the

9    mid to end '99 area.

10        Q.    I mean, you're someone who studies it.  When you

11    say mid to end '99, when was it that you stopped, basically,

12    hedging for people?

13        A.    That would have been the time where you couldn't

14    do it anymore.  The price was above the target prices that

15    the program wants to hedge at.

16        Q.    When you say, "the program wants to hedge at" --

17        A.    Yes, the hedging programs that I provide.

18        Q.    -- are you talking about different programs?

19        A.    All of them would be looking to hedge based on the

20    same price zones.

21        Q.    What was it about the cash crunch that led Yellow

22    Freight to not want to continue to hedge?

23        A.    Well, actually, they still had hedges on, it's

24    just that they cut back on all their consultants straight

25    across the board.

**B-53**

1    production numbers OC/PMCC 3 and 4.

2           Let me show you Deposition Exhibit 35 and ask you

3    if that is a confidentiality agreement that you signed on

4    July 1, 1998?

5    A.    Yes, that's my signature.

6    Q.    Why don't we keep the originals over here and not

7    mix them up.

8    A.    I put them on your pile.

9    Q.    It's okay.  But the court reporter might be

10   unhappy at the end of the deposition.

11   A.    We don't want to get her unhappy.

12   Q.    Now, did you give some chapters of the hedging

13   manual to Owens Corning after the contract was signed

14   October 23?

15   A.    Oh, yeah, then they started getting -- what I do

16   is I send them a chapter at a time, instead of sending them

17   two books.  So they get a chapter, then maybe three days

18   later they get another part.  That way they can read it and

19   spend maybe 30 or 40 minutes on it and not be overly

20   consumed by paper.

21   Q.    Did you have some of that done before the date of

22   the contract?

23   A.    Yes.

24   Q.    But you withheld it until the contract was signed;

25   is that correct?

JOSEPH DENNIS MANGAN

60

1      A.    Some of it is basically the same information I

2  sent everybody, so it just has to be updated and stuff like

3  that.  It is pretty applicable to all hedging.

4      Q.    And you had done hedging manuals similar to this

5  one in the past?

6      A.    Yes.

7      Q.    Was this one different in any way from other

8  hedging manuals?

9      A.    Well, it was an asphalt problem rather than  a

10  diesel fuel problem or crude oil problem.

11      Q.    Did that require you to do any different kind of

12  statistical analysis?

13      A.    Yeah, quite a bit of different work.  It doesn't

14  correlate as well.

15      Q.    When did you finish the last chapter of the

16  hedging manual?

17      A.    That would have been -- I'm thinking -- late

18  December, early January they would have gotten the last of

19  the manual.

20      Q.    What was the last chapter that you finished?

21      A.    It would be in the table of contents.  I don't

22  remember what it was called.

23      Q.    Is it the addendum?

24      A.    No, there's no addendum.  It just would have been

25  probably whatever the last chapter was entitled.

JOSEPH DENNIS MANGAN

72

1    A.    That's correct.

2    Q.    Your opinion in this case is that PMCC's position

3  is that full authority passed from Owens Corning to PMCC in

4  terms of hedging; is that correct?

5    A.    Yes.

6    Q.    And that PMCC had the contractual right to tell

7  Owens Corning to do whatever it decided it wanted to tell

8  Owens Corning to do; is that correct?

9    A.    Well, yes.

10    Q.    And there were no limits on that passage of

11  authority to PMCC; is that correct?

12    A.    Yes, to do the hedging, correct.

13    Q.    So it didn't matter if the board of directors or

14  anyone else at Owens Corning approved; is that correct?

15    A.    They had already approved it.

16    Q.    Sir, if in March of 1999 Owens Corning -- let me

17  rephrase this.

18          Is it your position that at all times after the

19  contract was signed and before it was terminated that

20  whatever PMCC told Owens Corning to do Owens Corning was

21  required to do without qualification?

22          MR. EDGINGTON:  Object to the form.

23    A.    Yes.

24    Q.    (BY MR. CHEMERS)  And it didn't matter if Owens

25  Corning was in a cash crunch; is that right?

JOSEPH DENNIS MANGAN

73

1    A.    They should have told me they were in a cash

2    crunch.

3    Q.    It didn't matter if Owens Corning had a cash

4    crunch that developed; is that right?

5    A.    No.

6    Q.    And it didn't matter if it was a recommendation of

7    yours that was at odds with Owens Corning's policies, did

8    it, in your view?

9    A.    They should have told me about the policies before

10   they signed the contract.

11   Q.    So your position is that total authority passed

12   from Owens Corning to PMCC to do whatever PMCC said with

13   regard to hedging; is that right?

14        MR. EDGINGTON:   Object to the form.  And asked and

15   answered.  You can answer.

16        MR. CHEMERS:   You can answer.

17   A.    Yes.

18   Q.    (BY MR. CHEMERS)  Let's look at Exhibit 36.  If

19   you would just put that in front of you.

20   A.    Uh-huh.

21   Q.    What is this document?

22   A.    It's a hedging checklist to give them guidance.

23   Q.    So this is part of the hedging manual, right?

24   A.    Right.

25   Q.    This is that last section of the hedging manual?

1    customers insofar as they sold asphalt?

2        A.    They didn't want to share that with me.

3        Q.    When did you ask for that?

4        A.    Initially I asked, you know, where does this stuff

5    go, what's the markup.  They said, Well, we have a

6    system-wide price we pay for the buying of asphalt.  For

7    every place in the country we come up with an average price,

8    which is the price we're going to give you.  We don't want

9    to disclose all of our clients to you or anything else.

10       Q.    What zone -- your damages calculation report is

11   based upon the pricing being in what zone?

12       A.    Oh, it was basically well past the 85.15.

13   Actually, it was past -- it was markedly past the lowest

14   price in all of history.

15       Q.    Does your damages report assume there should be

16   100 percent hedging as opposed to 31.5 percent hedging?

17       A.    Well, it is 31 1/2 percent each month that you are

18   in that pricing.

19       Q.    What is the assumption of your damages calculation

20   report?

21       A.    The assumption of the damages calculation report

22   is that Mitchell said to me, Well, how do we handle it that

23   we didn't do all of these trades over the last eight months?

24   I said, I'm going to look that over as far as what is the

25   best way to proceed, the best odds for the corporation and

JOSEPH DENNIS MANGAN

90

1    for the joint venture.

2        Q.    What have you done in the damages calculation

3    report in terms of the amount to be hedged?

4        A.    Well, when I did the initial report of March 13, I

5    calculated it out for a period of one year, two years, three

6    years, four years, and five years, to get where we would

7    have the best odds of being successful.

8        Q.    Exhibit 32, your damages calculation report,

9    assumes what percent of Owens Corning's asphalt procurement

10   as you understood it was going to be hedged?

11       A.    100 percent.

12       Q.    Is that one month or all months?

13       A.    100 percent for the whole entire five years.

14       Q.    Each month?

15       A.    Yes.

16       Q.    And there's nothing in your hedging manual that is

17   consistent with that, is there?

18       A.    No, not exactly.  But that was the best

19   transaction that there was available to do.  In other words,

20   I had a choice.  I could have put on two and a half years or

21   three years or three and a half years.  Since none of this

22   had been hedged for much higher prices, it was all available

23   to hedge at a lower price.  Okay.

24            So therefore I told Mitchell, I said, The best way

25   to look at this and the way I'm going to do it is to hedge

JOSEPH DENNIS MANGAN

91

1    out for the five-year period of time because that's the one

2    where we have the best odds of success.  In other words,

3    this price that we can lock up for five years has never

4    failed to make money.  If we do it for four years -- and I'm

5    paraphrasing now because I don't remember the exact

6    numbers -- I said about 96 percent of the time.  He said,

7    Wait a minute, he says, if it's 100 percent, we would be

8    foolish not to do it.  I said, That's my opinion.  That's

9    why I want to do it.

10        Q.   When was that conversation?

11        A.   Oh, I think that was Monday or Tuesday when

12   Hileman stopped the meeting and said, Okay, if we're going

13   to do this, obviously, I've got to go down and talk to the

14   CFO here for a second.

15        Q.   In that conversation did you say -- I didn't quite

16   hear.  Did you say I want to hedge 100 percent of your total

17   procurement?

18        A.   Yes.

19        Q.   And did anyone ever say to you that there were 17

20   million barrels of total procurement?

21        A.   Oh, yes, Mike Mitchell.

22        Q.   Had there been a discussion earlier that you were

23   going to hedge 100 percent of procurement?  Had you ever

24   told Owens Corning that before the contract?

25        A.   It was understood we might hedge one year, two

JOSEPH DENNIS MANGAN

92

1    years, three years.

2        Q.    Putting aside one year, two years, or three years

3    I'm talking about the percentage of the total procurement.

4        A.    Sure, they knew, when we initially discussed the

5    program and how I do this, that the hedges would go right up

6    to 100 percent of the year's usage.

7        Q.    Is there anything in the hedging manual that says

8    that, because I just see the 31 1/2 percent?

9        A.    It is in other places.  See, you could do 31 1/2

10   percent this month, and 31 1/2 percent next month, and

11   you're doing it for a whole year.  Okay.  So this month you

12   do 31 1/2 percent, next month you do 31 1/2 percent, and the

13   month after you do 31 1/2 percent, well, obviously, at that

14   point then you have 94 1/2 percent hedged.  Okay?  You

15   understand how they pile?  Then you would have maybe 6 or

16   8 percent to put on.

17       Q.    Your damages calculation report assumes 100

18   percent in the first month; is that right?

19       A.    Yes.

20       Q.    In fact, it assumes 100 percent based upon the.

21   prices, the Friday before --

22       A.    Right.

23       Q.    -- you had even sent your March recommendation to

24   Owens Corning; is that correct?

25       A.    Correct.  I mean, I couldn't send them Monday's

JOSEPH DENNIS MANGAN

96

1  recommendation; is that your testimony?

2      A.    Well, yeah.  First of all, to tell them how to do

3  it, okay, tell them what we're going to do.  And then, on

4  top of that, to explain why this is the best scenario.

5      Q.    But you were the hedging czar at this point, so it

6  didn't really matter; is that your testimony?

7      A.    Ultimately, yes.  The worst thing I can do is put

8  these people in a bad position where they will look stupid.

9  They are not going to appreciate that and I am going to have

10  to work with these people for the next five years.  So to

11  help them, to get them more up to speed so they have a

12  better clue of what's going on and they can say, Yeah, now

13  that you've explained it to me, I understand.

14      Q.    So you were doing a favor for these people by

15  trying to education them in something that they had no

16  decision-making authority in; is that right?

17          MR. EDGINGTON:  Object to the form.

18      A.    I wouldn't call it a favor.  It is a

19  responsibility that I have as one of the members of the

20  joint venture.

21      Q.    (BY MR. CHEMERS)  What role were the people you

22  were talking to going to play in this hedging that you were

23  recommending?

24      A.    They were there to learn and understand what was

25  going on, because it was directly affecting their particular

JOSEPH DENNIS MANGAN

97

1   area, Mike Mitchell's area, Jim Hileman, Tom LeCorchick

2   works with Mitchell.  Ed Mirra, I know, was above both of

3   them.

4        Q.   But at the point that you as czar said, I want

5   this to be done, because you had the right to say that,

6   that's your testimony, who was going to do what to execute

7   your orders?

8             MR. EDGINGTON:  Object to the form.

9        A.   Jim Hileman would take the directions from me and

10   I would say -- I wouldn't say, I direct and order, but I

11   would say, Jim, this is what we need to do now.  He would go

12   ahead and take the order and say, Okay, I'll call up Jack

13   and put the orders in.

14        Q.   (BY MR. CHEMERS)  Your testimony is that you had

15   the right to order Jim Hileman and anyone else in Owens

16   Corning to do exactly what you wanted to have done because

17   they had contractually agreed to that?

18        A.   That's right.

19        Q.   Who would you have the right to order to do what

20   to carry out your instructions?

21        A.   Jim Hileman.

22        Q.   In this connection, with your March

23   recommendation, what was your instruction to Jim Hileman?

24        A.   Buy five years of hedges as of right now.

25        Q.   What would he then have to do?

JOSEPH DENNIS MANGAN

112

1    Q.   So all of these contracts were $100 an hour or

2    less for your time?

3    A.   Well, it might have been $100 an hour or more, I

4    might have completed the work in less than rather than more

5    time.

6    Q.   Sure.  But based upon your prediction of the

7    hours?

8    A.   It should be about $100 an hour.

9    Q.   Did you in some cases try to overstate the number

10   of hours that would be used so you would be able to

11   negotiate on that?

12        MR. EDGINGTON:  Object to the form.

13   A.   No.  I told them what I thought it was going to

14   take.  It wouldn't matter if I told them it was 800 hours,

15   he probably wouldn't sign the contract.  And I knew how much

16   it was going to take, or pretty close.  I might miss it by

17   10 or 15 percent.  This one, as a matter of fact, I missed

18   by more than 10 or 15 percent.

19   Q.   (BY MR. CHEMERS)  Do you remember that you

20   proposed to Owens Corning an hourly rate of $325 an hour?

21   A.   Yes.

22   Q.   Why did you propose to Owens Corning a rate of

23   $325 an hour when were you working for everyone else at $100

24   an hour or less?

25        MR. EDGINGTON:  Object to the form.

JOSEPH DENNIS MANGAN

113

1    A.    Because it was pretty clear by Keener Hudson, I

2    did Keener's at the lower rate than what I wanted to charge

3    because he told me he wanted to get Owens Corning involved

4    in this, he knew it was the right thing to do.  So I knew

5    there was two sets of work there.

6         By the time I got done with this one, I knew what

7    a nightmare it was to go through that asbestos stuff --

8    asbestos -- asphalt, and that it was going to be a very

9    difficult project.

10   Q.    (BY MR. CHEMERS)  So, therefore, it might take you

11   more hours; is that your testimony?

12   A.    Not only more hours but it was going to be a lot

13   harder project to do.  There wasn't the correlation between

14   diesel fuel and heating oil.  When I got into this one I

15   also saw the same thing with these other things that he had

16   that I had to analyze, I believe part of it was 50 this, 100

17   this, and the 450 bright stock was something that drove me

18   wild.

19   Q.    So because you anticipated it was going to be --

20   A.    A very difficult project.

21   Q.    -- a more difficult analytical project, you would

22   charge --

23   A.    More money.

24   Q.    -- more than three times as much per hour; is that

25   your testimony?

JOSEPH DENNIS MANGAN

114

1      A.    Yes.

2      Q.    Did you tell Owens Corning that you were charging

3   them a lot more than you were charging anybody else?

4           MR. EDGINGTON:  Object to the form.

5      A.    No, they didn't ask.  They asked for a contract,

6   so I sent them one.

7           MR. CHEMERS:  Why don't we take a break here.

8   It's 12 o'clock.

9           (Lunch recess taken.)

10     Q.    (BY MR. CHEMERS)  Okay.  We have marked as

11  Exhibit 43, Mangan 43, a multipage document that says at the

12  top, Weekly Hedging Report, Week Ending January 8, '99, with

13  production numbers OC/PMCC 81 through 118.

14          Mr. Mangan, you have Exhibit 43 in front of you.

15  And I think we asked you to produce weekly hedging reports.

16  Do you maintain weekly hedging reports?

17     A.    No, I build these up.  They are extensive

18  documents and all the background information is quite large.

19  So I keep these for about between three and six weeks before

20  I erase them from the computer.

21     Q.    And during, say, the years 1997 through 2000 or

22  so, were you producing weekly hedging reports?

23     A.    Yes.

24     Q.    And did they go to all of your clients?

25     A.    Yes.

JOSEPH DENNIS MANGAN

165

1  carrying out whatever proposed hedging program that you came

2  up with, but that you would actually tell Owens Corning what

3  it had to do and that Owens Corning could not dissent?

4          MR. EDGINGTON:  Object to the form; and asked and

5  answered.  You may answer.

6      Q.   (BY MR. CHEMERS)  Did you ever tell that to them?

7      A.   I don't know how I worded it.  Like I say, the

8  wording was, You have to do the trades, Mike.  He said, We

9  understand that.  We want you to do the trades and we want

10  you to run the program.  I mean, that's the basis of the

11  whole conversation.

12      Q.   Let's have marked as Exhibit 51 a one-page

13  document, production number PMCC 9 -- or 2000009.

14          MR. EDGINGTON:  Are we on 51?

15          MR. CHEMERS:  It will be 51.

16          MR. EDGINGTON:  Thank you.

17      Q.   (BY MR. CHEMERS)  Mr. Mangan, is Exhibit 51 a

18  document that you received on or about September 27, 1998,

19  with the proposed revised contract that had been revised in

20  accordance with your wishes by Owens Corning?

21      A.   Yes, I think so.

22      Q.   And Mr. Mitchell sent you that document, correct?

23      A.   Yes.  I'm sure he did, his name is on it.

24      Q.   Did you discuss any of the contents of that

25  document after he sent it to you?

JOSEPH DENNIS MANGAN

166

1    A.    No.

2    Q.    Did you understand that a final signed contract

3    was going to be used as part of the process to get final

4    senior management approval at Owens Corning?

5    A.    No.

6    Q.    Did you read Exhibit 51?  I'm asking, did you read

7    it at the time you received it?

8    A.    Oh, I'm sure I did, sure.

9    Q.    And you did not call Mr. Mitchell back to discuss

10   it?

11   A.    No.

12   Q.    In the second paragraph it says, "In task 1 of

13   your write-up you reference 9 different contracts and

14   methods of pricing.  I assume these are illustrative of

15   methods available.  Some of these methods are not consistent

16   with our derivatives policy as approved by the Owens Corning

17   board of directors."  What did you understand them to mean

18   there?

19   A.    I'm not quite sure what he was referring to, to be

20   honest with you.  Task one.  These are basically generalized

21   methods of pricing out commodities futures contracts.

22   Q.    Well, did you want to figure out what it was and

23   speak to Mr. Mitchell about what it was that he was talking

24   about?

25   A.    No, I don't remember -- I don't remember

JOSEPH DENNIS MANGAN

170

1      A.    Well, are we talking after --

2      Q.    (BY MR. CHEMERS)  Yes, January of 1999, after the

3  agreement that was signed that you believed conveyed all

4  power and authority to you.

5          MR. EDGINGTON:  Object to the form.

6      A.    Okay.  Repeat your question now.  I'm trying to

7  keep dates straight.

8      Q.    (BY MR. CHEMERS)  How many meetings did you have,

9  training meetings?

10     A.    Training meetings, we had two.  We had one in

11  Toledo, Ohio, in January or February.  And I think we had

12  another one out here, I believe it was late February or

13  early March.

14     Q.    And who was at the first one?

15     A.    Mike Mitchell was at it.  He was the only one who

16  attended both days of meetings.  Tom LeCorchick came in for

17  a short period of time on each day, had lunch, and then had

18  other things to do.  The same with Ed Mirra and Ward Melat.

19  And Jack Schneider was there for the first hour of the

20  meeting the first day.

21     Q.    And why did you have to have -- did you have a

22  second meeting?

23     A.    We had another meeting the next day at Owens

24  Corning to finish the -- it was a two-day meeting.  So we

25  had the meeting the next day.  At the end of the first day's

JOSEPH DENNIS MANGAN

174

1   In most meetings was there any discussion of the need that

2   there would have to be for senior management approval or any

3   further approvals before any hedges could be placed?

4       A.   No.

5       Q.   You recall no such discussion?

6       A.   No.

7       Q.   After those meetings, were there any other

8   discussions you had in the January through early March time

9   frame with anyone from Owens Corning?

10      A.   The only other discussion, other than the two

11  meetings where we went through to give these guys a

12  background on what hedging was all about and what they were

13  going to do, was that they, in the meeting -- out here in

14  Denver, Colorado, was where the second meeting was at --

15  they said, Okay, what do we do now?  I said, Does anybody

16  have any questions about the hedging manual, how it works,

17  et cetera.  No.  Okay.  I said, In that case, I'll now write

18  up a report to you and explain to you what we're going to

19  do.

20      Q.   So you said, I'll write you a report?

21      A.   Right.

22      Q.   And that's when you came up with the March

23  recommendation; is that right?

24      A.   Right.

25      Q.   Exhibit 31, correct?

JOSEPH DENNIS MANGAN

175

1    A.    Uh-huh.

2    Q.    And after you described that you sent them

3    Exhibit 31, probably got there on that Monday after --

4    A.    Well, it had to get there, I believe, on Monday.

5    Q.    The 15th we think?

6    A.    Yeah, the 15th, I think, by Fed Ex.  It went out

7    Sunday, so it would be there Monday morning.

8    Q.    It went out Sunday?  Is there any Fed Ex pickup on

9    Sunday?  I don't think so.

10   A.    Yeah, there's one right down in the DTC, I

11   believe.  I might be wrong on that.

12   Q.    Let's assume it got there March 15 or March 16.

13   You think it went out on Sunday, huh?

14   A.    I think so.

15   Q.    You sent it to someone; is that right?

16   A.    Yes.

17   Q.    In March 1999.

18   A.    It was there either Monday or Tuesday, the 15th or

19   16th.

20   Q.    Because you talked to people who said they got it?

21   A.    No.  We had a conference call for over an hour.

22   Q.    You spoke to people on that conference call?

23   A.    Yes.

24   Q.    Did they indicate they had received it?

25   A.    Oh, yeah.  We went through it page by page.

JOSEPH DENNIS MANGAN

176

1    Q.    So what you had sent them had been received?

2    A.    Yeah.  I believe I sent five or six or seven

3  copies of it, too, for all the people.

4    Q.    Who was on that conference call?

5    A.    Mike Mitchell would have been on it, Jim Hileman,

6  Jack Schneider, Tom LeCorchick.  I don't know who else may

7  have been sitting in on it.  Those are the ones that I

8  remember speaking to.

9    Q.    And what was said by you at that conference call

10  and what did these folks say?

11    A.    I said, basically, what the situation is.  You

12  know, we can put on hedges between one and five years.  If

13  we put them on for one year, the odds would be about -- I

14  don't know.  Do we have that document?

15    Q.    It says Exhibit E on the upper right.

16          THE DEPONENT:  Which document?

17          MR. EDGINGTON:  30, or is it 31?

18    A.    I went through it, explained it to them.

19    Q.    (BY MR. CHEMERS)  Is this something you remember

20  because you're reading it now?

21    A.    Oh, no, I remember.  Basically, if you turn to

22  page 3 -- the charts aren't very good, obviously, the

23  copies -- the essence is the monthly probability of asphalt

24  staying at $60 is 25 percent.  For one year, 21.14, for two

25  years 14.44.

JOSEPH DENNIS MANGAN

177

1    Q.    Where are you?

2    A.    Page 3, where it says, "Current Prices and Odds to

3    maintain that Price for Varying Periods of Time."

4    Q.    Okay.

5    A.    Four years -- or, for three years, 12.12, 2.30,

6    and for five years, 0 percent.  The late option of crude oil

7    is at 14.49, so we went through that also, the late option

8    of heating oil, gasoline, then the crude basis.

9    Q.    So you went over the contents of this; is that

10   right?

11   A.    Yes, explained exactly how it was going to work.

12   Q.    What else happened?

13   A.    We had discussion and they wanted an explanation

14   of what that meant, which we did.

15   Q.    When you say "we," are you talking about yourself?

16   A.    Well, actually, some of them -- Mike Mitchell

17   worked fairly hard at getting an understanding of this, so

18   he would also interject in the conversation over the phone.

19        Then, basically, there was a bunch of data which

20   gave explanations of where things were at so that they could

21   see that.

22   Q.    After you explained what was in Exhibit 31, what

23   was said?

24   A.    They said, Okay, this looks great, we want to do

25   it.

JOSEPH DENNIS MANGAN

1          Then if you go back to page 9, and it says, I

2    believe we are currently sitting on the opportunity of a

3    lifetime from a business point of view in Crude Oil and

4    Asphalt.  The situation can best be summed up as follows:

5    Asphalt is in the lowest 25 percent of its price range since

6    1988.

7          Q.   I read this stuff.  I'm just wondering, after you

8    explained it, what was said?

9          A.   They said, Okay, fine, we understand.  We're ready

10   to go.  Exactly what are we going to do?  I said, Well,

11   we're going to hedge five years using crude oil.

12         Q.   What else was said?

13         A.   Then they said, Well, okay.  That's it?  I said,

14   Yeah.  I said, So what we want to do is put on 17 million

15   barrels per year for five years.

16         Q.   So you said that in that conversation, put on

17   17 million per year for five years?

18         A.   Yes.

19         Q.   What was said in response?

20         A.   Everybody said, Well, okay.  Jim Hileman said,

21   Well, okay.  I just need to go down and talk to the CFO and

22   let him know what we're doing.  He said, That's not in the

23   contract.  He said, Well, hey, the guy's my boss.  I said,

24   When are you going to talk to him? He said, I'll probably

25   talk to him this afternoon if not in the next hour.  He

**B-74**

JOSEPH DENNIS MANGAN

179

1    said, I'll call you back as soon as I talk to him.

2        Q.   What happened next?

3        A.   He didn't call back that day so I called back the

4    following morning, talked to him, and I said, What's going

5    on.  He said, Well, the CFO wants to run it by the

6    accountants.  I says, That's not in the agreement.  He said,

7    Well, I don't know.  I said, What do you mean, you don't

8    know.  He said, Well, I haven't read the contract.  I said,

9    So you didn't read the contract?  He said, Well, no.  I

10   said, That's not in the agreement.  The board has already

11   approved this as a joint venture.  He says, Well, you know,

12   I don't know what to tell you.  He says, As far as I know,

13   no hedging program can go forward at Owens Corning without

14   the CFO's approval.  What do you want me to do?  I can't go

15   down there and tell the guy what to do, he's my boss.

16       Q.   What was said next?

17       A.   I said, Well, I think you guys -- I said, we need

18   a meeting with the CFO now, not next week, not tomorrow, I

19   mean now.  We need to get him on the phone.  No, that can't

20   happen, he says, I will get back to you, I guarantee you,

21   tomorrow.

22       Q.   What happened next?

23       A.   He called me up and he said, Well, the accountant

24   said we can't hedge, so we can't hedge.

25       Q.   When did that occur?