1

```
 1                IN THE UNITED STATES BANKRUPTCY COURT
                       FOR THE DISTRICT OF DELAWARE
 2
        Bankruptcy No. 00-3837 (JKF)
 3
        In Re:                                      ORIGINAL
 4
        OWENS CORNING, et al.
 5
        Debtors.
 6        _____

 7      DEPOSITION OF:  ROBERT ZOLLER - February 9, 2004
         _____
 8
                   PURSUANT TO NOTICE, the deposition of ROBERT
 9      ZOLLER was taken on behalf of the Debtor Owens Corning at
        1050 17th Street, Suite 2300, Denver, Colorado 80265, on
10      February 9, 2004, at 10:02 a.m., before Debbie Zoetewey,
        Registered Merit Reporter and Notary Public within
11      Colorado.
                         A P P E A R A N C E S
12
                                    DANIEL R. CHEMERS, ESQ.
13      For the Debtor              KARISSA D. BRIDGES, ESQ.
        Owens Corning:              Saul Ewing, LLP
14                                  100 South Charles Street
                                    Baltimore, Maryland  21203-2773
15
                                    M. SHANE EDGINGTON, ESQ.
16      For the Deponent:           Hensley Kim & Edgington, LLC
                                    1560 Broadway
17                                  Suite 2000
                                    Denver, Colorado  80202
18
                                    Dennis Mangan
19      Also Present:

20

21

22

23

24

25
```

1

1    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE DISTRICT OF DELAWARE

2    Bankruptcy No. 00-3837 (JKF)

3    In Re:

4    OWENS CORNING, et al.                    **ORIGINAL**

5    Debtors.

6    ――――――――――――――――――――――――――――――――――

7    DEPOSITION OF:   ROBERT ZOLLER - February 9, 2004

8              PURSUANT TO NOTICE, the deposition of ROBERT
9    ZOLLER was taken on behalf of the Debtor Owens Corning at
     1050 17th Street, Suite 2300, Denver, Colorado 80265, on
10   February 9, 2004, at 10:02 a.m., before Debbie Zoetewey,
     Registered Merit Reporter and Notary Public within
11   Colorado.

                    A P P E A R A N C E S

12

13   For the Debtor          DANIEL R. CHEMERS, ESQ.
     Owens Corning:          KARISSA D. BRIDGES, ESQ.
                             Saul Ewing, LLP
14                           100 South Charles Street
                             Baltimore, Maryland  21203-2773

15

16   For the Deponent:       M. SHANE EDGINGTON, ESQ.
                             Hensley Kim & Edgington, LLC
17                           1560 Broadway
                             Suite 2000
                             Denver, Colorado  80202

18

19   Also Present:           Dennis Mangan

20

21

22

23

24

25

ROBERT ZOLLER

24

1    Q.   What else?

2    A.   And I -- Zoller Energy also consults to a

3    limited degree.

4    Q.   What do you consult on?

5    A.   Natural gas.  And I consult to clients that --

6    and I also consult in the area of crude oil, heating oil,

7    gasoline, natural gas, on a consultative basis with

8    clients that are entering into transactional business with

9    me.

10   Q.   I understand the marketing of energy swaps has

11   something to do with hedging; is that right?

12   A.   That's right.

13   Q.   Does it always have something to do with hedging

14   the marketing of energy swaps?

15   A.   In my case or in general.

16   Q.   In your case?

17   A.   Yes.

18   Q.   And can you give me a capsule description of

19   what you would define or you do define hedging as for this

20   purpose in your business?

21   A.   Taking an offsetting position equal and opposite

22   to the commodity that you're either buying or selling to

23   protect yourself against adverse price maneuvers.

24   Q.   Is the purpose of a hedge to try to control

25   volatility or is it to make money?

ROBERT ZOLLER

25

1        A.    The purpose of a hedge is to control revenue or

2    profits.

3        Q.    Control earnings?

4        A.    Yes.   To -- they can be for that -- yes, it can

5    be for that, to control earnings.

6        Q.    Well, you said revenue or profits.   When you say

7    control in that context, what do you mean by control

8    revenues or profits?

9        A.    Can I give you an example?

10       Q.    Sure.

11       A.    For example, if you were a crude oil producer

12   and if your revenues would be adversely hurt with the

13   price of crude oil dropping, you would sell a crude oil

14   swap into the future, basically giving you a short

15   position in the marketplace.   So that if crude oil prices

16   dropped, you would have a profit in crude oil that would

17   go to offset reduced revenues that you're seeing from the

18   sale of crude oil at the wellhead.

19       Q.    I guess my question is fairly simple.   When you

20   say control, do you mean to have an equal and opposite

21   effect, which I believe you said earlier, so that you are

22   basically just offsetting; or are you trying to actually

23   make money on it beyond an offset in your view of hedging?

24       A.    It can be both.

25       Q.    And when is it one and when is it the other, in

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| **OWENS CORNING, et al.** | : | **Case Nos. 00-3837 (JKF)** |
| Debtors. | : | **(Jointly Administered)** |
| | | Related to Docket Nos.: 9344 and 9834 |

### AFFIDAVIT OF GARY W. DORRIS

1.    I, Gary W. Dorris, am more than eighteen years of age, am competent to testify as a witness. I have knowledge of the facts set forth below from interviews I have conducted with Owens Corning personnel and my review of documents from this proceeding, including pleadings, affidavits, documents produced by the parties, and the deposition and testimony of Mr. Mangan and Mr. Zoller. A copy of my Curriculum Vitae is attached as Exhibit 1.

2.    I am familiar with the claims and evidence in this proceeding.

3.    PMCC's Hedging Manual describes what is a crude oil trading strategy, not a commodity hedging strategy. A hedging strategy can be developed only in conjunction with a study of a company's business risk.

4.    Mr. Mangan never studied Owens Corning's business, and never had a basis for recommending (among other things) how much of its asphalt procurement might be appropriate for hedging. Mr. Mangan's Hedging Manual does not address the issue of reducing Owens Corning's business risk.

5.    Based upon the information I have examined, Owens Corning was a candidate in early 1999 for hedging a few months worth of its internal usage (approximately 4 million barrels per year) on a time-limited basis. Mr. Mangan says he instead recommended that Owens Corning purchase 85 million barrels of crude oil futures in order to "hedge" the cost of its asphalt

supply. In other words, Mr. Mangan says he proposed that Owens Corning accept a $1.29 billion derivative position in a poorly correlated hedging commodity in order to address what was a very limited asphalt procurement risk. Such a massive investment in a derivative position would have constituted a speculative trading strategy that would have astronomically increased Owens Corning's financial risks. Such an investment would have been unprecedented in size, and utterly imprudent for a public company such as Owens Corning. Mr. Mangan's "program" and his claimed trading recommendation reflected highly speculative trading strategies, not a plan for hedging procurement price risk.

6.    Mr. Mangan's claimed mid-March 1999 trading recommendation (see above) was, in addition to everything else, inconsistent with his own Hedging Manual.

I declare under the penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

Date: _6/28/04_____                    _____

GARY W. DORRIS

-2-

B-80

# EXHIBIT 1

# GARY W. DORRIS

Tel. (303) 415-1400, gdorris@ascendanalytics.com

## EMPLOYMENT HISTORY

| | | |
|---|---|---|
| *President* | *Ascend Analytics* | Boulder, CO (2002-present) |
| *CEO and Chief Model Architect* | *e-Acumen* | Boulder, CO (2000-2001) |
| *Director of Energy Practice* | *Stratus (Hagler Bailly spinoff)* | Boulder, CO (1998-1999) |
| *Manager and Senior Associate* | *Hagler Bailly* | Boulder, CO (1997-1998) |
| *Faculty* | *Cornell University* | Ithaca, NY (1996) |
| *Power Marketing Manager* | *Citizens Power & Light* | Boston, MA (1990-1991) |
| *Power Supply Supervisor* | *UNITIL Power Corp* | Exeter, NH (1988-1990) |
| *Project Engineer: CO-OP* | *Electric Power Research Inst.* | Barker, NY (1987) |

## SUMMARY

- Developed an energy supply plan managing for costs and risks for PG&E's emergence from bankruptcy.
- Developed portfolio and risk management infrastructure and operating policies for supply procurement, retail offer pricing, hedging, and risk reporting for Entergy Solutions, Duke Solutions, The Energy Authority, and ConEdison Solutions.
- Developed a suite of industry-leading analytic products that support physical and financial risk management, trading, and structured transactions sold to 30 of top 100 energy companies. Grew e-Acumen to leader in energy trading and risk analytics with 60 people.
- Performed numerous independent market assessments for valuation of electric generating assets and gas storage facilities:
  - Assessments for financing of over $5 billion in generating and gas storage assets.
  - Valuations performed for leading energy developers, banks, and S&P and Moody's.
- Developed the key expert report for EPA's promulgation of the "SIP Call" addressing $NO_x$ emission controls and trading across the 22 eastern states.
- Performed one of the first above cost electricity transaction in US in (1988).
- Delivered expert testimony regarding: risk and portfolio management, asset valuation, trading practices, market power, rate design, and emissions trading.
- Received Distinguished Recognition in 2001 by the International Petroleum Exchange for innovations and contributions to the field of energy risk management..

## EDUCATION

Cornell University, Ph.D., Applied Economics and Finance, 1996

Cornell University, B.S., Mechanical Engineering, B.A., Economics, Magna cum Laude 1988

Ascend Analytics

**B-82**

## PROFESSIONAL EXPERIENCE

Gary W. Dorris, Ph.D., is President of Ascend Analytics and has been involved in the energy industry for over 15 years. He has written and delivered expert testimony regarding: risk management, trading practices, asset valuation, market power, rate design, and emissions trading. He has developed over ten analytic software products used by 30 of the top 100 energy companies. He served as CEO and Chief Model Architect for e-Acumen, a 60 person energy consultancy and software analytics firm, where he developed a suite of applications for modeling energy risk and the complexities of competitive energy markets. He has also provided independent expert reports for financing of over $5 billion in electric generating and gas storage assets. He directed the development of the analytic infrastructure and risk management policies for the launching of the trading floors of Entergy Solutions, DukeSolutions, The Energy Authority, and ConEdison. Before e-Acumen, he founded and directed the energy practice at Stratus Consulting and was a manager at Hagler Bailly. He has also traded power and structured power sales contracts at Citizens Power & Light and performed one of the first above cost market transaction in 1988 at UNITIL Power Corp.

Before joining Hagler Bailly in 1997, he was a faculty member at Cornell University, where he taught a doctoral-level course in modeling competitive energy markets. Dr. Dorris actively publishes research articles and speaks on portfolio management, risk analysis, and modeling of competitive energy markets. He has been honored in 2001 by the International Petroleum Exchange for his innovations and contributions to the field of energy risk management.

### EXPERT TESTIMONY

***Power Contract Valuation***                                                                      2004
*Goldenhersh v. Combined Energy Corp*, Colorado proceeding (testimony)

***Energy Risk Management and Trading Practices***                                     2002
*Nevada Power v. MGM Grand*, Nevada proceeding (testimony)

***Emissions Trading***                                                                                  2000
*AES Corp. v. Allegheny Power*, Pennsylvania proceeding (testimony and deposition).

***Intellectual Property of Derivative Trading Analytics***                         2000
*Koch Industries v. Scott Putnam*, Kansas State Court proceedings.
(supervised deposition and testimony).

***Power Contracts Litigation***                                                                    1999
*Alcan and Alcola Big Rivers Smelters v. Kentucky Electric*, Kentucky state court
proceeding. (testimony submitted).

***Environmental Damages***                                                                        1998
*US EPA v. Mid-west Ozone Group*, Washington D.C. federal court, (expert report).

***Cost Unbundling/Market Power***                                                            1997
*Bankruptcy of Cajun Electric COOP*, Louisiana state court, (testimony submitted).

Ascend Analytics

*Rate Design and Demand Response Program*                                      1989
*UNITIL Power Corp. v. New Hampshire Consumer Advocate.* State commission proceedings, (testimony).

## POWER MARKET ANALYSIS                                                    1998-2004

- *Market Assessment and Asset Valuation:*

  Dr. Dorris developed Stratus Asset Modeler (SAM) in March of 1999 (now PowerVal) as a new market based framework to value generating assets in competitive electricity markets. PowerVal was the first market based asset valuation technique to receive approval by S&P and Moody's and has become widely accepted by developers and the finance community as the most advanced tool for valuing power plants with the following clients:

  | **Developers** | **Financial Institutions** |
  |---|---|
  | AES Corporation | *Investment Banks* |
  | Columbia Electric | - CS First Boston |
  | Mosbacher Power | - Lehman Brothers |
  | PP&L Global | *Commercial Banks* |
  | US EPA | - GE Capital |
  | Enron | - Bank of Tokyo |
  | Xcel Energy | - Citibank |
  | Sempra Energy | *Credit Rating Agencies* |
  | Tampa Electric Co. | - S&P |
  | Select Energy | - Moody's |
  | El Paso | |
  | Energetix | |

- *Market Power:*
  - Evaluated electricity market price manipulation of Enron trading.
  - Estimated HHI and Lerner index for PJM deregulation initiatives. Filed results as part of market design report to state commission.

- *Capacity Market Design:* Drafted design of a capacity market for the CAISO.

## OIL AND GAS MARKET ANALYSIS

- *Market Assessment and Gas Storage Valuation:*
  Dr. Dorris developed AcuStorage in July 2000 and re-introduced a more advanced version in 2003 as *GasVal* to capture the full value of storage assets for project analysis, mark to market energy accounting, and deal structuring. With the use of state-space modeling to capture the underlying dynamics of gas market behavior, his market analysis and asset valuations have been performed for industry leaders in gas storage including:

  ENSTOR
  TXU

Ascend Analytics

      Pinnacle West
      PZ Oil
      TECO Energy
      Halliburton
      Baker Hughes Christensen

- *Energy Cycle Forecasting:*
  - Forecasting of rig counts for top two energy field service companies
  - Development of Paschc price index and index forecast for energy services

- *Portfolio Analysis:* Developed corporate strategy for portfolio risk analysis and capital investment allocation for large oil field service company.

## ENERGY RISK AND SUPPLY PROCUREMENT                              1988-2004

- *Trading Floor Launches:*
  - Launched the trading floors of Entergy Solutions, Duke Solutions, The Energy Authority, and ConEdison including top to bottom analytics and trading/supply procurement practices.
  - Supplied major risk management and deal analysis infrastructure for Entergy, TXU, PZ Oil, and Pinnacle West.

- *Power Trading:*
  - Executed of over 100 short-term and long-term power sale agreements for both utilities and IPPs.
  - Performed one of (if not) the first above cost electricity transaction in the US in 1988.
  - Marketed and structured complex long-term tolling contracts.
  - Pioneered first non-utility power transactions and marketed power at Citizen Power and Light (subsequently Citizens Lehman and now Edison Mission).

- *Risk Management:* Developed and implemented risk management policy and procedures for four trading floors.

- *Sarbaines Oxley:* Performed internal audits, implemented policies and procedures, defined corporate structure governance, and implemented software solutions

- *Supply Procurement:*
  - Developed least cost resource plan filing with risk analysis for PG&E.
  - Executed energy supply procurement for UNITIL Power Corp.

- *Trading from Fundamental:* Trained power traders on short-term trading strategies and identification of hedging strategies based on real-time market fundamentals. Clients included: Duke, TXU, PP&L, ConEd, Coral, El Paso, Reliant, CMS, and BP.

Ascend Analytics

### DISTRESSED UTILITIES                                          1990-2004

- *PG&E:* Developed energy supply portfolio analysis for commission filings and credit risk mitigation for the bankrupt utility. Implemented energy risk management policies and software solutions.
- *Cajun Electric COOP:* Economic support for bankruptcy trustee including workout scenarios, power purchasing strategy, and preparation of expert testimony.
- *Colorado Utah:* Sold excess generation to mitigate losses and maintain operations.
- *PSNH:* Developed counter party protective measures to continue supply trading.

### ANALYTIC SOFTWARE DEVELOPMENT                                1997-2004

Developed a suite of analytic software products for energy risk management, asset decision analysis, and energy trading that were sold to 30 of the 100 energy companies. After merging his business activities and software from Stratus with e-Acumen, he served as CEO and Chief Model Architect. Since founding Ascend, he has developed a second generation suite of analytic products which include:

- *PowerSimm:* Monte Carlo simulation of financial instruments and physical assets (power generation, retail load, and oil/gas refining and production) for risk measurement CFaR, EaR, and VaR, deal analysis, and structuring.
- *PriceSimm:* Simulates forward markets and spot commodity prices through structural state space models with explanatory factors such as intertie flows, gas transportation, regional load (LoadSimm), gas storage levels, hydro generation (HydroSimm), supply stack, system conditions.
- *PowerVal:* Values generating assets based on competitive market dynamics and fundamentals and includes a dynamic dispatch routine and PriceSimm.
- *GasVal:* Values gas storage assets that address the new dynamics of gas market spot and forward prices combined with the physical operating dynamics of storage assets.
- *HydroSimm:* Simulation of hydro generation assets applied to the western US.
- *CurveDeveloper:* Provides complete monthly forward curves using no-arbitrage strip reduction along with volatilities and correlations.
- *WeatherSimm:* Simulates climatic variables temporally and spatially to integrate with HydroSimm, LoadSimm, and PriceSimm.
- *LoadSimm:* Simulates system load, industrial customer load, or load profile demand.
- *DataScrubber:* An automated data cleaning system that analyzes analytic data, reviews it for accuracy, and identifies and remedies errors or omissions in the data.
- *OptionModeler:* A series of option models from complex regime switching and jump diffusion with mean reversion to Black's standard model.

### RETAIL PROGRAMS                                              1990-2004

- *Retail Offerings:* Developed a suite of retail product offerings for open market competition in Texas, PJM, and California.

Ascend Analytics

- *Retail Time Pricing:* Developed retail time price offerings in competitive offerings and for regulated companies.
- *Interruptible Load:* Developed and implemented an interruptible load program.

## INTELLECTUAL PROPERTY/BUSINESS VALUATION                2000-2001

- Conducted a number of business transactions as CEO of e-Acumen involving the acquisition of intellectual and valuing a business.
- Provided expert support concerning intellectual property ownership.

## ENVIRONMENTAL ANALYSIS/DAMAGES                          1994-1999

Dr. Dorris developed the Regional Economic Model for Air Quality (REMAQ), an integrated framework to assess the costs and air quality implications of different emission trading strategies. He has also applied REMAQ to assess the joint benefits of air quality regulations and been used to evaluate regulations of $NO_x$ emissions from power plants and address critical environmental policy question about electric utility restructuring. He was the principal investigator for the expert report to evaluate the air quality impacts and cost effectiveness of EPA's SIP Call for $NO_x$ point sources, the most expensive environmental legislation for the state of New York, Illinois, North Carolina, the province of Ontario Canada, wide emission standards, and has been central to the development of transboundary emission policy between the US and Canada. In addition, his environmental analysis of emission markets and regulations has been used by numerous electric generators for development of compliance strategy and the financing of over $15 billion in generation.

## INSTRUCTION                                             1996-2004

- *Academic*:
    - Taught a course at Cornell University on Modeling Competitive Energy Markets in Spring of 1996.
    - Teaching assistant for advanced doctoral course in econometrics at Cornell University.

- *Industry:*
    - Lead instructional seminars regarding:
        - Financial Risk Management
        - Portfolio Optimization
        - Techniques for Forward Curve Development
        - Energy Supply Planning
        - Trading Electricity from Fundamental
        - Option Pricing and Stochastic Process
        - Emissions Trading

## RELATED WORK EXPERIENCE                                 1986-1991

Ascend Analytics

At Citizens Power & Light, Dr. Dorris brokered electric power sales and developed strategies for power sales; managed international project feasibility studies in Poland, Czechoslovakia, the Dominican Republic, and India. He directed project development for a $700 million power plant in Poland. He negotiated conditions for a joint venture with the national oil refinery and a power sales agreement with Polish National Power grid, and performed financial analysis and pursued financing with the World Bank and EBRD.

At UNITIL, he negotiated power purchase contracts with independent power developers and utilities, and was responsible for the technical and economic analysis of new power projects. Conducted short-term power procurement and sales and was responsible for production costing and NEPOOL regulatory affairs.

At EPRI, Dr. Dorris performed pilot testing of spray dryer scrubbers for coal power plants. He also developed and coordinated a pH negative corrosion test program.

## HONORS AND PROFESSIONAL AFFILIATIONS

- International Petroleum Exchange (IPE) recognition for developments of "Earnings at Risk", a conceptual framework for measuring financial and physical risk (2001).
- Second person in history of Department of Applied Economics and Management to receive special exemption from Master thesis requirement, Cornell University (1992).
- Who's Who
- Graduated *Magna cum Laude,* Cornell University, 1988
- Nation Association of Business Economists
- American Economic Association
- International Association of Energy Economists
- General Association of Risk Professionals

Ascend Analytics

## SELECTED PUBLICATIONS

1) "Energy Risk Management, Making Risk Management an Affirmative Tool to Provide Stable Returns on Investment," with Andy Dunn, *Energy & Power Risk Management* and the *New Frontiers* supplement, December, 2001.

2) "Using Modern Risk Measurement Techniques to Understand the Risk Exposure of an Energy Company," *Energy & Power Risk Management*, February 2001.

3) "Making the Shift to Earnings at Risk," with Andy Dunn, *Electric Light & Power*, October, 2001.

4) "Evaluating Generation Using Modern Energy Risk Management," with Andy Dunn, *Power Industry Development*, August 2001.

5) "Portfolio Optimization Technology and Techniques: Making Risk Management an Affirmative Tool for Adding Value to the Bottom Line," with Andy Dunn, *Energy & Power Risk Management*, July, 2001.

6) "Using Modern Energy Risk Management," with Andy Dunn, *Global Energy Business*, May/June 2001.

7) "Electricity Pricing: How to Make Electricity Pricing Models More Accurate by Incorporating Price Spike," with R. Ethier, *Energy & Power Risk Management*, July/August 1999.

8) "Behavioral Transportation Controls Impact on Air Quality," with John Kim, *Transportation*, October, 1999.

9) "Power Purchase Contracts and the Cost of Debt," *The Fortnightly*, May, 1996.

10) "Rethinking Power Contracting: Implications of Dispatchable Power Purchase Contracts," with Timothy Mount, *Energy Journal, 15(4): 167-187.*

11) "Cogeneration Implication for Pollutant Reduction and Energy Conservation," with Timothy Mount, Cornell University, Department of Agricultural, Resource and Managerial Economics, Working Paper, December, 1991.

### SELECTED CONFERENCE PROCEEDING/WORKING PAPERS/PRESENTATIONS

1) "Avoiding Regulatory Disallowances," *Proceedings: Energy Central, Denver, CO, June 10, 2003.*

2) "Portfolio Management for Shareholder Value," *Proceedings: SunGard World, New Orleans, Louisiana, October 23, 2003.*

Ascend Analytics

3) "Portfolio Management As An Affirmative Business Tool," *Proceedings: Enterprise Wide Risk Management by EUCI, Denver, CO, September 19, 2002.*

4) "Portfolio Optimization: An Affirmative Tool to Maintain Earnings and Maximize Value," *Proceedings: Portfolio Optimization by Infocast*, Houston, TX, November 14-16, 2001.

5) "Time2Trade: Trading Power from Fundamentals," *Proceedings: Power Trading by e-Acumen, New York, NY, June 20, 2001.*

6) "Portfolio Optimization to Reduce Risks and Increase Profits," *Proceedings: Electric Utility Consultants, Washington, D.C. May 5-7, 2001.*

7) "Minimizing Earnings at Risk," *Proceedings: Electric Utility Consultants, Denver, CO, March 17-18, 2001.*

8) "Risk Measurement and Analysis," *Proceedings: Risk Conference, April, 2000.*

9) "Portfolio Optimization Under Uncertainty," *Proceedings: Portfolio Risk Management and Analysis by Infocast, Houston, Texas, February, 2000.*

10) "Utility Capital Structure and Non-Utility Power Purchase Agreements," *Proceedings of the Cornell University Workshop,* August, 1992

11) "Design and Operation of Combined Cycle Turbo Expanders for Gas Distribution Companies," *Proceedings of the New England Gas Association,* March, 1990.

12) "Developing Dispatchable Cogeneration Facilities: A Case Study," *Proceedings of the Joint Power Conference,* ASME Publication, October, 1990.

13) "Clean Power Supply through Cogeneration," Cornell University, Undergraduate Honors Thesis, June 1988.

14) "A Time-Dependent Endowment of Emission Allowances," *Proceedings of the Ozone Transport Assessment Group,* January 17, 1997.

15) "Least Cost Solutions for Ozone Attainment," *Proceedings of the Ozone Transport Assessment Group, May 8, 1997*

16) "An Application of the Regional Economic Model for Ozone Compliance for the Northeast," *Federal Advisory Committee Act, July 27, 1997.*

17) "Utility Capital Structure and Non-Utility Power Purchase Agreements," *Proceedings of the Cornell Utility Workshop,* August, 1992.

Ascend Analytics

SELECTED TECHNICAL REPORTS AS PRINCIPAL INVESTIGATOR

1) "Comparative Market Design Analysis," Prepared for California Independent System Operator, April, 2002.

2) "Evaluation of US EPA SIP Call for NO$_x$ Point sources," Prepared for US EPA, September, 1999.

3) "Environmental Analysis of Arizona Public Service Generating Assets," Prepared for Sempra Energy Resources, September, 1999.

4) "Economic and Air Quality Analysis of Episodic Controls to Reduce Ozone Concentrations in the State of Illinois," Prepared for Illinois department of Commerce and Community Affairs, October, 1998.

5) "Development of a Multivariate Ozone Response Surface," Prepared of Electric Power Research Institute, February, 1999.

6) "Least Cost Steps to Reduce Ozone in the Northeast Urban Corridor," Prepared for New York State Energy Research Development Authority, with Timothy Mount and S.T. Rao, November, 1998.

7) "Exploratory Analysis of Power Plant Retirements and Auctions," Prepared of US EPA, May 1998.

8) "Application of Option Models for Electricity," Prepared for The Energy Authority, July, 1997.

9) "Estimating Emission Weights for the Greater Chicago Metropolitan Area," Prepared for Illinois EPA, July 1997.

10) "Measuring Value at Risk," Prepared for the Energy Authority, August, 1997.

11) "Development of a Forward Price Curve for Electricity," Prepared for The Energy Authority, Jun 1997.

12) "Least Cost Solutions for Ozone Attainment in the Greater New York Metropolitan Area," Prepared for Niagra Mohawk Power Corp., with Timothy Mount and S.T. Rao, August, 1997.

13) "Capital Investment and risk of Private Sector Energy development in Egypt," Prepared for the Egyptian Electricity Authority by Arthor Anderson, August, 1996.

14) "Least Cost Strategies for Ozone Attainment," Prepared for New York Department of Environmental Conservation, with Timothy Mount, S.T. Rao, G. Sisla, P. Brandford, and Kurvila John, March, 1995.

Ascend Analytics

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 00-3837
                                    .
                                    .
  OWENS CORNING, et al,             .
                                    . 5414 USX Tower Building
                                    . Pittsburgh, PA 15222
                      Debtor,       .
. . . . . . . . . . . . . . . . . . September 3, 2004
                                    . 12:59 p.m.
OWENS CORNING, et al,               .
                                    .
                      Plaintiff,. Case No. 03-55736
           -v-                      .
                                    .
FORELAND REFINING CORP.,            .
                                    .
                      Defendant..
. . . . . . . . . . . . . .

        TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT HEARING
           BEFORE HONORABLE JUDITH K. FITZGERALD
           UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              SAUL, EWING LLP
                             By:  J. KATE STICKLES, ESQ.
                                  RISA GREENE, ESQ.
                             222 Delaware Ave., Ste. 1200
                             Wilmington, DE 19899
                             By:  DANIEL CHEMERS, ESQ.
                             100 South Charles Street
                             Baltimore, MD 21201

Audio Operator:              Cathy Younker

Proceedings recorded by electronic sound recording, transcript
           produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail: jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

2

APPEARANCES CONT'D:

For Foreland Refining:          Husch & Eppenberger, LLC
                                By:  CHRISTOPHER REDMOND, ESQ.
                                1200 Main St., Ste. 1700
                                Kansas City, MO 64501


For Foreland Refining:          Edwards & Angell LLP
                                By:  SELINDA A. MELNIK, ESQ.
                                919 N. Market St., 14th Floor
                                Wilmington, DE 19801


For Price Management Control    Hensley Kim & Edgington, LLC
Corporation:                    By:  M. SHANE EDGINGTON, ESQ.
                                1660 Lincoln Street, Suite 3050
                                Denver, CO 80264


TELEPHONIC APPEARANCES:

For Price Management Control    Cross & Simon, LLC
Corporation:                    By:  RICHARD H. CROSS, ESQ.
                                913 North Market Street
                                Suite 1001
                                Wilmington, DE 19801


For the Bank of America:        The Bayard Firm
                                By:  ERIC M. SUTTY, ESQ.
                                222 Delaware Avenue, Suite 900
                                Wilmington, DE 19899

73

1  it's sort of a Catch-22, Your Honor.  On the one hand --

2         THE COURT:  No, your client's put himself in a Catch-

3  22.

4         MR. EDGINGTON:  -- on the one hand -- on the one hand

5  I guess your decision is that the contract is unreasonable,

6  absurd because --

7         THE COURT:  No, the contract is perfectly reasonable.

8  That's my position.  I find the contract to be very reasonable,

9  very well stated and perfectly clear.  That's all.  The

10  interpretation that it -- that this contract requires Owens

11  Corning to commit what could be millions of dollars in any one

12  year without any approval by any corporate officer of Owens

13  Corning at the say-so of an independent contractor who was not

14  appointed as a broker, has no relationship with Owens, has no

15  fiduciary responsibilities whatsoever with Owens, is

16  unreasonable.  That interpretation is unreasonable.

17         MR. EDGINGTON:  Well, Your Honor, they signed the

18  contract.  It says what it says.  And the fact that you think

19  it's unreasonable or Owens Corning thinks it's unreasonable, I

20  would point the Court to the Fox v. Itin case.  And Colorado

21  law is pretty strict about that sort of thing.  They signed the

22  contract, and just because they now think it's a bad contract

23  or improvident --

24         THE COURT:  They don't think it's a bad contract.

25         MR. EDGINGTON:  -- you're right, Your Honor, because

**J&J COURT TRANSCRIBERS, INC.**

1    MR. EDGINGTON: That's all I have, Your Honor.

2    THE COURT: Anything further by the debtor?

3    MR. CHEMERS: Nothing further, Your Honor.

4    THE COURT: Okay. Let me explain my ruling.  My

5    ruling is very simple.  We've had a lot of discussion, most of

6    which is irrelevant to my ruling, so I want to make my ruling

7    clear.  My ruling is this.  The document which is called,

8    research and management proposal for Owens Corning, directed to

9    the attention of Michael G. Mitchell, indicates that the

10    parties to the agreement would be Owens -- or, are, pardon me

11    -- Owens Corning and Dennis Manguin of Price Management Control

12    Corporation.  The project which is submitted by PMCC to Owens

13    provides as its scope under the caption, project, "to research,

14    develop, design, implement, manage and execute the methodology

15    and control procedures of a hedging program for use in the

16    management of pricing of flux using crude oil futures or

17    derivatives," and so forth.  The schedule of services to be

18    provided, the timetable, documentation and compensation are

19    specified as follows and shall be acknowledged by all parties

20    concerned upon acceptance of the proposal as the terms of the

21    agreement.  The agreement is then dated October 23rd of 1998

22    between Owens and Price Management Control Corporation, states

23    that whereas PMCC is qualified to perform certain services as

24    identified in the proposal which was dated July 30th of 1998,

25    and whereas Owens Corning desired to engage PMCC in the

**J&J COURT TRANSCRIBERS, INC.**

81

1  capacity as independent consultant, that's the word,

2  independent consultant, rather than as an employee to perform

3  the services in conjunction with and for the mutual benefit of

4  Owens and PMCC, now therefore, and the agreement goes on.

5      In the first place, an independent consultant would

6  not have the authority to act on behalf of the corporation

7  because it's not even an independent contractor.  And so while

8  I spoke of independent contractor on the record, I apologize.

9  I amend that to state independent consultant, not contractor,

10  and not employee.  So there is nothing in the agreement that

11  provides PMCC with the ability in this whereas clause to engage

12  in transactions of a hedging nature on behalf of Owens Corning.

13  However, in paragraph 7 PMCC is now -- this -- let me just read

14  the beginning of paragraph 7.  It says, PMCC is an independent

15  contractor with respect to the performance of all service, the

16  word, singular, service, contained in this agreement.  PMCC

17  shall not be deemed for any purpose to be the employee, agent,

18  service or representative of Owens Corning in the performance

19  of any service or part thereof in any manner dealt with herein.

20  Owens has and shall have no direction or control of PMCC except

21  in the result to be obtained within this joint venture

22  agreement, and so forth.

23      It is clear from the face of this document that there

24  is not a broker or agent relationship between PMCC and Owens

25  because the document quite clearly says there is none.  The

**J&J COURT TRANSCRIBERS, INC.**

82

1    only thing that the parties agreed upon is that the result was

2    to develop, design, research, implement, manage and execute the

3    methodology and control procedures of a hedging program.  Mr.

4    Manguin on behalf of PMCC obviously carried out that provision

5    and Owens did what it was required to.  It paid for those

6    services.

7         So that is the full scope of my ruling.  The

8    documents are clear on their faces.  I cannot go behind the

9    documents under Colorado law when they are clear.  The parties

10   I believe agree, let me double check this, that Colorado is

11   governing, is that correct?

12        MR. CHEMERS:  Yes, Your Honor.

13        MR. EDGINGTON:  It's what the contract says, Your

14   Honor.

15        THE COURT:  Yes.  Okay.  I just wanted to be sure

16   that there was not an issue with respect to that.  Therefore I

17   believe that Owens' motion for summary judgment must be

18   granted.  Now, I'm sorry, would you -- I want to make sure I

19   deal with the motion -- the counter motion, cross motion, for

20   summary judgment.

21        MR. CHEMERS:  I think you just did, Your Honor.

22        THE COURT:  All right.  Thank you.  That motion is

23   denied.  Would you to like to get together to submit an order

24   under certification of counsel?

25        A SPEAKER:  Yes, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| **OWENS CORNING,** *et al.,* | : | **Case Nos. 00-3837 (JKF)** |
| **Debtors.** | : | **(Jointly Administered)**<br>Related to Docket Nos.: 9344, 11640, 11825 |

## ORDER

This Order is addressed to, and disposes of, Claim No. 6923 that was filed by Price Management Control Corporation ("PMCC") on April 9, 2002. Having reviewed and considered that claim, Debtors' Objection thereto, PMCC's Response to that Objection, Debtors' Motion for Summary Judgment, PMCC's Motion for Partial Summary Judgment, the exhibits and memoranda filed in support of or in opposition to the cross-motions for summary judgment, and the oral arguments presented by counsel on September 3, 2004; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court otherwise being fully advised in the premises, it is hereby it is now, this $\frac{7}{4}$ day of October, 2004 ORDERED:

1.    That Debtors' Motion for Summary Judgment is GRANTED;

2.    That PMCC's Motion for Partial Summary Judgment is DENIED;

3.    ~~That Debtors are awarded their costs;~~

4.    That this Court's bases for granting Debtors' Motion, and denying PMCC's Motion, which were set forth on the record at the September 3, 2004 hearing, are hereby incorporated by reference in this Order;

5.    That Claim No. 6923 shall be and hereby is DISALLOWED AND EXPUNGED in its entirety; and

6.    That Robert L. Berger and Associates, LLC, the official claims agent appointed in these cases, is hereby authorized and directed to make such revisions to the Official Claims Registry as unnecessary to reflect the relief granted pursuant to this Order.

SO ORDERED

This ___ day of October, 2004

*Judith K. Fitzgerald*

The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

308624.1 10/4/04                    -2-

**B-99**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| OWENS CORNING, *et al.* | : | Case Nos. 00-3837 (JKF) |
| Debtors. | : | (Jointly Administered) |
| | | Related to Docket Nos.: 9344 and 9834 |

## SUPPLEMENTAL AFFIDAVIT OF MICHAEL G. MITCHELL

1.    I, Michael G. Mitchell, am more than eighteen years of age, am competent to testify as a witness, and have personal knowledge of the facts set forth below. I submit this Affidavit to supplement the information contained in my May 7, 2004 Affidavit.

2.    In late November 1997, PMCC submitted a proposal to Owens Corning, a copy of which is attached as Exhibit 1. In that proposal, PMCC set forth alternative modes of compensation. Under one option contained in the proposal, PMCC would charge a fixed fee based upon an hourly rate of $325 per hour, and under other options it would charge a fee calculated at a reduced hourly rate plus an incentive fee. I believed the quoted $325 per hour rate was abnormally high and negotiable.

3.    I had a vague understanding of the type of program that PMCC might develop, but did not have any specifics on what Dennis Mangan ("Mangan") might produce or whether it would meet Owens Corning's needs. Regardless, I was supportive of having a contract under which Mangan would develop a program, and was hopeful that he would develop a program that would be acceptable. I was at all times supportive of the basic concept of hedging.

4.    I had no way of forecasting whether Mangan would be able to develop a program that would be acceptable to Owens Corning. I never indicated to anyone that Owens Corning

would implement and/or trade under whatever program Mangan might develop. If anyone states anything to the contrary, they are not telling the truth.

5.   During my negotiations with Mangan, I focused on the business terms of the contract, which were that PMCC would be obligated to provide certain services to Owens Corning, and Owens Corning would pay a fixed fee for the Manual and additional amounts if Owens Corning decided to implement the program (once delivered) and it decided to trade and the trades proved profitable in the aggregate. This was my understanding of the arrangement between the parties.

6.   During contract negotiations, I assumed that Mangan understood that any implementation of the program he was supposed to develop (and any trades thereunder) would be, at all times, subject to Owens Corning's review and approval. I could not imagine Mangan or anyone else thinking otherwise. Regardless, I happened to mention to Mangan in a September 27, 1998 letter that Owens Corning would not be able to begin taking steps towards implementing the program until it had been delivered and had received initial senior management approval, and I also told him that certain items in his proposal would not be useable because they were inconsistent with Owens Corning's Derivatives Policy. A copy of my September 27, 1998 letter is attached as Exhibit 2.

7.   Owens Corning never traded under the proposed program, and never received any benefit from it.

I declare under the penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

Date: ___25 June 2004___          _____
                                  MICHAEL G. MITCHELL

-2-

# EXHIBIT 1

# Consulting Proposal
for
## Owens Corning
One Owens Corning Parkway
Toledo, Ohio
43659

**Attention: Michael G. Mitchell**

**Date: November 21, 1997**

## PARTIES TO THIS AGREEMENT:

The parties to this agreement are **Owens Corning** with principal business offices at One Owens Corning Parkway; Toledo, Ohio, and, **Price Management Control Corporation** with principal business offices at 9222 West 73rd Street; Suite 102; Shawnee Mission, Kansas.

## PROJECT:

To research, develop, design and recommend methodology of implementation and control procedures of a Hedging Program for use in the Management of Pricing (Hedging) Flux using Crude Oil Futures or Derivatives, Mayan Crude Oil, Heating Oil Futures or Derivatives, Gasoline Futures or Derivatives or, Custom Designed Derivative Instruments as the Hedging Instrument. The schedule of services to be provided, timetable, documentation and compensation are specified as follows and shall be acknowledged by all parties concerned, upon acceptance of this proposal, as the **TERMS OF AGREEMENT.**

## TASK 1:

Create reference documentation with appropriate graphics for various Contracts and Methods of Pricing. This to include:
1. Cash Forward Contracts
2. Cash Flow Swap Contracts
3. Futures Contracts
4. Futures Call Options
5. Basis Contracts
6. Cap and Floor Contracts
7. No Cost Collar Contracts
8. Leveraged Put and Call Option Contracts
9. Custom Designed Derivatives

PMCC-00272

1

## TASK 2:

Creation of the Basis Matrix Scenarios and Financial Implications Tables and Graphic Presentation of all Procurement Basis that the company can face in a Hedging Program.

## TASK 3:

Guidelines and discussion for Procurement Hedging.

## TASK 4:

Setting of Target Prices.

## TASK 5:

Cash Price History Analysis and creation of analysis for measurement of Cash Prices to include the following:
1. Locational Symbols and Cities Represented by those Symbols
2. Locational Prices of Flux Monthly with Systemic High-Low-Weighted Usage Average
3. Graphic Presentation - Monthly Locational High-Lo-Average, January, 1985-Deccember, 1997
4. Systemic Monthly Flux Prices 1985-1997 with Graphic
5. Yearly Cash Monthly Flux Prices by Month and by Year 1985-1997 with Graphics
6. Flux Prices Dispersion Table  January, 1985 to December, 1997  with Graphic
7. Twelve Month Forward Flux Price Dispersion Tables with Graphic
8. Comparison of Twelve Month Forward Flux Price Dispersion Tables Table #1 through Table #5

## TASK 6:

Crude Oil Futures History Analysis and creation of analysis for measurement of Crude Oil Prices to include the following:
1. Explanation of Symbols and Formulas
2. Crude Oil Futures Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3. Graphic Presentation of the Above
4. Table of January to December Prices with associated Graphics 1985-1997
5. Tables of Dispersion for Contract C-1 and 12 Month Swap Prices 1985-1997
6. Graphic Presentation of Dispersion Table for Contract 1 1985-1997
7. Graphic Presentation of Dispersion Table for Contract 12 Month Swap 1985-1997
8. Graphic Presentation of Dispersion Table for Contract 1 and 12 Month Swap 1985-1997
9. Table of Prices C-1, 12 Month Swap and Spread Difference Contract 1-12 Month Swap
10. Graphic Presentation of Price C-1 and 12 Month Swap 1985-1997
11. Graphic Presentation of Spread Difference of C-1 and 12 Month Swap 1985-1997
12. Dispersion Table of Spread C-1 - 12 Month Swap

PMCC-00273

13.    Graphic Presentation of Dispersion Table of Spread C-1 - 12 Month Swap

---

## TASK 7:

Crude Oil Basis History Analysis and creation of analysis for measurement of Basis Price Differences to include the following:

1.    Explanation of Symbols and Formulas
2.    Basis Price Differentials = Flux - Crude Oil Futures Contracts 1 and 12 Month Strip 1985-1997
3.    Graphic Presentation Cash, C-1 and 12 Mo. Strip 1985-1997
4.    Graphic Presentation Monthly Basis Prices C-1 and 12 Mo. Basis 1985-1997
5.    Graphic Presentation Average Basis Differences C-1 and 12 Mo. Basis 1985-1997
6.    Graphic Presentation of Basis in Percentage Yield Format C-1 and 12 Mo. Strip 1985-1997
7.    Graphic Presentation Average Basis Yield Differences C-1 and 12 Mo. Basis 1985-1997
8.    Table of January to December Cash, C-1, 12 Mo. Strip, Basis and % Basis with associated Graphics 1985-1997
9.    Monthly Correlation's for Cash to C-1 & Cash to 12 Mo. Strip with Graphic
10.   Tables of Dispersion for Basis Differences Contract C-1 and 12 Month Swap Prices
11.   Graphic Presentation C-1 Basis Differences 1985-1997
12.   Graphic Presentation 12 Month Swap Basis Differences 1985-1997
13.   Graphic Presentation C-1 % Basis Differences 1985-1997
14.   Graphic Presentation 12 Month Swap  % Basis Differences 1985-1997

---

## TASK 8:

Heating Oil Futures History Analysis and creation of analysis for measurement of Heating Oil Prices to include the following:

1.    Explanation of Symbols and Formulas
2.    Heating Oil Futures Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3.    Graphic Presentation of the Above Item #2
4.    Table of Prices January through December with associated Graphics 1985-1997
5.    Tables of Dispersion for Contract C-1 and 12 Month Swap Prices 1985-1997
6.    Graphic Presentation of Dispersion Table for Contract 1 1985-1997
7.    Graphic Presentation of Dispersion Table for Contract 12 Month Swap 1985-1997
8.    Graphic Presentation of Dispersion Table for Contract 1 and 12 Month Swap 1985-1997
9.    Table of Prices C-1, 12 Month Swap and Spread Difference Contract 1 - 12 Month Swap
10.   Graphic Presentation of Price C-1 and 12 Month Swap 1985-1997
11.   Graphic Presentation of Spread Difference of C-1 and 12 Month Swap 1985-1997
12.   Dispersion Table of Spread C-1 - 12 Month Swap
13.   Graphic Presentation of Dispersion Table of Spread C-1 - 12 Month Swap

PMCC-00274

3

## TASK 9:

Heating Oil Basis History Analysis and creation of analysis for measurement of Basis Price Differences to include the following:

1. Explanation of Symbols and Formulas
2. Basis Price Differentials = Flux - Heating Oil Futures Contracts 1 and 12 Month Strip 1985-1997
3. Graphic Presentation Cash, C-1 and 12 Mo. Strip 1985-1997
4. Graphic Presentation Monthly Basis Prices C-1 and 12 Mo. Basis 1985-1997
5. Graphic Presentation Average Basis Differences C-1 and 12 Mo. Basis 1985-1997
6. Graphic Presentation of Basis in Percentage Yield Format C-1 and 12 Mo. Strip 1985-1997
7. Graphic Presentation Average Basis Yield Differences C-1 and 12 Mo. Basis 1985-1997
8. Table of January to December Cash, C-1, 12 Mo. Strip, Basis and % Basis with associated Graphics 1985-1997
9. Monthly Correlation's for Cash to C-1 & Cash to 12 Mo. Strip with Graphic
10. Tables of Dispersion for Basis Differences Contract C-1 and 12 Month Swap Prices
11. Graphic Presentation C-1 Basis Differences 1985-1997
12. Graphic Presentation 12 Month Swap Basis Differences 1985-1997
13. Graphic Presentation C-1 % Basis Differences 1985-1997
14. Graphic Presentation 12 Month Swap % Basis Differences 1985-1997

## TASK 10:

Gasoline Futures History Analysis and creation of analysis for measurement of Gasoline Prices to include the following:

1. Explanation of Symbols and Formulas
2. Gasoline Futures Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3. Graphic Presentation of the Above Item #2
4. Table of Prices January through December with associated Graphics 1985-1997
5. Tables of Dispersion for Contract C-1 and 12 Month Swap Prices 1985-1997
6. Graphic Presentation of Dispersion Table for Contract 1 1985-1997
7. Graphic Presentation of Dispersion Table for Contract 12 Month Swap 1985-1997
8. Graphic Presentation of Dispersion Table for Contract 1 and 12 Month Swap 1985-1997
9. Table of Prices C-1, 12 Month Swap and Spread Difference Contract 1 - 12 Month Swap
10. Graphic Presentation of Price C-1 and 12 Month Swap 1985-1997
11. Graphic Presentation of Spread Difference of C-1 and 12 Month Swap 1985-1997
12. Dispersion Table of Spread C-1 - 12 Month Swap
13 Graphic Presentation of Dispersion Table of Spread C-1 - 12 Month Swap

PMCC-00275

4

**B-106**

## TASK 11:

Gasoline Basis History Analysis and creation of analysis for measurement of Basis Price Differences to include the following:

1. Explanation of Symbols and Formulas
2. Basis Price Differentials = Flux - Gasoline Futures Contracts 1 and 12 Month Strip 1985-1997
3. Graphic Presentation Cash, C-1 and 12 Mo. Strip 1985-1997
4. Graphic Presentation Monthly Basis Prices C-1 and 12 Mo. Basis 1985-1997
5. Graphic Presentation Average Basis Differences C-1 and 12 Mo. Basis 1985-1997
6. Graphic Presentation of Basis in Percentage Yield Format C-1 and 12 Mo. Strip 1985-1997
7. Graphic Presentation Average Basis Yield Differences C-1 and 12 Mo. Basis 1985-1997
8. Table of January to December Cash, C-1, 12 Mo. Strip, Basis and % Basis with associated Graphics 1985-1997
9. Monthly Correlation's for Cash to C-1 & Cash to 12 Mo. Strip with Graphic
10. Tables of Dispersion for Basis Differences Contract C-1 and 12 Month Swap Prices
11. Graphic Presentation C-1 Basis Differences 1985-1997
12. Graphic Presentation 12 Month Swap Basis Differences 1985-1997
13. Graphic Presentation C-1 % Basis Differences 1985-1997
14. Graphic Presentation 12 Month Swap % Basis Differences 1985-1997

## TASK 12:

Mayan Crude Oil 12 Month Price History Analysis and creation of analysis for measurement of Mayan Crude Oil Prices to include the following:

1. Explanation of Symbols and Formulas
2. Mayan Crude Oil Futures 1985-1997, with Average, Value 100 & Pay/Cost
3. Graphic Presentation of the Above
4. Table of January to December Prices with associated Graphics 1985-1997
5. Tables of Dispersion for 1985-1997
6. Graphic Presentation of Dispersion Table for 1985-1997
7. Graphic Presentation of Dispersion Table for 1985-1997
8. Graphic Presentation of Dispersion Table 1985-1997
9. Graphic Presentation of Price 1985-1997

## TASK 13:

Mayan Crude Oil Basis History Analysis and creation of analysis for measurement of Basis Price Differences to include the following:

1. Explanation of Symbols and Formulas
2. Basis Price Differentials = Flux - Mayan Crude Oil Contract 1985-1997
3. Graphic Presentation Cash and Mayan 1985-1997
4. Graphic Presentation Monthly Basis Prices Flux - Mayan Basis 1985-1997
5. Graphic Presentation Average Basis Differences Flux - Mayan Basis 1985-1997

PMCC-00276

5

**B-107**

6.   Graphic Presentation of Basis in Percentage Yield Format Flux/Mayan 1985-1997
7.   Graphic Presentation Average Basis Yield Differences Flux/Mayan 1985-1997
8.   Table of January to December Flux, Mayan, Basis and % Basis with associated Graphics 1985-1997
9.   Monthly Correlation's for Flux to Mayan with Graphic
10.  Tables of Dispersion for Basis Differences Flux-Mayan
11.  Graphic Presentation Basis Differences 1985-1997
12.  Graphic Presentation C-1 % Basis Differences 1985-1997

## TASK 14:

Volatility of Cash, Mayan Crude Oil, Crude Oil Futures, Heating Oil Futures, Gasoline Futures and appropriate Hedging Ratios for the use of Mayan Crude Oil, Crude Oil Futures, Heating Oil Futures, Gasoline Futures as the Hedging instrument for Flux procurement.

1.   Discussion
2.   Table of Volatility of Flux, Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
3.   Table of Comparison and Hedge Multiplier Numbers with Graphic
4.   Table of 3 Month, 6 Month and 12 Month Floating Price Deltas for Flux, Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
5.   Graphic Presentation of 3 Month Delta Comparisons for Flux, Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
6.   Graphic Presentation of 6 Month Delta Comparisons for Flux, Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
7.   Graphic Presentation of 12 Month Delta Comparisons for Flux, Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures

## TASK 15:

Correlational Comparison Effect of Cash, Mayan Crude Oil, Crude Oil Futures, Heating Oil Futures, Gasoline Futures.

1.   Discussion
2.   Table of Correlation of Flux to Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
3.   Table of Comparison and Hedge Multiplier Numbers with Graphic
4.   Table of 3 Month, 6 Month and 12 Month Floating Price Correlation for Flux to Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
5.   Graphic Presentation of 3 Month Correlation of Flux to Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
6.   Graphic Presentation of 6 Month Correlation of Flux to Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures
7.   Graphic Presentation of 12 Month Correlation of Flux to Mayan Crude, Crude Oil Futures, Heating Oil Futures and Gasoline Futures

PMCC-00277

B-108

## TASK 16:

Heating Oil Crack Spread
1.   Explanation of Symbols and Formulas
2.   Heating Oil Crack Spread Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3.   Graphic Presentation of the Above Item #2
4.   Table of Prices January through December with associated Graphics 1985-1997
5.   Tables of Dispersion for Crack Spread C-1 and 12 Month Crack Spread Swap Prices 1985-1997
6.   Graphic Presentation of Dispersion Table for Crack Spread C-1 1985-1997
7.   Graphic Presentation of Dispersion Table for Crack Spread 12 Month Swap Crack Spread 1985-1997
8.   Graphic Presentation of Dispersion Table for Crack Spread C-1 and 12 Month Swap Crack Spread 1985-1997
9.   Table of Prices Crack Spread C-1, 12 Month Swap and Spread Difference Crack Spread C-1 - 12 Month Swap Crack Spread
10.  Graphic Presentation of Crack Spread C-1 and 12 Month Swap 1985-1997
11.  Graphic Presentation of Spread Difference of Crack Spread C-1 and 12 Month Swap Crack Spread 1985-1997
12.  Dispersion Table of Spread Crack Spread C-1 - 12 Month Swap Crack Spread
13.  Graphic Presentation of Dispersion Table of Crack Spread C-1 - 12 Month Swap Crack Spread

## TASK 17:

Gasoline Crack Spread:
1.   Explanation of Symbols and Formulas
2.   Gasoline Crack Spread Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3.   Graphic Presentation of the Above Item #2
4.   Table of Prices January through December with associated Graphics 1985-1997
5.   Tables of Dispersion for Crack Spread C-1 and 12 Month Crack Spread Swap Prices 1985-1997
6.   Graphic Presentation of Dispersion Table for Crack Spread C-1 1985-1997
7.   Graphic Presentation of Dispersion Table for Crack Spread 12 Month Swap Crack Spread 1985-1997
8.   Graphic Presentation of Dispersion Table for Crack Spread C-1 and 12 Month Swap Crack Spread 1985-1997
9.   Table of Prices Crack Spread C-1, 12 Month Swap and Spread Difference Crack Spread C-1 - 12 Month Swap Crack Spread
10.  Graphic Presentation of Crack Spread C-1 and 12 Month Swap 1985-1997
11.  Graphic Presentation of Spread Difference of Crack Spread C-1 and 12 Month Swap Crack Spread 1985-1997
12.  Dispersion Table of Spread Crack Spread C-1 - 12 Month Swap Crack Spread

PMCC-00278

7

**B-109**

13.  Graphic Presentation of Dispersion Table of Crack Spread C-1 - 12 Month Swap Crack Spread

## TASK 18:

Crude:Gasoline:Heating Oil (3:2:1) Crack Spread

1.  Explanation of Symbols and Formulas
2.  (3:2:1) Crack Spread Futures Contracts 1-12 and 12 Month Strip 1985-1997, with Average, Value 100 & Pay/Cost
3.  Graphic Presentation of the Above Item #2
4.  Table of Prices January through December with associated Graphics 1985-1997
5.  Tables of Dispersion for Contract C-1 and 12 Month Swap Prices 1985-1997
6.  Graphic Presentation of Dispersion Table for Contract 1 1985-1997
7.  Graphic Presentation of Dispersion Table for Contract 12 Month Swap 1985-1997
8.  Graphic Presentation of Dispersion Table for Contract 1 and 12 Month Swap 1985-1997
9.  Table of Prices C-1, 12 Month Swap and Spread Difference Contract 1 - 12 Month Swap
10.  Graphic Presentation of Price C-1 and 12 Month Swap 1985-1997
11.  Graphic Presentation of Spread Difference of C-1 and 12 Month Swap 1985-1997
12.  Dispersion Table of Spread C-1 - 12 Month Swap
13.  Graphic Presentation of Dispersion Table of Spread C-1 - 12 Month Swap

## TASK 19:

Statistical Tables of Dispersion Volatility of Price Change and Cash, Mayan Crude Oil, Crude Oil Futures, Heating Oil Futures, Gasoline Futures, Heating Oil Crack Spread, Gasoline Crack Spread, Crude:Gasoline:Heating Oil (3:2:1) Crack Spread.

## TASK 20:

Construction of the Mayan Crude Oil, Crude Oil Futures, Heating Oil Futures, Gasoline Futures. Data Base and Manual. This to include the following for each Individual Flux Pricing Location and for the Systemic Flux Cost usage as a whole.

A. Chronological Price data History from January, 1985 to December, 1997, including the following using a Monthly Average Format:

1.  Cash
2.  Cash Delta (Price Change)
3.  Mayan Crude Oil Spot Price
4.  Mayan Crude Delta (Price Change)
5.  Mayan Crude Oil Basis (Cash-Mayan Crude Oil Spot Price)
6.  Mayan Crude Oil % Basis (Cash/ Mayan Crude Oil Spot Price)
7.  Mayan Crude Oil Basis Delta (Change month to Month of the Basis)
8.  Crude Oil Contract C-1 (Spot Contract)
9.  Crude Oil Contract C-2 (Second to the Spot Contract)          PMCC-00279

8

10. Crude Oil Delta (Price Change Month to Month of C-1 vs. C-2 previous Month)
11. Crude Oil Basis (Cash- Crude Oil Contract C-1)
12. Crude Oil % Basis (Cash/ Crude Oil Contract C-1)
13. Crude Oil Basis Delta (Change month to Month of the Basis)
14. Gasoline Contract C-1 (Spot Contract)
15. Gasoline Contract C-2 (Second to the Spot Contract)
16. Gasoline Delta (Price Change Month to Month of C-1 vs. C-2 previous Month)
17. Gasoline Basis (Cash- Gasoline Contract C-1)
18. Gasoline % Basis (Cash/ Gasoline Contract C-1)
19. Gasoline Basis Delta (Change month to Month of the Basis)
20. Heating Oil Contract C-1 (Spot Contract)
21. Heating Oil Contract C-2 (Second to the Spot Contract)
22. Heating Oil Delta (Price Change Month to Month of C-1 vs. C-2 previous Month)
23. Heating Oil Basis (Cash-Heating Oil Contract C-1)
24. Heating Oil % Basis (Cash/Heating Oil Contract C-1)
25. Heating Oil Basis Delta (Change month to Month of the Basis)

B. Graphical Presentation from Item A of:
1.  Locational Monthly Average Price
2.  Mayan Crude Oil Monthly Price
3.  Crude Oil Futures Monthly Average Price
4.  Heating Oil Futures Monthly Average Price
5.  Gasoline Futures Monthly Average Price
6.  Mayan Crude Oil Basis (Cash-Mayan Crude Oil Spot Price)
7.  Crude Oil Basis (Cash- Crude Oil Contract C-1)
8.  Heating Oil Basis (Cash- Heating Oil Contract C-1)
9.  Gasoline Basis (Cash- Gasoline Contract C-1)
10. Mayan Crude Oil % Basis (Cash/Mayan Crude Oil Spot Price)
11. Crude Oil % Basis (Cash/Crude Oil Contract C-1)
12. Heating Oil % Basis (Cash/Heating Oil Contract C-1)
13. Gasoline % Basis (Cash/Gasoline Contract C-1)

C. Price Rank and Percentiles of Items 1-8, 10-14, 16-20, and 22-25 from Part A.

D. Graphical Presentation of Percentile Rankings of:
1.  Cash Price
2.  Mayan Crude Oil
3.  Crude Oil Contract C-1
4.  Heating Oil Contract C-1
5.  Gasoline Contract C-1
6.  Mayan Crude Oil Basis (Cash- Mayan Crude Oil)
7.  Crude Oil Basis (Cash-Crude Oil C-1)
8.  Heating Oil Basis (Cash-Heating Oil C-1)
9.  Gasoline Basis (Cash- Gasoline C-1)
10. Mayan Crude Oil Basis (Cash/Mayan Crude Oil)

PMCC-00280

9

11. Crude Oil Percent Basis (Cash/Crude Oil C-1)
12. Heating Oil Percent Basis (Cash/Heating Oil C-1)
13. Gasoline Percent Basis (Cash/Crude Oil C-1)

---

**TASK 21:** Meetings with Corporate personnel as follows:

**Meetings with Corporate personnel as follows:**
1. 4 Meetings to discuss and help implement the Hedging Program with appropriate management staff personnel. These meetings to be basically 4-6 hours each. These meetings to go over Hedging Methods and activities and to give an in depth question and answer period so as to give management a thorough understanding of the Hedging Program.
2. Other meetings may be scheduled by client as needed up to 4 per year to resolve any additional questions and to give any further advice to client. These meetings will be billed for at a rate of 8 hours plus expenses at the chosen hourly rate as designated by the client.

(Included in this is the fact that company personnel may call at any time to discuss questions or problems for 1 full year from the date of agreement.)

These meetings will be billed seperately as follows:

**Client will be billed seperately for Travel to and from Toledo, Ohio via air carrier.**

---

## RESTRICTIONS ON USE OF MATERIALS:

Materials developed for this program by the Consultant are for the use of the Client and cannot be released to third parties under any circumstances. Information owned by the Client may be used by the Consultant only for the purposes of carrying out the Tasks involved in the implementation of this proposal. All information owned by the Client under these Terms of Agreement cannot be released to any third party by the Consultant under any circumstances.

PMCC-00281

10

## SCHEDULE OF COMPLETION:

Consultant agrees to complete Tasks 1-20 of this agreement as outlined in the following table. These dates are considered to be the due dates as long as the cash data needed by the Consultant is available to the Consultant no later than 7 days after the signing of this agreement. For each day after that date the data is delayed shall add 1 day to the completion date agreement.

| Task Number | Completion Date | Hours For This Task |
|---|---|---|
| 1 | January 10, 1997 | 5 |
| 2 | January 10, 1997 | 5 |
| 3 | January 10, 1997 | 5 |
| 4 | January 10, 1997 | 5 |
| 5 | January 27, 1997 | 95 |
| 6 | February 1, 1997 | 35 |
| 7 | February 8, 1997 | 40 |
| 8 | February 13, 1997 | 35 |
| 9 | February 20, 1997 | 40 |
| 10 | February 25, 1997 | 35 |
| 11 | March 4, 1997 | 40 |
| 12 | March 8, 1997 | 25 |
| 13 | March 14, 1997 | 35 |
| 14 | March 23, 1997 | 55 |
| 15 | March 30, 1997 | 40 |
| 16 | April 7, 1997 | 50 |
| 17 | April 15, 1997 | 50 |
| 18 | April 23, 1997 | 50 |
| 19 | May 2, 1997 | 60 |
| 20 | May 10, 1997 | 55 |
| 21 | 1/1/98-12/31/98 | |
| Total | | 760 |

** = Client will be billed seperately for Travel to and from Toledo, Ohio via air carrier.

## COMPENSATION AND TERMS OF PAYMENT:

The choice of payment option for these services shall be elected by the client as follows:

A. $75.00 per hour plus 10% incentive fee
B. $150.00 per hour plus 5% incentive fee
C. $225.00 per hour plus 3.33% incentive fee
D. $325.00 per hour plus 0% incentive fee

Under Options A, B, and C finacial records for transactions pertinent to this program and executed under this program shall be made available to the Consultant. Consultant shall use these records to guide and account for transactions entered into, to switch hedge positions at appropriate times and insure program is being properly followed and executed.

PMCC-00282

11

B-113

## COMPENSATION PAYMENT SCHEDULE:

### Schedule for Option A:

| Task Number | Completion Date | Hours For This Task | Option A Payment | Payment Date | Amount |
|---|---|---|---|---|---|
| 1 | January 10, 1997 | 5 | 1 | January 15, 1997 | $375.00 |
| 2 | January 10, 1997 | 5 | 2 | January 15, 1997 | $375.00 |
| 3 | January 10, 1997 | 5 | 3 | January 15, 1997 | $375.00 |
| 4 | January 10, 1997 | 5 | 4 | January 15, 1997 | $375.00 |
| 5 | January 27, 1997 | 95 | 5 | February 1, 1997 | $7,125.00 |
| 6 | February 1, 1997 | 35 | 6 | February 6, 1997 | $2,625.00 |
| 7 | February 8, 1997 | 40 | 7 | February 13, 1997 | $3,000.00 |
| 8 | February 13, 1997 | 35 | 8 | February 18, 1997 | $2,625.00 |
| 9 | February 20, 1997 | 40 | 9 | February 25, 1997 | $3,000.00 |
| 10 | February 25, 1997 | 35 | 10 | March 2, 1997 | $2,625.00 |
| 11 | March 4, 1997 | 40 | 11 | March 9, 1997 | $3,000.00 |
| 12 | March 8, 1997 | 25 | 12 | March 13, 1997 | $1,875.00 |
| 13 | March 14, 1997 | 35 | 13 | March 19, 1997 | $2,625.00 |
| 14 | March 23, 1997 | 55 | 14 | March 28, 1997 | $4,125.00 |
| 15 | March 30, 1997 | 40 | 15 | April 4, 1997 | $3,000.00 |
| 16 | April 7, 1997 | 50 | 16 | April 12, 1997 | $3,750.00 |
| 17 | April 15, 1997 | 50 | 17 | April 20, 1997 | $3,750.00 |
| 18 | April 23, 1997 | 50 | 18 | April 28, 1997 | $3,750.00 |
| 19 | May 2, 1997 | 60 | 19 | May 7, 1997 | $4,500.00 |
| 20 | May 10, 1997 | 55 | 20 | May 15, 1997 | $4,125.00 |
| 21 | 1/1/98-12/31/98 | | 21 | December 31, 1998 | ** |
| Total | | 760 | | N/A | $57,000.00 |

**We the Client,** Corporate Representative do hereby elect the above Option A, for purposes of payment to the Consultant.

The above Option A consists of a payment of $75.00 per hour and 10% of the net profits each month as received or credited to the client from hedging operations. All losses to be accounted for and carried forward in the accounting, until profits exceed losses.

## SELECTED BY AND AGREED TO BY THE CLIENT:

_____ Date:_____

Name

_____

Title
Owens Corning

PMCC-00283

12

B-114

**Schedule for Option B:**

| Task Number | Completion Date | Hours For This Task | Option B Payment | Payment Date | Amount |
|---|---|---|---|---|---|
| 1 | January 10, 1997 | 5 | 1 | January 15, 1997 | $750.00 |
| 2 | January 10, 1997 | 5 | 2 | January 15, 1997 | $750.00 |
| 3 | January 10, 1997 | 5 | 3 | January 15, 1997 | $750.00 |
| 4 | January 10, 1997 | 5 | 4 | January 15, 1997 | $750.00 |
| 5 | January 27, 1997 | 95 | 5 | February 1, 1997 | $14,250.00 |
| 6 | February 1, 1997 | 35 | 6 | February 6, 1997 | $5,250.00 |
| 7 | February 8, 1997 | 40 | 7 | February 13, 1997 | $6,000.00 |
| 8 | February 13, 1997 | 35 | 8 | February 18, 1997 | $5,250.00 |
| 9 | February 20, 1997 | 40 | 9 | February 25, 1997 | $6,000.00 |
| 10 | February 25, 1997 | 35 | 10 | March 2, 1997 | $5,250.00 |
| 11 | March 4, 1997 | 40 | 11 | March 9, 1997 | $6,000.00 |
| 12 | March 8, 1997 | 25 | 12 | March 13, 1997 | $3,750.00 |
| 13 | March 14, 1997 | 35 | 13 | March 19, 1997 | $5,250.00 |
| 14 | March 23, 1997 | 55 | 14 | March 28, 1997 | $8,250.00 |
| 15 | March 30, 1997 | 40 | 15 | April 4, 1997 | $6,000.00 |
| 16 | April 7, 1997 | 50 | 16 | April 12, 1997 | $7,500.00 |
| 17 | April 15, 1997 | 50 | 17 | April 20, 1997 | $7,500.00 |
| 18 | April 23, 1997 | 50 | 18 | April 28, 1997 | $7,500.00 |
| 19 | May 2, 1997 | 60 | 19 | May 7, 1997 | $9,000.00 |
| 20 | May 10, 1997 | 55 | 20 | May 15, 1997 | $8,250.00 |
| 21 | 1/1/98-12/31/98 | | 21 | December 31, 1998 | ** |
| Total | | 760 | | N/A | $114,000.00 |

We the Client, Corporate Representative do hereby elect the above Option B, for purposes of payment to the Consultant.

The above Option A consists of a payment of $150.00 per hour and 5% of the net profits each month as received or credited to the client from hedging operations. All losses to be accounted for and carried forward in the accounting, until profits exceed losses.

## SELECTED BY AND AGREED TO BY THE CLIENT:

_____    Date:_____

Name

_____

Title
Owens Corning

PMCC-00284

13

Schedule for Option C:

| Task Number | Completion Date | Hours For This Task | Option C Payment | Payment Date | Amount |
|---|---|---|---|---|---|
| 1 | January 10, 1997 | 5 | 1 | January 15, 1997 | $1,125.00 |
| 2 | January 10, 1997 | 5 | 2 | January 15, 1997 | $1,125.00 |
| 3 | January 10, 1997 | 5 | 3 | January 15, 1997 | $1,125.00 |
| 4 | January 10, 1997 | 5 | 4 | January 15, 1997 | $1,125.00 |
| 5 | January 27, 1997 | 95 | 5 | February 1, 1997 | $21,375.00 |
| 6 | February 1, 1997 | 35 | 6 | February 6, 1997 | $7,875.00 |
| 7 | February 8, 1997 | 40 | 7 | February 13, 1997 | $9,000.00 |
| 8 | February 13, 1997 | 35 | 8 | February 18, 1997 | $7,875.00 |
| 9 | February 20, 1997 | 40 | 9 | February 25, 1997 | $9,000.00 |
| 10 | February 25, 1997 | 35 | 10 | March 2, 1997 | $7,875.00 |
| 11 | March 4, 1997 | 40 | 11 | March 9, 1997 | $9,000.00 |
| 12 | March 8, 1997 | 25 | 12 | March 13, 1997 | $5,625.00 |
| 13 | March 14, 1997 | 35 | 13 | March 19, 1997 | $7,875.00 |
| 14 | March 23, 1997 | 55 | 14 | March 28, 1997 | $12,375.00 |
| 15 | March 30, 1997 | 40 | 15 | April 4, 1997 | $9,000.00 |
| 16 | April 7, 1997 | 50 | 16 | April 12, 1997 | $11,250.00 |
| 17 | April 15, 1997 | 50 | 17 | April 20, 1997 | $11,250.00 |
| 18 | April 23, 1997 | 50 | 18 | April 28, 1997 | $11,250.00 |
| 19 | May 2, 1997 | 60 | 19 | May 7, 1997 | $13,500.00 |
| 20 | May 10, 1997 | 55 | 20 | May 15, 1997 | $12,375.00 |
| 21 | 1/1/98-12/31/98 | | 21 | December 31, 1998 | ** |
| **Total** | | 760 | | N/A | $171,000.00 |

**We the Client,** Corporate Representative do hereby elect the above Option C, for purposes of payment to the Consultant.

The above Option A consists of a payment of $225.00 per hour and 3.33% of the net profits each month as received or credited to the client from hedging operations. All losses to be accounted for and carried forward in the accounting, until profits exceed losses.

## SELECTED BY AND AGREED TO BY THE CLIENT:

_____ Date:_____

Name

_____

Title
Owens Corning

PMCC-00285

14

**Schedule for Option D:**

| Task Number | Completion Date | Hours For This Task | Option D Payment | Payment Date | Amount |
|---|---|---|---|---|---|
| 1 | January 10, 1997 | 5 | 1 | January 15, 1997 | $1,625.00 |
| 2 | January 10, 1997 | 5 | 2 | January 15, 1997 | $1,625.00 |
| 3 | January 10, 1997 | 5 | 3 | January 15, 1997 | $1,625.00 |
| 4 | January 10, 1997 | 5 | 4 | January 15, 1997 | $1,625.00 |
| 5 | January 27, 1997 | 95 | 5 | February 1, 1997 | $30,875.00 |
| 6 | February 1, 1997 | 35 | 6 | February 6, 1997 | $11,375.00 |
| 7 | February 8, 1997 | 40 | 7 | February 13, 1997 | $13,000.00 |
| 8 | February 13, 1997 | 35 | 8 | February 18, 1997 | $11,375.00 |
| 9 | February 20, 1997 | 40 | 9 | February 25, 1997 | $13,000.00 |
| 10 | February 25, 1997 | 35 | 10 | March 2, 1997 | $11,375.00 |
| 11 | March 4, 1997 | 40 | 11 | March 9, 1997 | $13,000.00 |
| 12 | March 8, 1997 | 25 | 12 | March 13, 1997 | $8,125.00 |
| 13 | March 14, 1997 | 35 | 13 | March 19, 1997 | $11,375.00 |
| 14 | March 23, 1997 | 55 | 14 | March 28, 1997 | $17,875.00 |
| 15 | March 30, 1997 | 40 | 15 | April 4, 1997 | $13,000.00 |
| 16 | April 7, 1997 | 50 | 16 | April 12, 1997 | $16,250.00 |
| 17 | April 15, 1997 | 50 | 17 | April 20, 1997 | $16,250.00 |
| 18 | April 23, 1997 | 50 | 18 | April 28, 1997 | $16,250.00 |
| 19 | May 2, 1997 | 60 | 19 | May 7, 1997 | $19,500.00 |
| 20 | May 10, 1997 | 55 | 20 | May 15, 1997 | $17,875.00 |
| 21 | 1/1/98-12/31/98 | | 21 | December 31, 1998 | ** |
| **Total** | | 760 | | N/A | $247,000.00 |

We the Client, Corporate Representative do hereby elect the above Option D, for purposes of payment to the Consultant.

The above Option A consists of a payment of $325.00 per hour and 0% of the net profits each month as received or credited to the client from hedging operations. All losses to be accounted for and carried forward in the accounting, until profits exceed losses.

## SELECTED BY AND AGREED TO BY THE CLIENT:

_____ Date:_____

Name

_____

Title
Owens Corning

PMCC-00286

15

**B-117**

## Yearly Updating of Hedging Manual and Data Base

Cost of yearly updating of the Hedging Manual Information and Data Base is hereby offered as follows:

1. 1 Year update cost = 90% of original cost.
2. 2 Years update cost = 85% of original cost, for each year.
3. 3 Years update cost = 80% of original cost, for each year.
4. None

| | | 90% | 85% | 80% |
|---|---|---|---|---|
| Option | Original Cost | 1 Year Update | 2 Year Update | 3 Year or more Update |
| A | $57,000 | $51,300 | $43,605 | $34,884 |
| B | $114,000 | $102,600 | $87,210 | $69,768 |
| C | $171,000 | $153,900 | $130,815 | $104,652 |
| D | $247,000 | $222,300 | $188,955 | $151,164 |

We the Client, do hereby elect the following for purposes of updating the Hedging Manual and Data Base for purposes of payment to the Consultant on a yearly basis.

We Select:

1. 1 Year update at a cost of 90% of original cost.    Name:_____

2. 2 Year update at a cost of 85% of original cost.    Name:_____

3. 3 Year update at a cost of 80% of original cost.    Name:_____

4. None    Name:_____

## SELECTED BY AND AGREED THE CLIENT:

_____ Date:_____
Name

_____
Title
Owens Corning

PMCC-00287

16

## AGREEMENT INITIATION:

This agreement shall be consummated and initiated by the signatures of the parties and/or the representatives of the parties.

IN WITNESS WHEREOF, the parties have signed and agreed to these TERMS OF AGREEMENT.

### SUBMITTED BY CONSULTANT:

_____ Date: November 24, 1998

Dennis Mangan
Price Management Control Corporation
9222 West 73rd Street, Suite 102
Shawnee Mission, Kansas 66204

### AGREED TO AND ACCEPTED BY THE CLIENT:

_____ Date:_____

Name

_____

Title
Owens Corning
One Owens Corning Parkway
Toledo, Ohio 43659

PMCC-00288

17

**B-119**

# EXHIBIT 2

September 27, 1998

Mr. Dennis Mangan
Price Management Control Corporation
4500 South Monaco Street, Suite 1614
Denver CO 80237

Dennis·

Here is a draft of the consulting services agreement our attorney revised based on your input.

Please review and advise me of any changes.  I will use the final agreement as part of the process to get final approval from senior management.  Our ability to proceed with this program is dependent on senior management approval.

In task 1 of your write up you reference 9 different contracts and methods of pricing.  I assume these are illustrative of methods available.  Some of these methods are not consistent with our derivatives policy as approved by the Owens Corning board of directors.

Please call with any questions.


Regards


Michael G. Mitchell
International Supply Manager



pmcc



OC/PMCC2000009

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                      :

**OWENS CORNING, et al.,**    :    **Case No. 04-cv-1359 (JPF)**

       Debtors.        :

―――――――――――――――――― :

**PRICE MANAGEMENT CONTROL**   :
**CORPORATION,**             :

       Appellant,      :

       v.              :

**OWENS CORNING, et al.,**    :

       Appellee.       :

## CERTIFICATE OF SERVICE

    I, J. Kate Stickles, Esquire hereby certify that on June 15, 2005, a copy of foregoing

**Appendix to Brief of Appellee** was served on the following in the manner indicated:

**_BY HAND DELIVERY_**
Richard H. Cross, Jr., Esquire
Cross & Simon, LLC
913 North Market Street; Suite 1001
Wilmington, DE 19899—1380

Frank J. Perch, III, Esquire
David Klauder, Esquire
United States Trustee
844 King Street, Suite 2313
Wilmington, DE 19801

**_BY FEDERAL EXPRESS_**
The Honorable John P. Fullam
U.S. District Court for the Eastern District of PA
U.S. Courthouse
601 Market Street
Room 15614
Philadelphia, PA 19106-1780

M. Shane Edgington, Esquire
Hensley, Kim & Edgington, LLC
1560 Broadway; Suite 2000
Denver, CO 80202

SAUL EWING LLP

By: _____
     J. Kate Stickles (No. 2917)
     222 Delaware Avenue, Suite 1200
     Wilmington, DE 19899-1266
     (302) 421-6800